**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHIRA PERLMUTTER,

     *Plaintiff*,

v.

TODD BLANCHE *et al.*,

     *Defendants*.

Case No. 25-cv-01659-TJK

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Introduction ...................................................................................................................1

I.    Plaintiff Is Likely to Succeed on the Merits ........................................................1

    A.    The President's Appointment of Mr. Blanche Was Unlawful .................2

        1.    The Federal Vacancies Reform Act Does Not Authorize Mr. Blanche's Appointment .................................................2

        2.    The Take Care Clause Does Not Give the President the Right to Appoint Mr. Blanche Without the Senate's Advice and Consent ...............6

    B.    The President's Purported Direct Removal of the Register Was Unlawful ..........11

II.    Plaintiff Will Suffer Immediate and Irreparable Harm Absent Immediate Relief, But Defendants Will Not Be Harmed By the Maintenance of the Status Quo .................15

III.    Plaintiff's Requested Relief Is Proper.................................................................21

    A.    Plaintiff Need Not Proceed By Writ of Quo Warranto .........................21

    B.    Plaintiff Has Demonstrated that She Is Entitled to the Requested Relief............22

Conclusion .................................................................................................................23

**INTRODUCTION**

The President seeks to seize control of the Library of Congress by purporting unilaterally to appoint a new Librarian of Congress and to terminate Plaintiff, the lawfully appointed Register of Copyrights.  Defendants fail to identify any lawful authority, statutory or constitutional, for their actions.  The Federal Vacancies Reform Act (FVRA) does not authorize Defendants' takeover of the Library of Congress, so Defendants attempt a breathtaking and entirely novel constitutional theory, but neither the Appointments Clause nor the Take Care Clause supports Defendants' sweeping assertions of power.  Instead, Defendants fall back to the argument that, even if Plaintiff is right—and even if Defendants have no legal basis whatsoever for their actions—this Court should stand idly by and do nothing while Defendants wield unprecedented, and unlawful, authority.  Neither the law nor common sense requires this result.  The Court can and should act to preserve the status quo and to prevent Defendants from interfering with Plaintiff's exercise of the duties that Congress has entrusted to her.

**I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

Defendants' two theories as to why Plaintiff's removal was lawful contravene both logic and relevant law.  First, Defendants argue that Mr. Blanche's appointment as acting Librarian of Congress was proper under the FVRA, but this argument flies in the face of the FVRA's plain text, the full statutory scheme, and D.C. Circuit precedent.  Second, Defendants contend that the President has inherent authority to remove Plaintiff but identify *nothing* in support of that novel proposition, which clearly runs afoul of the Appointments Clause.  Plaintiff is therefore likely to

succeed in showing that Mr. Blanche's appointment was invalid and that Plaintiff remains the Register of Copyrights.

### A.    The President's Appointment of Mr. Blanche Was Unlawful

#### 1.    The Federal Vacancies Reform Act Does Not Authorize Mr. Blanche's Appointment

Defendants' principal argument is that Mr. Blanche was lawfully appointed acting Librarian of Congress under the FVRA and therefore possessed the authority to remove Plaintiff as Register of Copyrights. That contention is meritless. Defendants acknowledge—as they must—that the FVRA confers appointment authority only for "Executive agenc[ies]," 5 U.S.C. § 3345, a category that is defined and limited by statute to (1) "Executive department[s]"; (2) "Government corporation[s]"; and (3) "independent establishment[s]." 5 U.S.C. § 105; *see Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995) (per curiam) (confirming that Section 105's list is exhaustive). Defendants concede that the Library of Congress is neither of the first two, leaving them to argue that the Library of Congress is an "independent establishment" and therefore "an establishment in the executive branch," 5 U.S.C. § 104. Opp. at 7. Defendants are incorrect, as the absence of any supporting authority confirms.

***First***, the Library of Congress is decidedly *not* an establishment in the executive branch. *See* 5 U.S.C. § 104. Since its inception, Congress has treated the Library of Congress as part of the Legislative Branch, *see* Pl.'s Br. at 7–9. Congress has used the term "independent establishment" in a manner that clearly does not include the Library of Congress. *See, e.g.*, 5 U.S.C. § 4101(1) ("For the purpose of this chapter 'agency' . . . means (A) an Executive department; (B) *an independent establishment*; (C) a Government corporation . . . ; (D) *the Library of Congress* . . . ." (emphases added)). Similar to *Haddon*, in which the Court

concluded that the White House Executive Residence was *not* an "independent establishment" for purposes of 5 U.S.C. § 105 because "elsewhere Congress has used the term 'independent establishment' in distinction to the Executive Residence," 43 F.3d 1488 (D.C. Cir. 1995) (per curiam), (citing 3 U.S.C. § 112), that Congress distinguished the Library of Congress from the term "independent establishment" in 5 U.S.C. § 4101(1) indicates that Congress does not regard the Library of Congress as an independent establishment, as it uses that term. *Id.*

