# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHIRA PERLMUTTER, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-01659-TJK |
| | ) | |
| TODD BLANCHE, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

I.    The Library of Congress and the U.S. Copyright Office operate under presidential
      control and exercise significant executive powers. ............................................... 3

II.   The President removed the Librarian and designated the Senate-confirmed Deputy
      Attorney General, Todd Blanche, as acting Librarian under the Federal Vacancies
      Reform Act. .......................................................................................................... 5

III.  The President removed Plaintiff as Register of Copyrights and this Court denied her
      motion for a temporary restraining order. .............................................................. 6

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT .................................................................................................................... 9

I.    Plaintiff has not shown likelihood of success on the merits.................................... 9

      A.   The President lawfully designated Mr. Blanche as acting Librarian and Mr.
           Blanche ratified the President's removal of Plaintiff as Register of
           Copyrights. .................................................................................................. 9

           1.    Mr. Blanche was lawfully designated as acting Librarian pursuant to the
                 Federal Vacancies Reform Act ............................................................. 10

           2.    Plaintiff offers no persuasive reason to exclude the Library of Congress
                 from the FVRA's definition of "Executive Agency." ......................... 13

           3.    Alternatively, the President's designation of Mr. Blanche as acting Librarian
                 is independently authorized by Article II of the Constitution. ............. 18

      B.   If the President lacks the authority to designate an acting Librarian to
           supervise the Register of Copyrights, he has the authority to remove the
           Register directly. ......................................................................................... 22

II.   Plaintiff still has failed to meet her burden of establishing that she will be irreparably
      harmed in the absence of injunctive relief............................................................. 25

      A.   Plaintiff's purported loss of her "statutory right to function" is not an
           irreparable injury. ........................................................................................ 27

      B.   Plaintiff's inability to perform the duties of the office she no longer holds is
           not irreparable injury. ................................................................................. 32

      C.   Institutional harm is not irreparable harm to Plaintiff. .................................. 34

i

III.    The balance of harms and the public interest weigh strongly against injunctive relief. .... 35

IV.    Plaintiff has no cause of action and no right to the relief she seeks. .................................. 37

CONCLUSION ................................................................................................................ 38

# TABLE OF AUTHORITIES

**Cases:**

*Abdullah v. Bush*,
   945 F. Supp. 2d 64 (D.D.C. 2013) ........................................................... 37

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2024) ............................................................. 25

*Atl. Richfield Co. v. Christian*,
   590 U.S. 1 (2020) ................................................................................. 15

*Aviel v. Gor*,
   ---F. Supp. 3d---, 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ............................... 31, 34

*Aviel v. Gor*,
   No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) ..................... 21, 24, 25, 29

*Berry v. Reagan*,
   Civ. A., No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983),
   *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) ................................. 31, 34

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ............................................................................. 23

*Brehm v. Marocco*, Civ. A. No. 1:25-cv-660,
   2025 U.S. Dist. LEXIS 71326 (D.D.C. Mar. 11, 2025) ..................................... 28, 34

*Burns v. U.S. Gen. Acct. Off. Emps. Fed. Credit Union*,
   Civ. A. No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) ............................... 28

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................... 9, 25, 26, 34

*Coal. for Common Sense in Gov't Procurement v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) ................................................................ 26

*Collins v. Yellen*,
   594 U.S. 220 (2021) ............................................................................. 22

*Cook Inlet Tribal Council, Inc. v. Dotomain*,
   10 F.4th 892 (D.C. Cir. 2021) ................................................................ 15

*Davis v. Billington*,
   76 F. Supp. 3d 59 (D.D.C. 2014) ........................................................... 28, 37

*Dellinger v. Bessent*,
766 F. Supp. 3d 57 (D.D.C. 2025) ........................................................................... 30

*Dellinger v. Bessent*,
No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025)........................................ 7, 28, 32, 36

*Dotson v. District of Columbia*,
Civ. A. No. 24-1864, 2024 WL 5046282 (D.D.C. Dec. 9, 2024) ............................................ 25

*Edmond v. United States*,
520 U.S. 651 (1997) .................................................................................................. 18

*EEOC v. City of Janesville*,
630 F.2d 1254 (7th Cir. 1980)................................................................................... 28

*Elite Ent., Inc. v. Reshammiya*,
Civ. A. No. 08-0641, 2008 WL 9356287 (D.D.C. Apr. 18, 2008)............................................ 37

*Eltra Corp. v. Ringer*,
579 F.2d 294 (4th Cir. 1978)................................................................................... 13, 14

*English v. Trump*,
279 F. Supp. 3d 307 (D.D.C. 2018) ........................................ 9, 26, 28, 31, 33, 34, 36

*Ethnic Emps. of Libr. of Cong. v. Boorstin*,
751 F.2d 1405 (D.C. Cir. 1985) ................................................................................ 15

*Farris v. Rice*,
453 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................... 9, 28

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................................. 38

*Franks v. Nimmo*,
683 F.2d 1290 (10th Cir. 1982)................................................................................. 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ................................................................................ 12, 18, 19, 22

*Grundmann v. Trump*,
770 F. Supp. 3d 166 (D.D.C. 2025) .......................................................................... 29

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
920 F.3d 1 (D.C. Cir. 2019) ...................................................................................... 35

iv

*Haddon v. Walters*,
   43 F.3d 1488 (D.C. Cir. 1995) ........................................................................ 16

*Harris v. Bessent*,
   ---F. Supp. 3d---, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ............................. 30, 35

*Hetreed v. Allstate Ins. Co.*,
   135 F.3d 1155 (7th Cir. 1998) ........................................................................ 28

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
   684 F.3d 1332 (D.C. Cir. 2012) ..................................................... 2, 4, 11, 12, 13

*Judd v. Billington*,
   863 F.2d 103 (D.C. Cir. 1988) ........................................................................ 16

*Kissinger v. Reps. Comm. for Freedom of the Press*,
   445 U.S. 136 (1980) ....................................................................................... 15

*Lamie v. U.S. Trustee*,
   540 U.S. 526 (2004) ....................................................................................... 14

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................. 8

*LeBlanc v. U.S. Priv. & Civ. Liberties Oversight Bd.*,
   ---F. Supp. 3d---, 2025 WL 1454010 (D.D.C. May 21, 2025) ........................... 29, 35

*Levesque v. Maine*,
   587 F.2d 78 (1st Cir. 1978) ............................................................................. 28

*Marxe v. Jackson*,
   833 F.2d 1121 (3d Cir. 1987) .......................................................................... 28

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
   103 F.4th 830 (D.C. Cir. 2024) ........................................................... 4, 5, 12, 15

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) ........................................................................... 38

*Mistretta v. United States*,
   488 U.S. 361 (1989) ....................................................................................... 14

*Myers v. United States*,
   272 U.S. 52 (1926) .................................................................................... 20, 23

*Nat'l Treasury Emps. Union v. Reagan*,
   663 F.2d 239 (D.C. Cir. 1981) ........................................................................ 23, 24

*Nichols v. Agency for Int'l Dev.*,
   18 F. Supp. 2d 1 (D.D.C. 1998) ........................................................................ 28

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) ........................................................................ 9

*Phillip v. Fairfield Univ.*,
   118 F.3d 131 (2d Cir. 1997) ........................................................................ 26

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ........................................................................ 8

*Rubino v. City of Mount Vernon*,
   707 F.2d 53 (2d Cir. 1983) ........................................................................ 28

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................ 3, 26, 28, 31-32

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ........................................................................ 18, 22, 23, 25, 36

*Sierra Club v. Johnson*,
   374 F. Supp. 2d 30 (D.D.C. 2005) ........................................................................ 37

*Small v. Avanti Health Sys., LLC*,
   661 F.3d 1180 (9th Cir. 2011) ........................................................................ 36

*Snyder v. United States*,
   603 U.S. 1 (2024) ........................................................................ 15

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021) ........................................................................ 37

*SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*,
   796 F.3d 67 (D.C. Cir. 2015). ........................................................................ 37

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ........................................................................ 38

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ........................................................................ 27

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ............................................................... 3, 7, 27, 29, 36

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ............................................................................................ 18

*United States v. Hernandez*,
  107 F.4th 965 (11th Cir. 2024) ..................................................................... 16

*Wilcox v. Trump*,
  ---F. Supp.3d---, 2025 WL 720914 (D.D.C. Mar. 6, 2025)......................... 30

*Williams v. Phillips*,
  482 F.2d 669 (D.C. Cir. 1973) ................................................................. 20, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................ 8, 35

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................. 26, 34

**Constitutional Provisions:**

U.S. Const. art. II, § 1, cl. 1 ........................................................................ 18, 36

U.S. Const. art. II, § 2, cl. 2 ........................................................................ 18, 24

U.S. Const. art. II, § 2, cl. 3 ............................................................................. 21

U.S. Const. art. II, § 3 ................................................................................... 2, 18

**Statutes:**

2 U.S.C. § 136-1 ......................................................................... 1, 3, 10, 17, 35

2 U.S.C. § 181 ................................................................................................. 14

5 U.S.C. § 104 .......................................................................... 1, 5, 10, 16

5 U.S.C. § 105 ................................................................................... 1, 5, 10

5 U.S.C. § 701 ................................................................................................. 15

5 U.S.C. § 1101 ............................................................................................... 16

5 U.S.C. § 3345 ...................................................................................... 5, 6, 10

5 U.S.C. § 3347 ................................................................................................... 6

17 U.S.C. § 410 ................................................................................................ 33

17 U.S.C. § 701 ................................................................................. 4, 12, 30

17 U.S.C. § 702 ................................................................................. 4, 5, 12

17 U.S.C. § 708 ................................................................................................. 4

39 U.S.C. § 201 ............................................................................................... 16

42 U.S.C. § 2286 ............................................................................................. 17

44 U.S.C. § 2102 ............................................................................................. 16

Act of Apr. 24, 1800, ch. 37, § 5, 2 Stat. 55 ................................................. 3