**Second**, at least a dozen additional provisions of Title 5 distinguish between an "Executive agency" on the one hand and the Library of Congress on the other. *See, e.g.*, 5 U.S.C. § 3102(a)(1) (defining "agency" to include both "an Executive agency" and "the Library of Congress); 5 U.S.C. § 3401(1) (same); 5 U.S.C. § 4501(1) (same); 5 U.S.C. § 5102(a)(1) (same); 5 U.S.C. § 5521(1) (same); 5 U.S.C. § 5541(1) (same); 5 U.S.C. § 5584(g) (same); 5 U.S.C. § 5595(a)(1) (same); 5 U.S.C. § 5921(2) (same); 5 U.S.C. § 5948(g)(2) (same);[1] 5 U.S.C. § 6121(1) (same); *see also* 5 U.S.C. § 3371(3) (same with the definition of "federal agency"). Viewing these provisions of Title 5 together, there can be little doubt that the Library of Congress is not an "executive agency" under Title 5, including with respect to the FVRA, which is situated in Title 5 and shares the same definition of "executive agency" as the rest of Title 5, *see* 5 U.S.C. § 105. *Cf. Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 837 (D.C. Cir. 2024) (invoking the *in pari materia* canon to construe different provisions of Title 17 "as if they were one law" (citation and internal quotation marks omitted)). Adopting Defendants'

---

[1] Should there remain any doubt, in 5 U.S.C. § 5948(g)(2), Congress specifically distinguished between "Executive agency, as defined in section 105 of this title" and "the Library of Congress"—clearly showing that Congress did not view the Library of Congress to be subsumed in Section 105's definition of an Executive agency.

contrary reading, Opp. at 7–9, would render portions of each of these statutory provisions superfluous—if the Library of Congress were an executive agency, there would be no need for each of these statutes to state that they apply both to an "Executive agency" as well as the "Library of Congress." *See Gustafson v. Alloyd Co*., 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant.").

*Third*, when Congress has wanted to designate an agency as an "independent establishment," it has done so through the organic statutes creating those agencies. *See, e.g.*, 44 U.S.C. § 2102 (establishing the National Archives and Records Administration as "an independent establishment in the executive branch"); 5 U.S.C. § 1101 (same for Office of Personnel Management); 42 U.S.C. § 10242 (same for Office of the Nuclear Waste Negotiator); 42 U.S.C. § 2286 (same for Defense Nuclear Facilities Safety Board). By contrast, nowhere in the Library of Congress's organic statute does Congress indicate that the Library of Congress should be classified as an "independent establishment." *See generally* 5 U.S.C., ch. 5.

*Fourth*, as Plaintiff cited in her opening brief, Pl.'s Br. at 8, courts have concluded that, under a number of statutory schemes—like the APA, FOIA, and the Rehabilitation Act—the Library is *not* treated as an Executive agency. Defendants dismiss these statutes as "unrelated" to the FVRA, Opp. at 9, but that misses the point: Courts have broadly understood Congress to have treated the Library of Congress as part of the legislative branch for statutory purposes. The fact that the Library of Congress is treated as part of "Congress" for purposes of other parts of Title 5 is strong evidence that Congress did not silently intend to treat the Library of Congress as part of the Executive Branch for the sole purpose of the FVRA. *See, e.g.*, *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) ("[W]e have held that the Library of

Congress (part of the legislative branch but a separate entity from 'the Congress,' narrowly defined) is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch.").

*Fifth*, Defendants' reliance on *Intercollegiate Broadcasting Systems v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), is misplaced. That case does not bear on the statutory definition of "Executive agency." Instead, *Intercollegiate* addresses whether the Library of Congress is a component of the Executive Branch for purposes of the Appointments Clause when the Librarian appoints Copyright Royalty Judges. The Court acknowledged the non-controversial proposition that the Library performs "a range of different functions, including some . . . that are exercised primarily for legislative purposes" and others that are "generally associated in modern times with executive agencies rather than legislators." *Id.* at 1341-42. It was only with respect to the Library's copyright functions that the D.C. Circuit affirmed that "the Library is undoubtedly a component of the Executive Branch." *Id.* at 1342 (citation and internal quotation marks omitted). Indeed, even the Department of Justice acknowledged, in the briefing in *Intercollegiate*, that "the Library is regarded as a legislative entity for various statutory purposes" precisely because "Congress's definition of 'executive departments' in 5 U.S.C. § 101" is not coextensive with the scope of Article II. Br. for Appellees, *Intercollegiate Broadcasting Sys.*, No. 11-1083 (D.C. Cir. Nov. 4, 2011), 2011 WL 5288867, at *12, *41.