Act of Feb. 19, 1897, ch. 265, 29 Stat. 538 ................................................... 4

Act of Jan. 26, 1802, ch. 2, § 3, 2 Stat. 128 ................................... 3, 11, 17

Act of July 8, 1870, ch. 230, § 85, 16 Stat. 198 ........................................... 4

D.C. Code § 16-3501 ...................................................................................... 37

Pub. L. No. 89-554, 80 Stat. 378 (1966) ...................................................... 16

Pub. L. No. 90-620, 82 Stat. 1238 (1968) .................................................... 16

Pub. L. No. 91-375, 84 Stat. 719 (1970) ................................................. 16-17

Pub. L. No. 95-454, tit. II, § 201(a), 92 Stat. 1111 (1978) .......................... 16

Pub. L. No. 100-456, div. A, tit. XIV, § 1441(a)(1), 102 Stat. 1918 (1988) ................................. 17

Pub. L. No. 103-110 § 122(b), 107 Stat. 1037 (1993) ................................. 14

Pub. L. No. 115-414 § 2, 132 Stat. 5430 (2019) ......................................... 14

**Office of Legal Counsel Opinions:**

*Authority of the President to Remove the Staff Director of the Civil Rights Commission &
   Appoint an Acting Staff Director*, 25 Op. O.L.C. 103 (2001) .................................................. 19

Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger,
Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting
Staff Director of the United States Commission on Civil Rights* (Jan. 13, 1994),
https://www.justice.gov/olc/page/file/1311936/dl?inline ........................................................... 19

*Power of the President to Designate Acting Member of the Federal Home Loan
    Bank Board*,
    1 Op. O.L.C. 150 (1977) ............................................................................................. 19, 20

*Temporary Presidential Designation of Acting Board Members of Inter-American
    Foundation & U.S. African Development Foundation*,
    49 Op. O.L.C. __ (Mar. 14, 2025) ...................................................................... 18, 19

**Other Authorities:**

1 Annals of Cong. 463 (1789) ...................................................................................... 18

29 Cong. Rec. 318 (1897) .............................................................................................. 4

29 Cong. Rec. 387 (1897) .............................................................................................. 4

H.R. 1695, 115th Cong. (2017) ................................................................................... 25

Ivan Morena, *Unsigned Copyright Certificates Raise Validity Questions*,
    Law360 (June 3, 2025), https://www.law360.com/articles/2348985/unsigned-copyright-
    certificates-raise-validity-questions ...................................................................... 33

John Y. Cole, *For Congress and the Nation: A Chronological History of the Library of
    Congress* (1979) ........................................................................................................ 4

Library of Congress, *George Watterston (1783-1854): 3rd Librarian of Congress 1815-1829*,
    https://www.loc.gov/item/n83041676/george-watterston-1783-1854/ ..................... 11

Library of Congress, *Librarians of Congress, 1802-1974* (1977) ............................... 11

R.R. Bowker, *The American National Library*, 21 Lib. J. 357 (1896) ......................... 4

Theodore Roosevelt, Message to the Senate and the House of Representatives (Dec. 3, 1901),
    https://millercenter.org/the-presidency/presidential-speeches/december-3-1901-first-annual-
    message .................................................................................................................... 4

The Federalist No. 70 (J. Cooke ed. 1961) ................................................................. 19

## INTRODUCTION

This is Plaintiff Shira Perlmutter's second attempt at convincing this Court to reinstate her as Register of Copyrights and Director of the U.S. Copyright Office after she was removed from that office last month. This Court denied Plaintiff's first request because she "ha[d] not met her burden of showing that she will suffer imminent irreparable harm" absent a temporary restraining order. Tr. of Hr'g on Mot. for Temporary Restraining Order, at 51:25–52:3 (May 28, 2025) ("TRO Hr'g Tr.").[1] Plaintiff's current motion is indistinguishable from her first—it raises the same legal arguments, asserts the *exact* same theories of irreparable injury, and relies on the same evidence (a single declaration). The Court can easily deny Plaintiff's motion. Although Plaintiff has not established that she is likely to succeed on the merits of her claims, this Court need not reach the merits at this stage; instead, the Court need only apply its prior ruling to conclude that Plaintiff (still) has failed to show that *she* will suffer any irreparable injury absent an injunction.

The President of the United States lawfully removed Carla Hayden from her position as Librarian of Congress and lawfully designated the Deputy Attorney General, Todd Blanche, as acting Librarian. The Library of Congress is not an autonomous organization free from political supervision. It is part of the Executive Branch and is subject to presidential control, according to the strictures of the Federal Vacancies Reform Act ("FVRA"). That law imposes parameters on presidential designation of acting officials to fill vacancies in an "Executive agency," which includes "an establishment in the executive branch[.]" 5 U.S.C. §§ 104(1), 105. The Library of Congress fits squarely in that definition. The Librarian of Congress is appointed by the President, with the advice and consent of the Senate, *see* 2 U.S.C. § 136-1(a), "is subject to unrestricted

---

[1] The transcript is attached as Exhibit A to this memorandum of law.

removal by the President," and the Library exercises powers "generally associated in modern times with executive agencies," *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341–42 (D.C. Cir. 2012).   Hence the D.C. Circuit's conclusion that the Library "is undoubtedly a component of the Executive Branch."   *Id*. at 1342 (citation omitted).

To the extent the FVRA does not apply, the President's constitutional power to supervise the Library is greater—not less.   The President has the constitutional power—indeed the obligation—to "take Care that the Laws be faithfully executed."   U.S. Const. art. II, § 3.   That power includes the power to designate subordinate officials to supervise components of the Executive Branch when they are otherwise leaderless.   The FVRA is not the source of the President's power to designate acting officials; it channels how the President may exercise that designation authority in certain contexts.   The President's power to designate Mr. Blanche ultimately comes from the Constitution, not a statute.   And that constitutional power operates here if the FVRA is silent.

Because Mr. Blanche is properly serving as acting Librarian, he had clear authority to remove the Register of Copyrights, as he did in designating Paul Perkins as acting Register.   In addition, the President removed the Register directly—a removal that likewise is within his constitutional power when, as at that time, there was no Librarian.   The general rule is that the power to remove tracks the power to appoint; thus, the Librarian normally has the power to remove the Register.   But if there is no Librarian and the President cannot designate an acting Librarian (as Plaintiff argues), the President's removal authority extends to inferior officers like the Register. The Constitution does not countenance federal entities free from all political control.

Merits aside, Plaintiff (once again) has failed to demonstrate either that she will suffer irreparable injury absent a preliminary injunction or that the equities favor that relief.   Plaintiff has

2

no right to perpetual service as Register of Copyrights, and her loss of employment is not irreparable absent a "genuinely extraordinary situation."  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Plaintiff argues she is being deprived of her "statutory right to function" as Register of Copyrights, but the Supreme Court has rejected that precise theory of injury as a basis for emergency injunctive relief.  *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025).   The other injuries Plaintiff postulates are not *her* injuries, but supposed *institutional* injuries to the Library or to Congress—injuries that cannot support *her* request for judicial reinstatement to office.   And Plaintiff makes no claim that the U.S. Copyright Office is somehow in jeopardy, such that she could not be reinstated, if she were to prevail, after this litigation has run its course.

The Court should deny the motion.

## BACKGROUND

**I.     The Library of Congress and the U.S. Copyright Office operate under presidential control and exercise significant executive powers.**

The Library of Congress is a statutorily created entity that is headed by a Librarian. Although the Library was initially created "for the use [by] Congress," Act of Apr. 24, 1800, ch. 37, § 5, 2 Stat. 55, 56, it has for over two centuries operated under the control of the Executive Branch and provided services to the federal government broadly, not just Congress.   Since the position of Librarian was created in 1802 and to this day, Congress has directed that the Librarian be appointed by the President—now, with the advice and consent of the Senate.   *See* Act of Jan. 26, 1802, ch. 2, § 3, 2 Stat. 128, 129 ("1802 Act") (providing that "a librarian [is] to be appointed by the President of the United States solely"); 2 U.S.C. § 136-1(a) ("The President shall appoint the Librarian of Congress, by and with the advice and consent of the Senate.").   In the same law that created the office of Librarian, Congress authorized the President and Vice-President to borrow books from the Library, 1802 Act, § 4, and privileges were soon extended to cabinet officials, *see*

John Y. Cole, *For Congress and the Nation: A Chronological History of the Library of Congress*
12, 15 (1979). Thus, as Congress recognized in 1897, "it is a misnomer to call it the Congressional
Library. It is a great national Library and belongs to the Government of the United States." 29
Cong. Rec. 318–19 (1897) (Rep. Dockery); *accord id.* at 387 (Rep. Stone); *id.* (Rep. Fairchild); *see
also* R.R. Bowker, *The American National Library*, 21 Lib. J. 357 (1896) ("[T]he Library of
Congress, so called, is now the library of the nation as well as of Congress."); Theodore Roosevelt,
Message to the Senate and the House of Representatives (Dec. 3, 1901) (stating that "the Federal
library, which, though still the Library of Congress, and so entitled, is the one national library of
the United States.").[2]

The Library of Congress is composed of several divisions. One of these is the U.S.
Copyright Office, which Congress established within the Library in 1897. *See* Act of Feb. 19,
1897, ch. 265, 29 Stat. 538, 545.[3] That office is headed by the Register of Copyrights and Director
of the U.S. Copyright Office, who is appointed by the Librarian. 17 U.S.C. § 701(a). The
Register of Copyrights has "broad authority … to make copyright rules," *Med. Imaging & Tech.
All. v. Libr. of Cong.*, 103 F.4th 830, 833 (D.C. Cir. 2024), including the authority "to promulgate
copyright regulations, to apply the statute to affected parties, and to set rates and terms case by
case," *Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1342; *see* 17 U.S.C. §§ 702, 708. However,
the Register of Copyrights cannot exercise this power unilaterally; instead, the Register "acts under
the direction and supervision of the Librarian," *Med. Imaging & Tech. All.*, 103 F.4th at 833 (citing
17 U.S.C. § 701(a)), and "[a]ll regulations established by the Register … are subject to the approval

---

[2] https://millercenter.org/the-presidency/presidential-speeches/december-3-1901-first-annual-message.