For Defendants to prevail on their theory that the Library of Congress is "an establishment in the executive branch," the Court would need to accept that Congress adopted that aspect of *Intercollegiate*'s Appointments Clause holding in its statutory definition of Executive agencies for purposes of the FVRA. *See* Opp. at 9. But that cannot possibly be

correct:  Congress enacted the FVRA almost 15 years *before* the D.C. Circuit decided

*Intercollegiate*, so it is hardly surprising that the FVRA's legislative history makes no mention of

it.  Second, many precedents predating the FVRA held that the Library was an agency within

Congress.  *See, e.g.*, *Keeffe v. Libr. of Cong.*, 777 F.2d 1573, 1574 (D.C. Cir. 1985) (noting that

the Library was "a congressional agency" (citing 2 U.S.C. § 171(1)).  If Congress wanted to treat

the Library as an "Executive agency" for purposes of the FVRA, it could easily have said so in

the statute.  But it did not.  Finally, Defendants' theory—that Congress's use of the statutory

term "Executive agency" must be *identical* to *Intercollegiate*'s discussion of "executive"

functions—ignores Congress's prerogative to define statutory terms for itself.  *See Carachuri-

Rosendo v. Holder*, 560 U.S. 563, 575 (2010) (noting Congress's authority to even "give words

unorthodox meanings").

> ### 2.    The Take Care Clause Does Not Give the President the Right to Appoint Mr. Blanche Without the Senate's Advice and Consent

Acknowledging the weakness of their reliance on the FVRA, Defendants also press the

far-fetched assertion that the President's constitutional responsibility to "take Care that the Laws

be faithfully executed" permits him to appoint acting officers in situations where Congress has

not expressly conferred that authority.  *See* Opp. at 11.  That argument is wrong twice over.

First, this is not a situation in which Congress has failed to provide for appointment of an

acting officer.  Congress expressly delegated to the Librarian of Congress the authority to make

all regulations necessary for the "government of the Library," 2 U.S.C. § 136, and the Librarian

has promulgated a regulation that expressly prescribes who will serve as acting Librarian of

Congress in the event of a vacancy.  Lib. Reg. 1-120.  This is therefore not a situation in which

the President is acting in the face of Congressional silence.  To the contrary, the President is

acting in defiance of the authority Congress expressly conferred on the Librarian to prescribe who should serve in the role of acting Librarian. The Take Care Clause confers no such authority.

Second, and in all events, the President does not possess the inherent constitutional authority that Defendants claim. Not a single case—from any Circuit or any time period—establishes such an extreme proposition. To the contrary, it is foreclosed by the Constitution's text, historical practice, Supreme Court precedent, and the congressional intent underlying the FVRA—all of which prescribe the exclusive means by which a President can appoint a principal officer such as the Librarian of Congress. If a President could bypass those prescribed methods of appointment merely by invoking the Take Care Clause, surely some court in the history of the Republic would have sustained its exercise. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 505 (2010) (lack of historical precedent is a "telling indication of the severe constitutional problem") (cleaned up).

The Take Care Clause does not supersede the Appointments Clause. That clause permits the President to appoint principal Officers of the United States only in the way the Constitution prescribes: "*by and with the Advice and Consent of the Senate.*" U.S. Const., Art. II, sec. 2 (emphasis added). The President thus has no inherent authority to appoint principal officers unilaterally, without involving the Senate. Were it otherwise, "there would be no need for the Recess Appointments Clause." *Aviel v. Gor*, -- F. Supp. 3d --, No. 25-778 (LLA), 2025 WL 1009035, at *9 (D.D.C. Apr. 4, 2025), *appeal filed*, No. 25-5105 (D.C. Cir.) (rejecting argument that the President has "inherent" authority to appoint acting principal officers). The Recess Appointments Clause addresses the President's "continuous need for the assistance of

subordinates" by providing a narrow "exception" to the Appointments Clause when the Senate is in recess. *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 519, 523 (2014) (citation and internal quotation marks omitted). Thus, as the Supreme Court has emphasized, the Recess Appointments Clause does "not offer[] the President the authority routinely to avoid the need for Senate confirmation." *Id*. at 524. But under the government's view, the President *could* routinely avoid the need for Senate confirmation, simply by purporting to appoint an acting official of his choice to serve indefinitely in the principal officer's position. That cannot be right. Because the Framers "recognized the serious risk for abuse and corruption posed by permitting one person to fill every office in the Government," "[w]e cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency." *N.L.R.B. v. SW Gen., Inc*., 580 U.S. 288, 317 (2017) (Thomas, J. concurring); *see also Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991).