[3] Congress had previously tasked the Librarian with administering the copyright laws. *See* Act of July 8, 1870, ch. 230, § 85, 16 Stat. 198, 212.

of the Librarian of Congress," 17 U.S.C. § 702; *see Med. Imaging & Tech. All.*, 103 F.4th at 838 (copyright laws "give[] rulemaking authority to the Librarian, who explicitly acts upon the recommendation of the Register").

## II.    The President removed the Librarian and designated the Senate-confirmed Deputy Attorney General, Todd Blanche, as acting Librarian under the Federal Vacancies Reform Act.

On May 8, 2025, the President exercised his authority under Article II of the Constitution to remove Carla Hayden from her position as Librarian of Congress.   Compl. ¶ 17 (ECF No. 1); Decl. of Shira Perlmutter ¶ 5, ECF No. 24-3 ("Perlmutter Decl.").   The next day, the President designated Defendant Todd Blanche, the current Deputy Attorney General, as acting Librarian of Congress and "directed [him] to perform the duties of [that] office."   ECF No. 24-5, at 2.   In designating Mr. Blanche as acting Librarian, the President invoked his authority under Article II of the Constitution, both generally and as addressed in applicable federal statutes, including the FVRA, 5 U.S.C. §§ 3345–3349e.   *See id.*

The FVRA governs the President's designation of an acting officer for a Senate-confirmed position in an "Executive agency" when the officer previously holding that position "dies, resigns, or is otherwise unable to perform the functions and duties of the office…."   5 U.S.C. § 3345(a). The term "Executive agency" includes an "independent establishment."   *Id.* §§ 104(1), 105.   An "independent establishment," in turn, includes "an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission)."   *Id.* § 104(1).   The definition also excludes "an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment[.]"   *Id.*   The statute also expressly designates the Government Accountability Office as an "independent establishment."   *Id.* § 104(2).   For a governmental entity encompassed by the FVRA, that statute delineates the

"exclusive means for temporarily authorizing an acting official to perform the functions and duties" of that entity, except in limited circumstances. *Id*. § 3347(a).

The FVRA limits who may be designated as an acting officer and how long that person may serve. By default, the "first assistant" to the vacant office automatically assumes the role of the acting officer, but the President may designate an alternative—either another "officer or employee" of the same entity, subject to certain limits, or "a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3345(a)(1)–(3). A person designated under the FVRA may not serve indefinitely; rather, the FVRA imposes detailed limits on the duration of an acting officer's tenure. *Id*. § 3346(a)(1).

### III.    The President removed Plaintiff as Register of Copyrights and this Court denied her motion for a temporary restraining order.

On May 10, 2025, the President removed the then-Register of Copyrights, Plaintiff Shira Perlmutter. ECF No. 24-4, at 1. Mr. Blanche, as acting Librarian, then appointed Brian Nieves and Defendant Paul Perkins to serve as the acting Principal Deputy Librarian of Congress, and acting Register of Copyrights, respectively. ECF No. 24-5, at 1. By appointing Mr. Perkins as acting Register of Copyrights, Mr. Blanche ratified the President's removal of Plaintiff. Compl. ¶ 23.

Plaintiff filed this lawsuit on May 22, challenging her removal as Register of Copyrights and requesting a temporary restraining order to enjoin Mr. Blanche from serving as acting Librarian of Congress, prohibiting Mr. Perkins from serving as acting Register of Copyrights, and reinstating Plaintiff to the position of Register of Copyrights. *See generally* Mot. for TRO, ECF No. 2; Mem. in Supp. of Pl.'s Mot. for TRO, ECF No. 2-1. This Court held a hearing on Plaintiff's motion six days later. At the conclusion of that hearing, this Court issued a ruling from the bench denying

Plaintiff's motion because she "ha[d] not met her burden of showing that she will suffer imminent irreparable harm" absent a temporary restraining order.   TRO Hr'g Tr. at 51:25–52:6.

First, the Court concluded that Plaintiff was not irreparably harmed by a "deprivation 'of her statutory right to function in the role that the Librarian of Congress [had] lawfully appointed her to perform.'"   TRO Hr'g Tr. at 41:4–8.   The Court explained that although other courts in this District had endorsed this theory of irreparable harm "to one degree or another," "the reasoning of those cases … is not as clearly applicable" to Plaintiff's situation.   *Id*. at 41:15–20, 42:5–11.   In particular, those cases "link[ed] a finding of irreparable harm to the President's disruption of a statutory scheme involving 'a Senate-confirmed principal officer of a Congressionally created independent agency,'" but Plaintiff "was not confirmed by the Senate to her position as Register of Copyrights," and she failed to explain why the Copyright Office "should function with any degree of independence from control by the Executive Branch," especially given the "executive authority" it exercises.   *Id*. at 42:8–11, 42:32–43:6.   Moreover, in contrast to those other decisions, this Court concluded that Plaintiff failed to show that "the very survival" of the Library of Congress or the Copyright Office "w[ere] at stake," such that "there would be no agency for her to return to" absent an injunction.   *Id*. at 43:21–24, 44:2–13, 50:25–51:15.

In addition, the Court concluded that Plaintiff's theories of irreparable harm were effectively foreclosed by the D.C. Circuit's and the Supreme Court's decisions in *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025), and *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)—both of which stayed district court injunctions barring the removal of Executive Branch officials based on the same "statutory right to function" theory of irreparable harm.   TRO Hr'g Tr. at 44–46. As this Court explained, *Wilcox* "strongly implied that being unable to perform [a] statutory

duty is typically not such an irreparable harm, or at least [is] not a harm that outweighs the corresponding risk of harm to the government." *Id*. at 46:13–19.

Second, the Court rejected Plaintiff's argument that she is irreparably harmed because "she will be prevented from performing [her] legislative functions that are assigned to her." TRO Hr'g Tr. at 46:25–47:4. The Court found this theory of harm to be indistinguishable from Plaintiff's statutory-right-to-function theory: "both assert the same theory of harm[] [t]hat Ms. Perlmutter cannot do the job she was appointed to do." *Id*. at 47:11–19.

Third, the Court rejected Plaintiff's effort to show irreparable harm based on separation-of-powers harms to Congress or institutional harms to the Library and the Copyright Office because those harms "do not count as the harm *to her* that is required" for irreparable harm. TRO Hr'g Tr. at 48:14–19 (emphasis added). In particular, the Court rejected Plaintiff's argument that her personal injuries are "inextricably intertwined" with those of the Library or the Copyright Office; unlike in the cases on which Plaintiff relied, there was no evidence that the Library or the Copyright Office "will [be] so drastically change[d] … such that should [Plaintiff] win reinstatement at the end of the case, the job would not be 'comparable' to the one she left." *Id*. at 51:16–24.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). "A movant's failure to show any irreparable harm is … grounds for refusing to issue a preliminary

injunction, even if the other three factors … merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018) (plaintiff "must demonstrate the likelihood of irreparable harm *to her* if an injunction does not issue"), *appeal dismissed*, 2018 WL 3526296 (D.C. Cir. July 13, 2018). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Moreover, where, as here, a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party" must show, not only that it is *likely* to succeed on the merits, but that it is "'clearly' … entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

## ARGUMENT

### I.   Plaintiff has not shown likelihood of success on the merits.

The Court should deny Plaintiff's motion for a preliminary injunction, because she has failed to establish a likelihood of success on the merits. *English*, 279 F. Supp. 3d at 316 ("[F]ailure to show a likelihood of success on the merits is, standing alone, sufficient to defeat" a preliminary injunction motion).

### A.   The President lawfully designated Mr. Blanche as acting Librarian and Mr. Blanche ratified the President's removal of Plaintiff as Register of Copyrights.

The President's designation of Mr. Blanche as acting Librarian of Congress was lawful. First, the Library of Congress is an "Executive agency" under the FVRA, and the President's designation of Mr. Blanche thus traveled an established path to designating an acting official under that law.   Second, if the FVRA's statutory limits on designating acting officials do *not* apply to the

9

Library of Congress, the President properly exercised his inherent authority under Article II to designate Mr. Blanche. Either way, Mr. Blanche is properly serving as the acting Librarian of Congress.

### 1. Mr. Blanche was lawfully designated as acting Librarian pursuant to the Federal Vacancies Reform Act.

The President lawfully designated Mr. Blanche as the acting Librarian of Congress pursuant to the FVRA. That law authorizes the President to fill a vacancy that has arisen in a Senate-confirmed position within an "Executive agency" by designating, among others, "a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346." 5 U.S.C. § 3345(a)(2). Mr. Blanche is the Senate-confirmed Deputy Attorney General, and there is no dispute that former-Librarian Hayden is now "unable to perform the functions and duties of [that] office." *Id*. § 3345(a). The only remaining question is whether the Library of Congress is an "Executive Agency" to which the FVRA applies, which is defined as "an Executive department, a Government corporation, and an independent establishment." *Id*. § 105.