Historical practice confirms that the President lacks any inherent authority to fill vacancies in principal offices. The Appointments Clause's requirement of Senate confirmation for principal officers means that the functions of a principal office "may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement." *SW Gen*., 580 U.S. at 292. "*Congress*"—not the President alone—"has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *Id*. at 293 (emphasis added). "Since President Washington's first term," therefore, "Congress has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal]

office without first obtaining Senate approval" only through a series of statutory grants—including, most recently, the FVRA.  *Id.* at 294 (emphasis added).  That unbroken historical practice of Congress conferring limited temporary appointment authority on the President confirms that the President has never been understood to have inherent Article II authority to appoint officers to principal offices.  Indeed, the government does not identify a *single* example of a President unilaterally appointing an acting official to a principal office outside of then-governing statutory temporary-appointment frameworks.   That "lack of historical precedent" is a "telling indication of the severe constitutional problem" with the government's claim of sweeping presidential authority.  *Free Enter. Fund*, 561 U.S. at 505 (citation and internal quotation marks omitted).  Making matters worse, the government's argument lacks any limiting principle: if the government were correct, the President could unilaterally appoint officials to serve in principal offices *indefinitely*, and the Senate—which has only the authority to confirm a presidential nominee, not to nominate a successor itself—would be powerless to re-assert its constitutional prerogative under the Appointments Clause.  The government's position would thus render the Appointments Clause a nullity.

Absent a statutory grant of authority, therefore, the President has only the power expressly given to him by the Appointments Clause and the Recess Appointments Clause, and no more.  *Aviel*, 2025 WL 1009035, at *7 ("The only exceptions are if another 'statutory provision expressly' authorizes the President or another official to make such an appointment . . . or if the President validly makes a recess appointment under Article II.");  S. Rep. 105-250 (1998) at *4–5 (in enacting the FVRA, Congress emphasized that "the President lacks any inherent appointment

authority for government officers").[2]  Because the FVRA does not confer authority on the

President to appoint an officer to temporarily perform the functions of the Librarian of Congress,

the President's appointment of Mr. Blanche was ultra vires.

Notably, the only authority Defendants can muster for their contrary position comes

from the Executive Branch itself.  *See* Opp. at 12 (citing Office of Legal Counsel opinions).  But

of the four cited opinions, two do not concern constitutional officers at all (let alone principal

officers).  *See* Authority of the President to Remove the Staff Director of the Civil Rights

Commission and Appoint an Acting Staff Director, 25 Op. O.L.C. 103, 105 (2001);

Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger,

Assistant Attorney General, Office of Legal Counsel, Re: Appointment of an Acting Staff

Director of the United States Commission on Civil Rights (Jan. 13, 1994),

https://www.justice.gov/olc/page/file/1311936/dl?inline ("Dellinger Memo").  And a third was

written two months ago in an attempt to justify the President's conduct in firing the board of the

Inter-American Foundation and purporting to appoint acting board members.  In all events, to the

extent that OLC could be said to have asserted a consistent position, that assertion was premised

---

[2] *Williams v. Phillips*, 482 F.2d 669 (D.C. Cir. 1973), is not to the contrary.  As Defendants
acknowledge, the district court in *Williams* had concluded that, absent statutory authorization
"the President lacked the authority to appoint an acting director of the Office of Economic
Opportunity."  Opp. 14.  Defendants contend that the Court of Appeals "did not agree," but the
D.C. Circuit began its opinion by confirming that "the Constitution unequivocally requires an
officer of the United States to be confirmed by the Senate unless different provision is made by
congressional statute."  *Williams*, 482 F.2d at 670.  The Court went on to note that "it could be
argued" that the Take Care clause provides an implied power of appointment—but never
resolved that question.  The Supreme Court's subsequent decisions in *Noel Canning* and
*Southwest General* make clear that the Appointments Clause and Recess Appointments Clause
leave no room for a historically unprecedented claim of unilateral presidential authority to
bypass the Constitution's careful provision for appointment of principal officers.

exclusively on the ground that the President's Take Care Clause authority must include the ability to "keep the government running" when vacancies arise. Dellinger Memo at 2. That justification manifestly does not apply here, where the President *created* the vacancy by firing the Librarian. While the President had authority to fire the Librarian, he may not use the resulting vacancy to arrogate to himself untrammeled authority to bypass the Senate's constitutional role in appointments. The OLC opinions are thus not only not controlling; they are not persuasive here. For precisely those reasons, "[t]he separation of powers does not depend on the views of individual Presidents." *Free Enter. Fund,* 561 U.S. at 497 (cleaned up).

      **B.     The President's Purported Direct Removal of the Register Was Unlawful**

      The President's supervisory powers over the Executive Branch do not include direct removal of inferior officers—a rank that Defendants concede includes the Register of Copyrights—unless Congress has acted to give the corresponding appointment power to "the President alone." Art. II, sec. 2, cl. 3. Where Congress has not so acted, Defendants concede that, under what they tellingly term the "normal approach," the President may supervise inferior officers only "by exercising control over the principal officer (here, the Librarian of Congress)." Opp. at 16. But, in the event "the President is *unable* to appoint an acting principal officer upon removal of the principal officer," Defendants concoct what they describe as a "background rule" that a President possesses authority "to oversee and supervise the inferior officer until a new principal officer is installed." *Id.* That contention is misconceived.