It is. An "independent establishment" is "an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment," as well as "the Government Accountability Office." 5 U.S.C. § 104. Despite having "Congress" in its name, the Library has numerous characteristics and powers that bring it firmly within the statutory language "establishment in the executive branch." *Id*.

*First*, federal law authorizes the President to appoint the Librarian with the advice and consent of the Senate, *see* 2 U.S.C. § 136-1, and the President accordingly has the sole authority to

remove the Librarian.  *See Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1341.  The President's power to appoint and remove the Librarian—a power he does *not* have over true congressional entities like the House Sergeant-at-Arms or the Senate Parliamentarian—confirms the Library of Congress's placement in the Executive Branch.  The D.C. Circuit held that the Librarian's appointment by, and subordination to, the President are key features that make the Library a "Department" in the Executive Branch for purposes of the Appointments Clause.  *Id*.

The President's control over the Library is not a new development that Congress would have been unaware of when it passed the FVRA.  Ever since the position of Librarian was created in 1802, Congress has directed that the Librarian be appointed by the President.  1802 Act, § 3 (providing for "a librarian to be appointed by the President of the United States solely").  Presidents, moreover, have not shied away from exerting authority over Librarians, including with respect to such mundane tasks as which books the Library should purchase.  *See* Library of Congress, *Librarians of Congress, 1802-1974* 20 (1977) (describing President Jefferson as taking active oversight over the first Librarian's purchase of books).   And when Librarians and Presidents have not seen eye to eye, Presidents have removed Librarians, as President Jackson did based on political differences with the Librarian at the time.  *See* Library of Congress, *George Watterston (1783-1854): 3rd Librarian of Congress 1815-1829* ("It therefore is hard to believe that he was surprised on May 28, 1829, when newly elected President Andrew Jackson, a Democrat, replaced him as Librarian with a fellow Democrat, John Silva Meehan, a local printer and publisher.").[4]

*Second*, the Library of Congress, including the Copyright Office housed within, exercises quintessential executive functions.  Specifically, "the Library of Congress … exercises significant

---

[4]  https://www.loc.gov/item/n83041676/george-watterston-1783-1854/.

regulatory authority over copyrights," *Med. Imaging & Tech. All.*, 103 F.4th at 833, including the power to "promulgate copyright regulations, to apply the statute to affected parties, and to set rates and terms case by case," *Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1342; *see also Med. Imaging & Tech. All.*, 103 F.4th at 839 (same).    Although the Copyright Office is responsible for developing and proposing the copyright regulations, it cannot institute those rules unilaterally; rather, "[a]ll regulations established by the Register … are subject to the approval of the Librarian of Congress." 17 U.S.C. § 702; *see Med. Imaging & Tech. All.*, 103 F.4th at 837 ("Congress provided that the Register may establish copyright regulations, with the approval of the Librarian").    And those regulations are subject to judicial review under the APA, *see* 17 U.S.C. § 701(e); *Med. Imaging & Tech. All.*, 103 F.4th at 838—just like regulations promulgated by any other executive-branch agency.

These powers to regulate and set rates are executive powers.    As the D.C. Circuit has explained, these powers "are ones generally associated in modern times with executive agencies rather than legislators," and those core executive powers led the court of appeals to hold that the Library is "undoubtedly a 'component of the Executive Branch.'"    *Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1341–42 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511 (2010)).    The D.C. Circuit reaffirmed that holding just last year, explaining that "whatever the Library's historical association with Congress," it exercises "important executive power" that make it "squarely a component of the Executive Branch in its role as a copyright regulator."    *Med. Imaging & Tech. All.*, 103 F.4th at 840 n.4.

The Library of Congress thus falls squarely within the Executive Branch.    The Librarian is appointed by the President, and the Library exercises quintessential executive powers, especially through the operations of the Copyright Office that Plaintiff wishes to lead.    Therefore, the Library

of Congress is an "establishment in the executive branch," and the President's designation of Mr. Blanche as acting Librarian was authorized by the FVRA.

      **2.**      **Plaintiff offers no persuasive reason to exclude the Library of Congress from the FVRA's definition of "Executive Agency."**

Plaintiff acknowledges that these features put the Library squarely within the Executive Branch for *constitutional* purposes, *see Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1341, but she insists that the same features are insufficient to make the Library "an establishment in the executive branch" under the FVRA, *see* Pl.'s Mot. for Prelim. Inj. at 13–14, 19 ("Pl.'s Mem.). But Plaintiff identifies no textual basis for cleaving "a component of the Executive Branch" under the Appointments Clause, *Intercollegiate Broad. Sys., Inc.*, 684 F.3d at 1341–42, out of the capacious statutory term "establishment in the executive branch." The most natural reading of the statute's text is that "an establishment in the executive branch" under the FVRA includes the Executive Branch under the Constitution.

First, Plaintiff argues that the Library of Congress is not "in the executive branch" because it is codified in Title 2 of the U.S. Code, a few provisions in Title 2 label the Library of Congress a "legislative branch agency," and "funding for the Library of Congress and the Copyright Office is provided through Legislative Branch appropriations." Pl.'s Mem. 14–15. That argument has already been rejected. Although the Library of Congress performs numerous core executive functions, some of its activities are legislative in character—such as the Congressional Research Service's responsibilities to advise Congress—so that the Library "could have been grouped code-wise under either the legislative or executive department." *Eltra Corp. v. Ringer*, 579 F.2d 294, 301 (4th Cir. 1978). Therefore, for purposes of classifying the Library of Congress as "legislative" or "executive," it is "irrelevant that the Office of the Librarian of Congress is codified under the legislative branch or that it receives its appropriation as part of the legislative appropriation." *Id.*

13

The fact that the Library is housed under Title 2 "cannot determine"—indeed, is irrelevant to—"whether a given function is executive or legislative."  *Id.*[5]

Equally uninformative are the handful of statutory provisions that refer to the Library of Congress as a "legislative branch agency."  Those provisions include the Library of Congress within *definitions* of various phrases, such as "offices and agencies of the legislative branch."  2 U.S.C. § 181(b)(1); *see also* Pub. L. No. 115-414 § 2(a)(3), 132 Stat. 5430, 5430 (2019) (defining the term "agency" and designating the Library of Congress as a "legislative branch agency"); Pub. L. No. 103-110 § 122(b), 107 Stat. 1037, 1043 (1993) (similar).  As Plaintiff acknowledges, Congress is free to define terms "as it pleases," Pl.'s Mem. 13 (quoting *Mistretta v. United States*, 488 U.S. 361, 423 (1989) (Scalia, J., dissenting)), and the fact that Congress grouped the Library of Congress into a definition of "legislative branch agencies" in a smattering of statutory provisions over the span of decades offers no insights into whether the Library of Congress is "in the executive branch" for purposes of the FVRA.

Second, Plaintiff argues that Defendants' interpretation would "render superfluous" several provisions in Title 5 that distinguish between an "independent establishment" or "Executive agency" and the Library of Congress.  Pl.'s Mem. 15–16.  Like all canons of statutory interpretation, the rule against superfluity "is not absolute," *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004), as "Congress commonly writes federal statutes … [in] a belt and suspenders manner."

---

[5] The Department of Justice has not conceded that the Library of Congress is part of the legislative branch.  The first brief Plaintiff references, Pl.'s Mem. 15, addressed whether the Government Accountability Office is subject to FOIA and paraphrased a case reiterating that the Library of Congress is exempt from the APA's definition of "agency."  That has no relevance to this case.  The same goes for the Department's brief in *Intercollegiate*.  *Id.* at 19–20.  The relevant passage of that brief makes the unremarkable observation that statutory labels are not determinative of constitutional status.  *See* Br. for Appellees, *Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*, No. 11-1083, 2011 WL 5288867, at *41 (D.C. Cir. Nov. 4, 2011).

*Snyder v. United States*, 603 U.S. 1, 19 (2024); *see, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020) (holding that "Congress employed a belt and suspenders approach to make sure that *all* CERCLA lawsuits are routed to federal court"); *Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892, 896 (D.C. Cir. 2021) (rejecting surplusage argument and adopting "belt-and-suspenders" interpretation).    That is true here.

Critically, each of the cited provisions adopts a unique definition of the term "agency" to govern a specific section or chapter of Title 5, which differs from the definition of "agency" under the APA.    Pl.'s Mem. 15 (describing statutes as defining the term "agency"); *see* 5 U.S.C. § 701(b). That matters, because courts have long held that the Library of Congress is *excluded* from the APA's definition of "agency," as Plaintiff acknowledges.    Pl.'s Mem. 18; *see, e.g.*, *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) (citing *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 145 (1980)).    With that backdrop, it is hardly surprising that Congress would have felt the need to list the Library of Congress by name when drafting a definition of "agency" for a specific portion of Title 5.    By contrast, no similar dynamic applies to the FVRA's definitions of the distinct statutory terms "Executive agency" and "independent establishment," especially in light of the Library's exercise of "important executive power" that places it "squarely" within "the Executive Branch."    *Med. Imaging & Tech. All.*, 103 F.4th at 840 n.4; *cf.* Pl.'s Mem. 16.    Even without the backdrop of precedent, Congress would have had every reason to adopt a belt-and-suspenders approach when drafting the specialized definitions of the term "agency" that Plaintiff cites, given the "Library's historical association with Congress" that ultimately led courts to conclude that the Library is part of "Congress" for purposes of the exclusion from the APA's and FOIA's identical definitions of "agency."    *Med. Imaging & Tech. All.*, 103 F.4th at 840 n.4; *see* 5 U.S.C. § 701(b)(1)(A).