      For one thing, the Appointments Clause itself forecloses any claim of background presidential authority to remove inferior officers who were not appointed by the President. That Clause provides that Congress may exclude the President entirely from appointing inferior

officers:  "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. Art. II, § 2, cl. 2.  Once Congress has exercised its right to vest the appointment of an inferior officer in, for instance, a Head of Department, the President lacks any "background" authority to circumvent that statutory provision.  Otherwise, the Appointments Clause's conferral of authority on *Congress* to "by Law vest the Appointment" of inferior officers in officials *other than the President* would be meaningless; the President could simply remove such officials the instant they were appointed.

The Constitution does not give the President the right to circumvent the Appointments Clause through a freestanding removal power.  Instead, the removal power is "incident[al]" to the appointment power, *Free Enter. Fund*, 561 U.S. at 509, and Congress may exclude the President from the removal of an inferior officer, by excluding the President from appointing that officer.  No other conclusion would be consistent with the Appointments Clause.  Indeed, even President Nixon evidently shared this understanding of the Appointments Clause: there would have been no need for the Saturday Night Massacre if Nixon could simply have fired the special prosecutor himself.

Just a few weeks ago, a court in this District reaffirmed that what the government terms the "normal approach" is the constitutionally required one: the removal power follows the appointment power and does not leap up the chain of command by virtue of an intervening vacancy.[3]  *See Aviel*, 2025 WL 1009035, at *6.  In *Aviel*, the Government did not even contest

---

[3] Nor is there even an intervening vacancy here, where a regulatory line of succession provided a lawful Acting Librarian.  *See* Section II.B.2, *infra*.

the point; "nor could they." *Id.* "[T]he law is that an inferior officer is removable by the authority that appointed him, but nobody else—unless Congress alters that default rule." *Id.* at n.4 (quoting Tr. of TRO Hr'g, *Brehm v. Marocco*, No. 25-CV-660 (D.D.C. Mar. 11, 2025), at 9:5-9). By statute, that authority is the Librarian of Congress. 17 U.S.C. § 701 ("The Register of Copyrights, together with the subordinate officers and employees of the Copyright Office, shall be appointed by the Librarian of Congress, and shall act under the Librarian's general direction and supervision.").

Defendants' position is particularly alarming given that Congress only recently considered whether to give the President the power to remove the Register of Copyrights—and decided against it. *See* Register of Copyrights Selection and Accountability Act of 2017, H.R. 1695, 115th Cong. (2017). That bill would have amended the Copyright Act to do exactly what Defendants now contend they have had the right to do all along: *i.e.*, allow the President "to remove the Register from office subject to a notification requirement to the House of Representatives and Senate." H. Rpt. 115-91. It passed the House but failed in the Senate. *See* S. Hrg. 115-613 (2018) ("It is hard to comprehend why Congress would voluntarily cede to the executive branch the authority of its own Librarian to select a key congressional adviser.").

There would have been no need for this legislative action if the President already had the presently asserted "background" authority to remove the Register. He plainly does not, though the failed 2017 bill to authorize what Defendants would otherwise impose by fiat shows that Congress knows full well how to alter the removal authority for inferior officers generally, and for the Register of Copyrights in particular. It has not done so. *Cf. Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its

13

adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

A finding that the President lacks the constitutional or statutory authority to remove Ms. Perlmutter directly does not amount to "[s]addling the President with a Register of Copyrights over whom he has no say." Opp. at 16. To begin with, this is a mess of the President's own making, and "it is well settled that a litigant cannot cry foul over a 'self-inflicted' injury." *Aviel*, 2025 WL 1009035, at *3. The President chose to remove Dr. Carla D. Hayden as Librarian of Congress. Now, after unlawfully purporting to appoint a top official from his Justice Department to the role, the President complains that, if his appointment of Mr. Blanche was in fact unlawful, he has no other way to exert power over the Register of Copyrights, short of removing Ms. Perlmutter himself. But that is merely another way of saying that one unlawful act justifies another.

The President retains the only mechanism for exerting influence over the Register of Copyrights he ever had: by directing the principal officer, the Librarian of Congress. Ms. Perlmutter is not insulated from removal; she just cannot be removed by the President. There is thus no lack of a "clear and effective chain of command." *Free Enter. Fund*, 561 U.S. at 498. *Cf. Trump v. United States*, 603 U.S. 593, 620–21 (2024) (the President's threat to remove an acting principal officer "implicates [his] 'conclusive and preclusive' authority" and "unrestricted power to remove the most important of his subordinates").