15

That context also separates this case from *Haddon v. Walters*, 43 F.3d 1488 (D.C. Cir. 1995). *Cf*. Pl.'s Mem. 15.  There, the D.C. Circuit held that the Executive Residence at the White House is not an "independent establishment" for purposes of 5 U.S.C. § 104, relying in part on a provision in Title 3 of the U.S. Code that references the Executive Residence and "independent establishments" separately.  *Haddon*, 43 F.3d at 1490.  But in matters of statutory interpretation, "context is king," *United States v. Hernandez*, 107 F.4th 965, 969 (11th Cir. 2024), and none of the factors that justified Congress's belt-and-suspenders approach to the Library of Congress in the context of drafting specialized definitions of "agency" apply to the Executive Residence.  *Judd v. Billington*, 863 F.2d 103 (D.C. Cir. 1988), which Plaintiff also cites, is even less relevant.  It did not involve any of the provisions or definitions from Title 5 that are relevant to this case, and it offered virtually no analysis of the statutory question presented there.  *Id*. at 104.

Third, Plaintiff says that the Library of Congress cannot be an "independent establishment" because Congress "invariably" designates an entity as such "through the organic statutes creating those agencies."  Pl.'s Mem. 16.  If that is true, it is only as a matter of recent practice.  Congress created Title 5 of the U.S. Code in 1966 to consolidate the various laws related to the organization of the U.S. Government, and it was in that law that Congress first adopted the definition of "Executive agency" and "independent establishment" that are codified at 5 U.S.C. §§ 104 and 105. *See* Pub. L. No. 89-554, 80 Stat. 378 (1966).  Each of the provisions Plaintiff cites was adopted after the adoption of Title 5.  *See* 44 U.S.C. § 2102 (National Archives created as "an independent establishment in the executive branch" by Pub. L. No. 90-620, 82 Stat. 1238, 1287 (1968)); 5 U.S.C. § 1101 (Office of Personnel Management created as "an independent establishment in the executive branch" by Pub. L. No. 95-454, tit. II § 201(a), 92 Stat. 1111 (1978)); 39 U.S.C. § 201 (U.S. Postal Service created as "an independent establishment of the executive branch" by Pub. L. No. 91-375,

84 Stat. 719, 720 (1970)); 42 U.S.C. § 2286(a) (Defense Nuclear Facilities Safety Board created as "an independent establishment in the executive branch" by Pub. L. No 100-456, div. A, tit. XIV, § 1441(a)(1), 102 Stat. 1918, 2076 (1988)).   After going to the trouble of reorganizing the U.S. government under Title 5, it is no surprise that Congress would have used the language from Title 5 to categorize newly created entities.   But the Library of Congress does not fit that mold—it was established in 1800, more than 150 years before Congress adopted Title 5.   *Supra*, p. 3.   The fact that Congress did not employ language from the modern era in describing the Library of Congress in 19th century legislation is hardly probative of whether that institution's executive features and functions make it "an independent establishment in the executive branch."

Finally, Plaintiff's appeal to "congressional intent" gets her nowhere.   Pl.'s Mem. 17–18. She says it "strains credulity" that Congress would have "hand[ed] over to the President *sub silentio* the authority to appoint an acting Librarian *for its own Library*."   *Id*. at 17 (emphasis in original). It is hard to take that assertion seriously, as it is Congress that gave the President authority to appoint the *permanent* Librarian of Congress.   2 U.S.C. § 136-1(a).   Indeed, when Congress first created the position of Librarian in 1802, it provided "[t]hat a librarian [was] to be appointed by the President of the United States *solely*," without any congressional input.   1802 Act, § 3 (emphasis added).   Presidential control over the Library is by *congressional* design.[6]   For that reason, it is hardly surprising that Congress would have made the Library of Congress subject to the FVRA, just like the plethora of other Executive Branch entities whose principal officers are nominated by the President and confirmed by the Senate.

---

[6] The President's control over the Library and the Library's core executive functions refute Plaintiff's suggestion that the Library has only an attenuated connection with the Executive Branch. *Cf*. Pl.'s Mem. 20 n.6.

**3.    Alternatively, the President's designation of Mr. Blanche as acting Librarian is independently authorized by Article II of the Constitution.**

Even if Plaintiff were correct that the Library of Congress is not an "Executive agency" under the FVRA, the President's designation of Mr. Blanche as acting Librarian was a lawful exercise of the President's Article II authority.

Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). As the Framers well understood, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789) (Madison, J.)). Pursuant to the Appointments Clause, the President "may be assisted in carrying out" his duties "by officers nominated by him and confirmed by the Senate, as well as by other officers not appointed in that manner but whose work … must be directed and supervised by an officer who has been." *United States v. Arthrex, Inc.*, 594 U.S. 1, 6 (2021); U.S. Const. art II, § 2, cl. 2.

The President's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, "grants him the concomitant authority to designate acting officers" to "keep the Government running." *Temporary Presidential Designation of Acting Board Members of Inter-American Foundation & U.S. African Development Foundation*, 49 Op. O.L.C. __, at 1, 11 (Mar. 14, 2025) (slip op.) ("*Temporary Presidential Designation*"). The President "functionally could not exercise his Take Care authority" if he were unable to "task a politically accountable official to fill … agencies' leadership positions in an acting capacity[.]" *Id.* at 9. The authority also flows from the "structural safeguards" of political accountability reflected in the Appointments Clause. *Edmond v. United States*, 520 U.S. 651, 659 (1997). The power to designate acting officials

18

ensures the President can "temporarily maintain the constitutional chain of supervision over an organization created by Congress to perform executive functions." *Temporary Presidential Designation*, 49 Op. O.L.C. __, at 1. Absent that "clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter. Fund*, 561 U.S. at 498 (quoting The Federalist No. 70, at 467 (J. Cooke ed. 1961) (A. Hamilton)).

Given those serious constitutional concerns, the Office of Legal Counsel in Administrations of both parties has long recognized that, "at least where no statute precludes it," Article II authorizes the President to designate acting officials to supervise agencies' operations temporarily. *Temporary Presidential Designation*, 49 Op. O.L.C. __, at 1, 4; *see also Authority of the President to Remove the Staff Director of the Civil Rights Commission & Appoint an Acting Staff Director*, 25 Op. O.L.C. 103, 103 (2001); Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights* (Jan. 13, 1994) ("*Dellinger Memo*")[7]; *Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*, 1 Op. O.L.C. 150, 151 (1977) ("*Home Loan Bank Board*"). That longstanding and unbroken view of the Executive power is matched by equally longstanding historical practice. *See Home Loan Bank Board*, 1 Op. O.L.C. at 151 (noting a consistent "governmental practice going back more than a century"); *Dellinger Memo*, at 2–3 & n.3 (detailing historical practice dating to the Founding).

---

[7] https://www.justice.gov/olc/page/file/1311936/dl?inline.

The D.C. Circuit, too, has acknowledged in dicta the President's need for a limited authority to appoint acting principal officers—reasoning that "the intersection of the President's constitutional obligation to 'take care that the laws be faithfully executed' and his obligation to appoint [a principal officer] 'with the Advice and Consent of the Senate' [could be argued to] provide[] the President an implied power, in the absence of limiting legislation … to appoint an acting [principal officer] for a reasonable period of time before submitting the nomination of a new [Librarian] director to the Senate." *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973).[8]

Plaintiff does not dispute that the President lawfully exercised his Article II powers when he removed Ms. Hayden as Librarian of Congress. And she points to no statute prohibiting the President from designating an acting Librarian to replace her. Instead, Plaintiff's theory appears to be that the President may only designate acting officials if Congress has affirmatively granted him that authority by statute, such as through the FVRA. Pl.'s Mem. 20–21. That would upend the Constitution. The President "alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926). That includes the power to *install* subordinates—subject in some cases to statutory restrictions on who is eligible to serve in particular roles. The FVRA is the most well-known such limitation, but it is "not a source, but rather a regulation" of the President's installation power. *Home Loan Bank Board*, 1 Op. O.L.C. at 151. Should that statute not apply here, as Plaintiff contends, all that means is that the President had greater authority over the appointment of an acting Librarian, not less.

---

[8]    The D.C. Circuit rejected the specific exercise of this Article II power in the context of the case before it, where the acting director of the agency had been in that position for a "four-and-a-half-month period" without any nominee being submitted to the Senate. *Williams*, 482 F.2d at 671. That was not a "reasonable time" for the President to appoint an acting official without nominating a replacement. *Id.* Nothing close to that scenario is presented here.

Plaintiff says that recognizing the President's Article II authority to designate an acting official, no matter how short the duration, would render the Recess Appointments Clause meaningless. Pl.'s Mem. 21. That is wrong. The Recess Appointments Clause serves the very specific function of authorizing the President to fill a principal officer vacancy that arises "during the Recess" until "the End of [Congress's] next Session." U.S. Const. art. II, § 2, cl. 3. It does not address the very different problem of principal officer vacancies that arise when Congress is in session. The President's authority to address that problem by designating an acting officer to serve only "for a reasonable period of time" until the President can nominate and secure Senate confirmation of a replacement, *Williams*, 482 F.2d at 670, neither renders the Recess Appointments Clause meaningless, nor authorizes the President "to appoint an acting official of his choice to serve indefinitely." *Cf.* Pl.'s Mem. 21.[9]

Finally, Plaintiff relies on the D.C. Circuit's stay order in *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025), which concluded that the President does not have "unfettered discretion to designate acting principal officers." *Id.* at *2 (Katsas, J., joined by Pillard, J., concurring). That interlocutory decision did not definitively resolve this question, and, in any event, Defendants have not argued that the President has "unfettered discretion" to appoint an acting officer—he may do so, as *Williams* indicated, only "for a reasonable time" until a nominee has been submitted to the Senate for approval. 482 F.2d at 670.