14

## II.    PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT IMMEDIATE RELIEF, BUT DEFENDANTS WILL NOT BE HARMED BY THE MAINTENANCE OF THE STATUS QUO

Plaintiff has shown that there is a likelihood of "clear and present need for equitable relief to prevent irreparable harm," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), namely, to Plaintiff's statutory right to continue to function in the position she has faithfully served in for nearly five years, Plaintiff's ability to perform the statutory functions and duties that Congress assigned to her, and the Library of Congress and U.S. Copyright Office as institutions, such that any later reinstatement of Plaintiff would not "resurrect her right to function" as it exists now, *Aviel*, 2025 WL 1009035, at *11.  This is the exact type of "extraordinary situation" contemplated in *Sampson*—in which the appropriate remedy is well-beyond the "temporary loss of income, ultimately to be recovered" ordinarily at issue in a garden-variety employee dispute.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).[4]

Nor has this "extraordinary situation" been all that rare in recent months: in the past few months alone, at least five judges in this District have held that the unlawful removal of a senior government official caused irreparable harm.  *See, e.g.*, *Grundmann v. Trump*, No. 25-cv-425 (SLS), 2025 WL 782665 (D.D.C. Mar. 12, 2025) (Sooknanan, J.) (irreparable harm where chair of Federal Labor Relations Authority was unlawfully removed); *Aviel*, 2025 WL 1009035, at *10–11 (irreparable harm where President of Inter-American Foundation was unlawfully

---

[4] Moreover, in *Sampson*, the Supreme Court denied temporary relief in part because of the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *Sampson*, 415 U.S. at 83 (citation omitted).  That concern is "minimized in the context of an action that at this stage appears to be nakedly illegal, such that the Government's range of options is necessarily constrained."  *Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL 521027, at *6 (D.D.C. Feb. 18, 2025).

15

removed); *Harris v. Bessent*, -- F. Supp. 3d --, No. 25-cv-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) (Contreras, J.); *Dellinger v. Bessent*, -- F. Supp. 3d --, No. 25-cv-385, 2025 WL 471022 (D.D.C. Feb. 12, 2025) (Berman Jackson, J.) (irreparable harm where Special Counsel of the Office of Special Counsel was unlawfully removed); *Wilcox v. Trump*, -- F. Supp. 3d --, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) (Howell, J.), *hearing en banc denied sub nom. Harris v. Bessent*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (irreparable harm where Member of National Labor Relations Board was unlawfully removed).

Defendants' claim that the Supreme Court's non-precedential order of a stay pending appeal in *Wilcox* is somehow a "holding" that "categorically rejects Plaintiff's [statutory right to function] theory of harm," Opp. at 18, is flatly incorrect. *See Trump v. Wilcox*, 605 U.S. __, No. 24A966, 2025 WL 1464804, at *1 (S. Ct. May 22, 2025). The Supreme Court has not "held" anything in *Wilcox*—the question of whether the loss of a "statutory right to function" may qualify as an irreparable injury is currently pending before the D.C. Circuit. *See* Notice of Appeal, *Harris v. Bessent*, No. 25-5055 (D.C. Cir. Mar. 4, 2025); Notice of Appeal, *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. Mar 7, 2025).[5]

Defendants also appear to conflate the "statutory right to function" theory of harm articulated in *Berry* (which the Court concluded *was* irreparable harm) with the "loss of income" harm present in garden-variety federal employee personnel actions like *Sampson* (that is *not* irreparable harm). *See* Opp. at 18–20. As the Court makes clear in *Berry*, "the deprivation of [the plaintiff's] statutory right to function" is an irreparable injury "sufficient in kind and degree

---

[5] Moreover, the Supreme Court's decision in *Wilcox* reflected the Court's "judgment that the Government is likely" to succeed on the merits of the Appointments Clause dispute in that case. 2025 WL 1464804, at *1. The opposite is true here.

to override the factors cutting against the general availability of preliminary injunctions . . . in Government personnel cases." *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (quoting *Sampson*, 415 U.S. at 84).  The irreparable harm suffered by Ms. Perlmutter is therefore of a different nature than the harm noted in the various cases cited by Defendants regarding lower-level federal employee and non-federal employee claims.  *See* Opp. at 19–20. The plaintiffs in those matters do not allege any harm beyond the traditional harm an employee suffers by loss of employment that can be later remedied at law.  *See, e.g., Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998) (alleging loss of income and reputation); *Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) (alleging loss of income, forced retirement, and difficulty obtaining other employment); *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987) (alleging loss of ability to gather information in support of litigation).  Defendants' claim that Plaintiff can "obtain monetary relief in the form of back pay" to remedy these harms, Opp. at 20, is therefore irrelevant to the issues in this case: Plaintiff does not seek compensation for monetary harm, but instead, seeks to redress an injury arising from Defendants' purported removal of her from a position that she was lawfully appointed to perform.  Defendants should not be able to buy their way out of a serious, ongoing separation of powers violation by holding out the prospect of retrospective damages at some undetermined future date.