---

[9] Plaintiff's argument also proves too much. After all, if the Recess Appointments Clause really provides the exclusive means by which the President may fill a principal-officer vacancy without the Senate's advice and consent, even on a temporarily basis, then Congress could not enact legislation—like the FVRA—which "bypass[es] [that] prescribed method[] of appointment" by authorizing the President to designate acting officials, without Senate approval, when Congress is in session. Pl.'s Mem. 20.

\*      \*      \*

The President lawfully designated Mr. Blanche as acting Librarian and, as Plaintiff concedes, Mr. Blanche's appointment of "Mr. Perkins to replace Ms. Perlmutter as the acting Register of Copyrights and the Director of the U.S. Copyright Office … served as Mr. Blanche's ratification of the President's decision to remove Ms. Perlmutter from her position."   Compl. ¶ 23. Nothing more is needed to hold that Plaintiff's removal was lawful, and for the Court to deny the motion for a preliminary injunction.

> **B.** **If the President lacks the authority to designate an acting Librarian to supervise the Register of Copyrights, he has the authority to remove the Register directly.**

If Plaintiff were correct that the President lacked the authority to designate Mr. Blanche as acting Librarian, the Court still should deny the requested preliminary injunction because the President had the authority under Article II to terminate the Register of Copyrights directly.

"[A]s a general matter," the executive power encompasses "the authority to remove those who assist [the President] in carrying out his duties."   *Free Enter. Fund*, 561 U.S. at 513–14; *cf.*, *Collins v. Yellen*, 594 U.S. 220, 250 (2021) (finding acting Department Head to be removable at will even when the Department Head otherwise had statutory removal protections).   Without such power, the President would be unable to control those who aid him in executing the laws and "could not be held fully accountable for discharging his own responsibilities."   *Free Enter. Fund*, 561 U.S. at 514.   For nearly a century, the Supreme Court has reaffirmed "[t]he President's power to remove—and thus supervise—those who wield executive power on his behalf."   *Seila Law*, 591 U.S. at 204.

Normally, the President exercises supervisory authority over inferior officers—like the Register of Copyrights—by exercising control over the principal officer (here, the Librarian of

Congress).   No one doubts, for example, that the President could direct the Librarian of Congress to remove the Register of Copyrights.   *See Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 247–48 (D.C. Cir. 1981).   But that normal approach is not absolute:   if the President is *unable* to appoint an acting officer upon removal of the principal officer, then Article II supplies the background rule, and the President has the constitutional authority—and obligation—to oversee and supervise the inferior officer until a new principal officer is confirmed by the Senate.   The Constitution does not confer autonomous status on executive entities that lack component heads.

Here, the President exercised his Article II authority to remove the Librarian of Congress. If Plaintiff is correct that the President cannot designate an acting Librarian, then the President's supervisory and removal powers must extend to the *inferior* officers in the Library of Congress— particularly inferior officers like the Register of Copyrights that wield significant executive power. Only the President is "charged specifically to take care that [the laws] be faithfully executed" and the "reasonable implication" is that "he should select those who were to act for him under his direction in the execution of the laws."   *Myers*, 272 U.S. at 117.   Saddling the President with a Register of Copyrights over whom he has no say would give the Senate an effective veto over the "President's power to remove—and thus supervise—those who wield executive power on his behalf," which is precisely the type of infringement on Article II that the Supreme Court rejected "in the landmark decision [of] *Myers*."   *Seila Law*, 591 U.S. at 204; *see Myers*, 272 U.S. at 161 (Congress lacks "the power to remove or the right to participate in the exercise of that power"). The President must have the authority to remove the leadership of an agency because it is "'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'"   *Seila Law*, 591 U.S. at 213–14 (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)).   If the President cannot designate an acting Librarian to remove Plaintiff from serving as

23

Register of Copyrights—as Plaintiff argues—then the President retains the authority to remove Plaintiff himself.   *See Aviel*, 2025 WL 1600446, at *3–5 (Rao, J., dissenting).[10]

None of Plaintiff's arguments undermines the President's Article II power in this narrow context.   She says that "[t]he Appointments Clause itself forecloses any claim of background presidential authority to remove inferior officers who were not appointed by the President" because it authorizes Congress to vest the appointment of inferior officers—like the Register of Copyrights—in the "Heads of Departments."   Pl.'s Mem. 10 (quoting U.S. Const. art. II, § 2, cl. 2). That just begs the question of who may *remove* those inferior officers.   She insists it must be only the principal officer, otherwise "the Appointments Clause's conferral of authority" on principal officers to appoint inferior officers "would be meaningless," as the "President could simply remove such officials the instant they were appointed."   *Id*. at 10–11.   Of course, the President could accomplish the same thing by commanding *the principal officer* to remove the inferior officers "the instant they were appointed."   *Id*. at 11.   The Appointments Clause is not a tool for insulating inferior officers from the President's control.   And while that presidential control may normally be exercised indirectly through principal officers, that default mechanism of presidential supervision breaks down in the absence of a principal officer over whom the President can exercise control. *Supra*, p. 23; *Aviel*, 2025 WL 1600446, at *3–5 (Rao, J., dissenting).

The proposed legislation Plaintiff cites has no relevance to the narrow question of whether Article II authorizes the President to remove the Register when the principal office is vacant.   *Cf.* Pl.'s Mem. 9–10.   That legislation was not, as Plaintiff suggests, a bill focused on giving the

---

[10]  The absence of a principal officer between the President and Plaintiff—assuming, for purposes of this alternative argument, that Mr. Blanche was not properly designated as acting Librarian—is what distinguishes this case from *National Treasury Employees Union*, 663 F.2d 239, and Plaintiff's hypothetical about the Saturday Night Massacre.   Pl.'s Mem. 8, 11.

President authority to remove the Register of Copyrights; it would have made the Register directly appointable by the President, with the advice and consent of the Senate, and in that context removable by the President.   *See* H.R. 1695, 115th Cong. § 2 (2017).   Neither Chamber's view on the prudence of that restructuring of the chain-of-command says anything about the nature of the President's Article II authority to remove an inferior officer when the principal office is vacant.

Finally, Plaintiff again relies on the D.C. Circuit's order in *Aviel*, in which a divided panel concluded that Article II does not authorize the President to remove an inferior officer, even where the principal officer's position is vacant.   *Aviel*, 2025 WL 1600446, at *1 (Katsas, J., joined by Pillard, J., concurring); *see* Pl.'s Mem. 9.   Again, that decision is not binding and merely reflects the stay panel's preliminary assessment of this constitutional question.   As Judge Rao explained, although "[t]he President rarely has cause to turn his attention to the removal of an inferior officer because such officers are directly controlled by principal officers in the chain of command," "when that chain of command is broken … '[t]he Constitution requires that such officials remain dependent on the President' and subject to his control."   *Aviel*, 2025 WL 1600446, at *5 (Rao, J., dissenting) (quoting *Seila Law*, 591 U.S. at 238).   So too here.

## II.    Plaintiff still has failed to meet her burden of establishing that she will be irreparably harmed in the absence of injunctive relief.

The Court can—and should—deny Plaintiff's motion for a preliminary injunction on the independent ground that she has failed to satisfy her burden of establishing that *she* will be irreparably harmed by her termination.   *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) ("[A] movant's failure to show any irreparable harm is … grounds for refusing to issue a preliminary injunction" (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297)); *Dotson v. District of Columbia*, Civ. A. No. 24-1864, 2024 WL 5046282, at *6 (D.D.C. Dec. 9, 2024) (same).

"The irreparable injury requirement sets a 'very high bar' for a movant seeking a preliminary injunction." *English*, 279 F. Supp. 3d at 333 (quoting *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008)). The "high standard for irreparable injury," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297—even higher here as Plaintiff has requested a mandatory injunction that would alter the status quo, *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)—requires a two-fold showing. First, because an irreparable injury "must be both certain and great," Plaintiff "must show '[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Second, "the injury must be beyond remediation." *Id*. In the context of an employee's discharge, the Supreme Court has been clear that these requirements will be satisfied only in the "genuinely extraordinary situation." *Sampson*, 415 U.S. at 92 n.68.

Plaintiff asserts three purported injuries she claims are irreparable: (1) deprivation of her "statutory right to function" as Register of Copyrights; (2) "frustrat[ion of] her ability to perform the mandatory statutory duties that Congress assigned to her"; and (3) "irreversible institutional damage to the Library of Congress and Copyright Office." Pl.'s Mem. 22; *see id*. at 25–32. Those are the exact same purported injuries Plaintiff asserted in support of her motion for a temporary restraining order, *see* Mem. in Supp. of Pl.'s Mot. for Temporary Restraining Order at 10–14, ECF No. 2-1, and in denying that motion, this Court held that she "ha[d] not met her burden of showing that she will suffer imminent irreparable harm" absent emergency injunctive relief, TRO Hr'g Tr. at 51:25–52:6. The Court should reach the same conclusion once again.

26

A.    **Plaintiff's purported loss of her "statutory right to function" is not an irreparable injury.**

Plaintiff first argues that she will be irreparably harmed "because Defendants' actions deprive her of her 'statutory right to function' in the role that the Librarian of Congress lawfully appointed her to perform."  Pl.'s Mem. 25. The Supreme Court has definitively rejected that precise theory of injury as a sufficient basis for preliminary injunctive relief.  *See Wilcox*, 145 S. Ct. at 1415.  *Wilcox* stayed two injunctions against removals of the members of the National Labor Relations Board and the Merit Systems Protection Board, explaining that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id*. (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).  That holding forecloses Plaintiff's argument that the loss of her "statutory right to function" counts as irreparable harm.  As this Court previously concluded, the Supreme Court's decision in *Wilcox* "strongly implied that being unable to perform her statutory duty is typically not such an irreparable harm, or at least not a harm that outweighs the corresponding risk of harm to the government.  So, too, in this case."  TRO Hr'g Tr. at 46:13–19.