Beyond the loss of her "statutory right to function," Plaintiff will be prevented from performing the legislative functions assigned to her if the Court does not issue preliminary relief. Plaintiff *is* the Register of Copyrights and Director of the U.S. Copyright Office.  As Register, Plaintiff is statutorily required to perform a number of functions and duties, *see* Perlmutter Decl. ¶¶ 4–8.  Unlike the plaintiff in *English v. Trump*, Ms. Perlmutter will be prevented from

performing the legislative functions that *are already assigned to her* and that she has been ably discharging for nearly five years if the Court does not issue preliminary relief. *Cf. English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018) ("[T]here was never a time here in which English functioned as the CFPB's acting Director"). Ms. Perlmutter, as the Register of Copyrights, is responsible for (among other things) evaluating applications for registration of copyright and registering such claims if they concern copyrightable subject matter—actions that have significant implications for private copyright rights, including in copyright litigation. 17 U.S.C. § 401 (registration gives rise to a presumption of copyright validity in litigation). Permitting the Register's extensive statutory functions to be performed by an unlawfully appointed official will call into question the validity of those actions, with cascading consequences for the affected individuals and entities. As Register, Ms. Perlmutter is also statutorily required to "[c]onduct studies . . . regarding copyright" and "[a]dvise Congress on national and international issues relating to copyright." 17 U.S.C. § 701(b)(1), (b)(4), Perlmutter Decl. ¶ 7, and review the operation of the recently established small claims tribunal, the Copyright Claims Board, *id.* ¶ 8, among other duties, *see* Compl. at ¶ 14. Plaintiff therefore seeks to preserve the *status quo* because she will be unable to perform these duties that are assigned to her absent the immediate prevention of Mr. Blanche's appointment, Mr. Perkins's appointment, and Ms. Perlmutter's removal. *See* Perlmutter Decl. ¶ 13–14.

Defendants also disparage Plaintiff's separation-of-powers concerns as "wildly speculative harms." *See* Opp. at 20–21. They are anything but. There is nothing "speculative" about Plaintiff's assertion that the purported appointments of three high level Executive Branch officials—Mr. Blanche as acting Librarian of Congress, Mr. Nieves as acting Principal Deputy

Librarian, and Mr. Perkins as acting Register of Copyrights—amount to an unprecedented Executive Branch takeover of "the Library's operations and an unprecedented grant to Executive Branch officials of "access to the Library of Congress's confidential research for Members of Congress and confidential congressional records" and the Copyright Office's "deposits of copyrighted works." Pl.'s Br. at 12. This Court can and should consider the irremediable harm to the status and functions of the Library of Congress and U.S. Copyright Office themselves, *see Berry*, 1983 WL 538, at *5 ("The irreparable nature of this injury is evident by the obviously disruptive effect the denial of preliminary relief will likely have on the Commission's final activities"); *Wilcox*, 2025 WL 720914, at *15 ("Courts have recognized as irreparable harm[] . . . the obviously disruptive effect that such removal has on the organization's functioning) (citation and internal quotation marks omitted). And the harm to Plaintiff and the harm to the Library of Congress are inextricably intertwined. This situation is therefore similar to *Berry*, *Aviel*, and *Wilcox*, in which the Court deemed irreparable injury to the institution to constitute irreparable harm to the plaintiff, and unlike English, in which the Court observed that "English and the CFPB are not similarly situated here … [the CFPB] continues to operate with Mulvaney functioning as acting Director." *Cf. English*, 279 F. Supp. 3d at 335. If Mr. Blanche assumes the role of Acting Librarian of Congress, the Executive Branch will gain access to reams of confidential information that belongs to Congress and that Congress has zealously guarded from disclosure, as well as privately owned copyright deposits.[6] By the same token, if Mr. Perkins

---

[6] Letter from Rep. Joe Morelle, Ranking Member, Comm. H. Admin., to Inspector Gen. Kimberly Benoit (May 12, 2025), https://democrats-cha.house.gov/sites/evo-subsites/democrats-cha.house.gov/files/evo-media-document/5.12.25-letter-to-loc-ig-re-investigation.pdf (Dr. Hayden's removal "raises serious concerns" that the executive branch is seeking improper access

replaces Ms. Perlmutter as Register of Copyrights, Ms. Perlmutter will lose her ability to carry out the responsibilities of the office of Register of Copyrights as it currently exists and therefore any post-hoc legal remedy would be inadequate. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (stating that injunctive relief is appropriate when post-hoc "legal remedies" are "inadequa[te]"); *Harris*, 2025 WL 521027, at *8 (absent injunctive relief, "any later reinstatement of [plaintiff] would not restore the state of affairs that existed prior to her purported termination, given that she would no[] longer serve as a member of a truly independent agency") (cleaned up).