*Wilcox* validated the D.C. Circuit's earlier decision in *Dellinger* rejecting the same "statutory right to function" theory of irreparable injury.  There, the court of appeals held that even if the discharged Special Counsel's "removal [wa]s statutorily ultra vires," a deprivation of his "statutory right to function in office" was not irreparable—"At worst, [the discharged Special Counsel] would remain out of office for a short period of time," whereas "the potential injury to the government of both having its designated Acting Special Counsel sidelined and unable to act while also having to try and unravel [the discharged Special Counsel's] actions is substantial."  2025 WL 887518, at *4 (citation omitted).

27

These rulings did not break any new ground; they solidified the longstanding rule that, absent a "genuinely extraordinary situation," loss of employment does not constitute irreparable harm. *Sampson*, 415 U.S. at 92 n.68.   Indeed, "[c]ases are legion holding that loss of employment does not constitute irreparable injury." *English*, 279 F. Supp. 3d at 334 (quoting *Farris*, 453 F. Supp. 2d at 79–80); *see also Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65–66 (D.D.C. 2014) (collecting cases).

This rule is not limited to low-level employees.   Courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is somehow a more irreparable injury.   *See Brehm v. Marocco*, Civ. A. No. 1:25-cv-660, 2025 U.S. Dist. LEXIS 71326 (D.D.C. Mar. 11, 2025) (president of U.S. Africa Development Foundation); *Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. U.S. Gen. Acct. Off. Emps. Fed. Credit Union*, Civ. A. No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors); *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78 (1st Cir. 1978) (Maine Commissioner of Manpower).

Plaintiff says the Supreme Court's decision in *Wilcox* is irrelevant because "the stay granted in that case reflected [the Court's] judgment that the government was likely to prevail on the merits."   Pl.'s Mem. 26.   That is wrong—the Supreme Court was clear that its "stay *also* reflect[ed] [its] judgment that the Government faces greater risk of harm from an order allowing a

28

removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."  *Wilcox*, 145 S. Ct. at 1415 (emphasis added). Moreover, the D.C. Circuit in *Aviel* did not, as Plaintiff says, "confirm[]" that *Wilcox* "does *not* apply where the President is *not* likely to succeed on the merits."  Pl.'s Mem. 26.   In the relevant part of *Aviel*, the D.C. Circuit was addressing whether the government was likely to succeed on its claim that reinstatement was not an available remedy.   2025 WL 1600446, at *2.   It was in that context that the court observed that *Wilcox*'s "*merits* ruling rested on the proposition that the removals at issue in those cases were likely lawful," and "did not separately address the question whether reinstatement would have been an appropriate remedy if the removals at issue were unlawful."  *Id*. at *2 n.2.   The court of appeals did not address irreparable harm at all, and it and certainly did not conclude that *Wilcox*'s rejection of the "statutory right to function" theory of irreparable harm was dependent on its view that the government was likely to succeed on the merits.

Even putting *Wilcox* aside, this case is nothing like those Plaintiff cites, as this Court has already determined.   *See* TRO Hr'g Tr. at 42:5–11 ("the reasoning of those cases … is not as clearly applicable to this situation here, as [Plaintiff] claims").   First, most of the cases Plaintiff cites found that a loss of a "statutory right to function" was irreparable injury because the office required Senate confirmation and was in an independent multi-member independent agency.   *See Grundmann v. Trump*, 770 F. Supp. 3d 166, 188 (D.D.C. 2025) (removed Federal Labor Relations Authority member was deprived of her "statutory right to function" because the plaintiff was "a Senate-confirmed principal officer" in "an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling," with for-cause removal protections (emphasis in original)); *LeBlanc v. U.S. Priv. & Civ. Liberties Oversight Bd.*, ---F. Supp. 3d---, 2025 WL 1454010, at *29–30 & n.34 (D.D.C. May 21, 2025) (finding irreparable

harm because "plaintiffs are appointed by the President, with the advice and consent of the Senate, to a nonpartisan, multimember board of experts," with for-cause removal protections); *Dellinger v. Bessent*, 766 F. Supp. 3d 57, 60, 62, 68–71 (D.D.C. 2025) (holding that plaintiff was deprived of his "right to fulfill the five-year position created and defined by Congress to which he was nominated and confirmed by the Senate" and stating that "[t]his case falls outside of the typical paradigm [of *Sampson*] since the [Office of Special Counsel] is an independent agency" with for-cause removal protections); *Wilcox v. Trump*, ---F. Supp.3d---, 2025 WL 720914, at *15–16 (D.D.C. Mar. 6, 2025) (finding irreparable harm where "plaintiff has been deprived of a presidentially appointed and congressionally confirmed position of high importance, and both she and … the NLRB have been deprived of the ability to carry out their congressional mandate" and there has been a "the loss of the office's independence," whose members had for-cause removal protections); *Harris v. Bessent*, ---F. Supp. 3d---, 2025 WL 521027, at *6–8 (D.D.C. Feb. 18, 2025) (irreparable harm because plaintiff was "appointed to and confirmed as a member of an agency charged with acting with a degree of independence from the President," with for-cause removal protections, and was "prevented from chairing the Board following Senate confirmation to that position").

By contrast, the Register of Copyrights is appointed by the Librarian and does not require Senate confirmation. 17 U.S.C. § 701(a). Further, the Copyright Office is unlike the "independent" or "nonpartisan" entities at issue in the cases Plaintiff cites, which Congress sought to shield from political influence using multi-member boards, removal protections, or both. Plaintiff insists that the cases she cites are no "less persuasive" despite these differences, Pl.'s Mem. 24 n.8, but this Court already determined that these very features were significant to those cases' holdings, *see* TRO Hr'g Tr. at 42:5–43:6, including in the *Grundmann* decision Plaintiff cites.

Second, the remainder of the cases Plaintiff cites found irreparable harm on a statutory-right-to-function theory because "the very survival of the plaintiff's organization was at stake." TRO Hr'g Tr. at 43:21–24.   In *Berry v. Reagan*, Civ. A. No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983), the district court deemed harm from removal to be irreparable because the agency itself was, by law, set to terminate within a few weeks—meaning the plaintiff commissioners *could not* be reinstated to their posts if their removals were eventually deemed unlawful.   *Id.* at *5; *see English*, 279 F. Supp. 3d at 335 ("in *Berry*, absent an injunction, any harm suffered by the commissioners was plainly irreparable because the commission would have expired and they could not have been reinstated to it").   The same is true of *Aviel v. Gor*, ---F. Supp. 3d---, 2025 WL 1009035 (D.D.C. Apr. 4, 2025), where the plaintiff "persuasively argue[d] that, absent immediate injunctive relief, there would be no [Inter-American Foundation] left for her to lead" due to a planned "dramatic reduction" in the entities staff and responsibilities.   *Id.* at *10.   Here, by contrast, Plaintiff has not offered any evidence that either the Library of Congress or the Copyright Office face a similar risk.   Therefore, Plaintiff's argument that she "suffers harm solely from not functioning as the [Register] … cannot succeed because any such harm can be remediated in the ordinary course of this case."   *English*, 279 F. Supp. 3d at 335.

Finally, Plaintiff says her inability to perform her statutory function is irreparable because, without a preliminary injunction, she will not be able to lead the Copyright Office "at this precise time" or "during the months-long pendency of this lawsuit."   Pl.'s Mem. 25, 26.   Under that theory, *every* removed officer (or employee) could claim irreparable injury because he or she is being prevented from occupying the desired office "at th[at] precise time," but that sweeping theory of injury is inconsistent with *Wilcox*, as well as the long line of cases holding that loss of employment is not irreparable harm absent a "genuinely extraordinary situation."   *Sampson*, 415

31

U.S. at 92 n.68.  Plaintiff's theory is also incompatible with the D.C. Circuit's decision in *Dellinger*, which rejected the argument that merely "remain[ing] out of office" is *per se* irreparable harm.  2025 WL 887518, at *4.  Plaintiff says that *Dellinger* is different because that case was expedited, while this lawsuit will "likely take many months" to be resolved.  Pl.'s Mem. 27.  That is no answer to *Wilcox*, and in any event, it is merely a description of the situation every party who is denied a preliminary injunction faces—they may get relief (if at all) at the end of litigation; it is not a reason to grant a preliminary injunction.  Nor is the fact that this Court, like most federal district court judges, has a busy docket and cannot in fairness allow Plaintiff to jump ahead of cases filed long before Plaintiff's.

### B.    Plaintiff's inability to perform the duties of the office she no longer holds is not irreparable injury.

Plaintiff next claims that she will be irreparably harmed by being "prevented from performing the legislative functions that continue to be required of her."  Pl.'s Mem. 28.  As this Court already recognized, this theory of harm is indistinguishable from Plaintiff's statutory-right-to-function theory: "both assert the same theory of harm[] [t]hat Ms. Perlmutter cannot do the job she was appointed to do."  TRO Hr'g Tr. at 47:11–19.  The Court should reject this theory of irreparable harm for the reasons already given.