And as discussed in Plaintiff's opening brief, Pl.'s Br. at 1415, Defendants will not be harmed by the maintenance of the status quo, in which Plaintiff, who has faithfully served as the Register of Copyrights for the last nearly five years, continues to fulfill her statutory role as an advisor to Congress and steward of the copyright system.

## III.    PLAINTIFF'S REQUESTED RELIEF IS PROPER

### A.    Plaintiff Need Not Proceed By Writ of Quo Warranto

This Circuit's precedent forecloses Defendants' argument that Plaintiff must proceed by writ of quo warranto. *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 81 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017); *Andrade v. Lauer*, 729 F.2d 1475, 1497 (D.C. Cir. 1984).

"In its traditional form, the de facto officer doctrine" entirely barred "collateral attacks" on an officer's *actions* but permitted "direct attack[s]" on an officer's *qualifications* "via writ of quo warranto only." *SW Gen*, 796 F. 3d. at 81. "A collateral attack challenges government

---

to "confidential communications between congressional offices and the Library's various service units," which the executive has no "authority to demand or receive.").

action on the ground that the officials who took the action were improperly in office." *Id.* (citation and internal quotation marks omitted). "A direct attack, by contrast, challenges the qualifications of the officer, rather than the actions taken by the officer." *Id.* (emphasis omitted) (citation and internal quotation marks omitted).

The D.C. Circuit "has *rejected* the traditional version of the de facto officer doctrine" and has "disapprove[d] of any interpretation of the de facto officer doctrine that would render legal norms concerning appointment and eligibility to hold office unenforceable." *Id.* (cleaned up, emphasis added). Under this Circuit's precedent, "collateral attacks on an official's authority are permissible when two requirements are satisfied:" "First, the plaintiff must bring his action at or around the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office." *Id.* at 81–82 (citation omitted).

Here, Plaintiff's challenge is a "collateral attack." Plaintiff challenges Mr. Blanche's *actions*—his purported ratification of the President's attempt to remove Plaintiff from her position. *See Andrade v. Lauer*, 729 F.2d 1475, 1480, 1497 (D.C. Cir. 1984) (construing as a collateral attack a challenge to a "reduction in force" ordered by officials allegedly "occupying their offices in violation of the Appointments Clause of the Constitution"). And Plaintiff meets both requirements to collaterally attack Mr. Blache's attempt to remove her. First, Plaintiff has brought her challenge 11 days after Mr. Blanche's action. Second, Defendants had notice of the defect in Mr. Blanche's claimed right to office. *See* Dkt. 2-3 at 3–4 (Mr. Blanche's purported appointees were never given access to the Library); *see also* Press Release, Sen. Alex Padilla, Ranking Members Padilla, Morelle Condemn Trump Administration's Brazen Attempt to Take

Over Library of Congress (May 12, 2025), https://www.padilla.senate.gov/newsroom/press-releases/ranking-members-padilla-morelle-condemn-trump-administrations-brazen-attempt-to-take-over-library-of-congress; Hillel Italie and Seung Min Kim, "Deputy Attorney General Who Defended Trump in Hush Money Trial is Named Acting librarian of Congress," *Associated Press* (May 12, 2025), https://apnews.com/article/trump-library-congress-todd-blanche-carla-hayden-cc2154fa8644a5c29d196e505e4faa51.

### B.    Plaintiff Has Demonstrated that She Is Entitled to the Requested Relief

Plaintiff is not seeking reinstatement to her office, as she has never properly been removed.  Rather, she requests that the Court maintain the status quo—one in which she remains the Register of Copyrights and is able to fulfill her duties as such.  But even if she were seeking reinstatement, courts are empowered to issue injunctions that require subordinate executive officials to treat a wrongly removed official as the *de facto* holder of their position.  *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *44 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting), *vacated on reconsideration en banc*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ("Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are well known to the law."); *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *see also Sampson*, 415 U.S. at 71; *Service v. Dulles*, 354 U.S. 363, 370, 389 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant the temporary restraining order.

Dated: May 27, 2025                          Respectfully submitted,

*/s/ Allyson R. Scher*
Brian D. Netter (D.C. Bar No. 979362)
Allyson R. Scher (D.C. Bar No. 1616379)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bnetter@democracyforward.org
ascher@democracyforward.org

Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
donald.verrilli@mto.com
ginger.anders@mto.com

Kuruvilla J. Olasa (pro hac vice forthcoming)
James R. Salzmann (pro hac vice forthcoming)
Miranda E. Rehaut (pro hac vice forthcoming)
Adeel Mohammadi (pro hac vice forthcoming)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100
kuruvilla.olasa@mto.com
james.salzmann@mto.com
miranda.rehaut@mto.com
adeel.mohammadi@mto.com

*Counsel for Plaintiff*