In any event, Plaintiff's assertion that she will be "prevented" from performing the various functions of the Register of Copyrights is not supported by her declaration.  The declaration says that the "considerable confusion" around who is Register will "impede[]" her ability to "effectively" performing those functions, Perlmutter Decl. ¶¶ 11, 14, but she conspicuously avoids saying that any of the Register's functions will not be completed.  *See, e.g. id*. ¶ 7 (stating that "Part 4 of the Copyright and Artificial Intelligence report … remains in progress"); *id*. ¶ 14(b) (stating that "redesignat[ions]" for mechanical and digital licensing "required every five years" "began in

32

January 2024 and remains incomplete"); *id*. ¶ 14(c) (referring to need to "appoint a new Copyright Claims Officer … whose term is ending" without specifying timing).    That is the same failure that led the Court to reject this same theory of injury last time.    *See* TRO Hr'g Tr. at 48:3–7 (rejecting same argument because "plaintiff does not explain the timeline" for the Copyright Office's functions).

Searching for an example of any harm, Plaintiff says her ability to do her job has been "impede[d]" because "the Copyright Office has been issuing certificates without the Register's signature."    Pl.'s Mem. 29.    She acknowledges, however, that this practice is "authorized by law," and she offers only conjecture that it "could lead to challenges in litigation."    *Id*. (citing 17 U.S.C. § 410(a)).    Such speculative harms to third parties do not qualify as irreparable harm *to Plaintiff*. Notably, the same news article Plaintiff cites quotes a statement from the Copyright Office that belies Plaintiff's portrait of an agency unable to perform its functions:    "The Office is open for business, including examining applications for claims to copyright, recording documents, and providing information to the public.    This includes issuing certificates under the seal of the Office," and allowing the public to "check the Copyright Office's public records system online to verify that their work has been recorded."    Ivan Morena, *Unsigned Copyright Certificates Raise Validity Questions*, Law360 (June 3, 2025).[11]

In the end, Plaintiff offers no support for her argument that the functions of the Copyright Office will grind to a halt if she does not obtain a preliminary injunction.    Even if the "confusion" and "uncertainty" Plaintiff postulates were to cause some delay, she offers no authority that mere delay of some unspecified duration satisfies the "very high bar," *English*, 279 F. Supp. 3d at 333,

---

[11]  https://www.law360.com/articles/2348985/unsigned-copyright-certificates-raise-validity-questions.

for demonstrating harm that is "both certain and great," imminent, and "beyond remediation," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

### C. Institutional harm is not irreparable harm to Plaintiff.

Finally, Plaintiff's remaining theory of harm posits "institutional harm[s]" to Congress, the Library of Congress, and the Copyright Office—not to *herself*. Pl.'s Mem. 30–32. For example, she claims that "the U.S. Copyright Office [will] lose[] its credibility as a reliable administrator of the copyright system and non-partisan advisor to Congress," Perlmutter Decl. ¶ 16, and raises "separation-of-powers harms" to Congress, Pl.'s Mem. 30–31. But Plaintiff "must demonstrate the likelihood of irreparable harm *to her* if an injunction does not issue." *English*, 279 F. Supp. 3d at 335 (emphasis in original); *Brehm*, 2025 U.S. Dist. LEXIS 71326, at *6–7 (denying a temporary restraining order to enjoin the plaintiff's removal as President of the U.S. Africa Development Foundation for lack of irreparable harm because the plaintiff "has not identified any cognizable irreparable harm to *himself* as opposed to potential harm to the agency and its partners").

Plaintiff cannot transform those admittedly "institutional harm[s]" into her own injuries on the theory that they are "inextricably intertwined" with her proffered harms because they will prevent her from being able "to return to her position *as it currently exists*." Pl.'s Mem. 30 (emphasis added). Plaintiff will not suffer irreparable harm if she is reinstated and the Library or Copyright Office are not exactly as when she left, and none of the cases she cites supports such a sweeping theory of irreparable harm. As explained, in both *Berry*, 1983 WL 538, at *5, and *Aviel*, 2025 WL 1009035, at *10, the district courts deemed harm irreparable because the relevant agency would be virtually or literally *non-existent* at the end of the litigation. *Supra*, p. 31. Plaintiff does not—and cannot—assert that the Library of Congress or the Copyright Office is at risk of anything similar.

34

Plaintiff's concerns of separation-of-powers harms to Congress are legally defective for the same reason. *Cf.* Pl.'s Mem. 31–32. They are also unconvincing even on their own terms. Plaintiff objects that "[t]he Copyright Office cannot perform its statutory role as a neutral advisor to Congress if an Executive Branch official controls the Library of Congress's operations." *Id.* at 31. That cannot possibly be true—Congress put the President in charge of the Library of Congress by giving him the power to appoint (and remove) the Librarian. 2 U.S.C. § 136-1(a). As a presidential appointee, the Librarian and her own appointees—including the Register of Copyrights—are already subject to the control of the Executive Branch. That is nothing like the entities in *LeBlanc* and *Harris*, which were multi-member independent agencies whose members had for-cause removal protections. *See LeBlanc*, 2025 WL 1454010, at *4, *19; *Harris*, 2025 WL 521027, at *1–2; *cf.* Pl.'s Mem. 31. Otherwise, Plaintiff hypothesizes that Defendants might inflict "irreversible" damage by "unlawfully access[ing] the Library of Congress's confidential records" or may "jeopardize[]" the value of copyrighted works by "unlawfully access[ing] the deposits" of those works "safeguarded in the Copyright Office," Pl.'s Mem. 32—but she offers no evidence to back up this speculation, just as she did not before. *See* TRO Hr'g Tr. at 49:18–23 (finding "no evidence" that "the confidentiality of [congressional] … requests is being affected").

## III.    The balance of harms and the public interest weigh strongly against injunctive relief.

The balance of harms and public interest also weigh decisively against a preliminary injunction. The last two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). When balancing the equities, the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

35

The balance of harms decisively favors Defendants. The Supreme Court has made its "judgment" clear that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Wilcox*, 145 S. Ct. at 1415. That clear statement from the Supreme Court is dispositive here. As the D.C. Circuit explained, "there is no doubt that it is impossible to unwind the days during which a President is directed to recognize and work with an agency head whom he has already removed," which "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising." *Dellinger*, 2025 WL 887518, at *3 (quotation marks and alterations omitted).

Moreover, "the public interest favors applying federal law correctly." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). As discussed above, Mr. Blanche was lawfully designated acting Librarian, and Plaintiff was lawfully removed from her prior position as Register of Copyrights. Granting the extraordinary relief Plaintiff requests would mark a severe intrusion into the President's authority to exercise "all of" the "executive Power" of the United States. *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1).

Plaintiff says the public interest favors "clarity," but "it is hard to see how granting [her] an injunction would bring about more of it." *English*, 279 F. Supp. 3d at 337. "The President has designated [Mr. Blanche] the [acting Librarian]" and Mr. Perkins has been designated the acting Register of Copyrights; "[g]ranting [Plaintiff] an injunction would not bring about more clarity" but "would only serve to muddy the waters." *Id*.

Finally, in seeking an order reinstating her as Register of Copyrights, Plaintiff seeks to change the status quo. Injunctions that "'would change the status quo' are disfavored as 'an even more extraordinary remedy' than the typical preliminary injunction, … 'especially when directed

36

at the United States Government.'"   *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quoting *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), and *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005)).   Injunctions that alter the status quo, on balance, favor the non-movant.   *See, e.g.*, *Davis*, 76 F. Supp. 3d at 68; *Elite Ent., Inc. v. Reshammiya*, Civ. A. No. 08-0641, 2008 WL 9356287, at *4 (D.D.C. Apr. 18, 2008).   The third and fourth factors weigh against granting injunctive relief.

## IV.    Plaintiff has no cause of action and no right to the relief she seeks.

Aside from the lack of substantive merit to Plaintiff's claims, two additional obstacles further undermine her likelihood of success:   lack of a cause of action and lack of entitlement to the relief she seeks.

First, Plaintiff's action appears to be an attempted end-run around the requirements and restrictions for bringing a quo warranto action.   The federal quo warranto statute, which Congress codified for historical reasons in the D.C. Code, provides a civil action against any person who, within the District of Columbia, "usurps, intrudes into, or unlawfully holds or exercises . . . a public office of the United States, civil or military."   D.C. Code § 16-3501.   The D.C. Circuit has indicated that the quo warranto statute is the sole means by which an interested party may make a direct attack on the authority of another person to perform the duties of a public office (as opposed to an indirect attack on his or her official actions).   *See SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*, 796 F.3d 67, 81 (D.C. Cir. 2015) ("The de facto officer doctrine allows [direct] attacks [on an officer's authority,] but they can be brought via writ of quo warranto only."), *aff'd*, 580 U.S. 288 (2017). Plaintiff's failure to satisfy the requirements for a direct challenge to Mr. Blanche's (or anyone else's) authority to perform his duty as an acting official itself prevents her from prevailing on the merits.

Second, even if the President's designation of Mr. Blanche as acting Librarian and his removal of Plaintiff were not lawful, this Court still should not grant Plaintiff's motion to the extent that she seeks injunctive and declaratory relief against the President himself.   For a century and a half, the Supreme Court has maintained that courts, "in general," have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."   *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)); *see also id.* at 826–27 (Scalia, J., concurring).   A "District Court's grant of injunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows."   *Id.* at 802 (plurality opinion).   "[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment."   *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).   Granting Plaintiff's requested relief would "at best create[] an unseemly appearance of constitutional tension and at worst risk[] violation of the constitutional separation of powers."   *Id*. at 978.   For that reason, too, the Court should deny relief.

## CONCLUSION

The Court should deny Plaintiff's motion for a preliminary injunction.

Dated:   June 24, 2025                          Respectfully submitted,

                                                     BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Benjamin Hayes*
BENJAMIN HAYES
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-8214
Benjamin.T.Hayes@usdoj.gov

*Counsel for Defendants*

39