# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHIRA PERLMUTTER,

     *Plaintiff,*

v.

TODD BLANCHE *et al.*,

     *Defendants*.

Case No. 25-cv-01659-TJK

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

I.    Ms. Perlmutter Will Succeed on the Merits..........................................................1

    A.    The Library of Congress is not subject to the FVRA ..............................1

        1.    The statutory scheme makes clear that the Library of Congress
            is not an "independent establishment in the executive branch"...................3

        2.    Defendants' non-statutory arguments are unpersuasive ............................5

    B.    The Take Care Clause does not authorize the President to appoint Mr.
        Blanche without the Senate's advice and consent ....................................6

    C.    The President lacks direct removal authority.........................................11

II.   Ms. Perlmutter Will Continue to Suffer Immediate and Irreparable Harm
    Absent Preliminary Relief.................................................................................14

    A.    The unlawful removal of Ms. Perlmutter is causing serious injury to
        Ms. Perlmutter and the Copyright Office ..............................................15

    B.    Ms. Perlmutter's removal is an "extraordinary situation" .....................19

    C.    Ms. Perlmutter has a statutory right to function as Register.................20

    D.    The equitable factors strongly favor preliminary relief .........................21

III.  Ms. Perlmutter Is Entitled to Relief ..................................................................22

    A.    Ms. Perlmutter need not proceed by writ of quo warranto ...................22

    B.    Ms. Perlmutter has demonstrated that she is entitled to the requested
        relief ....................................................................................................23

CONCLUSION.................................................................................................24

## TABLE OF AUTHORITIES

### CASES

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)................................................................. 22, 23

*Aviel v. Gor*, No. 1:25-cv-00778, 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ................... 7, 10, 11

*Aviel v. Gor*, No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025).............. 7, 10, 12, 14, 21

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983)................................. 18, 20

*Bowsher v. Synar*, 478 U.S. 714 (1986)....................................................................................... 13

*Brehm v. Marocco*, No. 1:25-cv-00660 (D.D.C. Mar. 11, 2025) ................................................ 12

*Collins v. Yellen*, 594 U.S. 220 (2021) ........................................................................................ 13

*Dellinger v. Bessent*, 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025).............................. 21

*English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018) ......................................................... 14, 22

*Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................... 20

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)......................................................................... 24

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)........... 10, 11, 13

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ..................................................... 8

*Grundmann v. Trump,* No. 1:25-cv-00425, 2025 WL 782665 (D.D.C. Mar. 12, 2025) ............. 18

*Haddon v. Walters,* 43 F. 3d 1488 (D.C. Cir. 1998)..................................................................... 4

*Harris v. Bessent*, 1:25-cv-00412, 2025 WL 679303 (D.D.C. Mar. 4, 2025) ............................ 18

*Harris v. Bessent*, No. 1:25-cv-00412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ..................... 19

*Harris v. Bessent*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)...................... 14, 24

*Harris v. Bessent*, No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ........................... 24

*Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998)........................................................ 20

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)....................................................... 21

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ..................................................... 14

*Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012) ............... 5

*Keeffe v. Libr. of Cong.*, 777 F.2d 1573 (D.C. Cir. 1985) ............................................................ 6

*Kennedy v. Braidwood Mgmt., Inc.*, No. 24-316, 2025 WL 1773628 (U.S. June 27, 2025) .................................................................................................. 11, 12

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) ............................................................ 3

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 1:25-cv-00542, 2025 WL 1454010 (D.D.C. May 21, 2025) ............................................................ 18, 20

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ......................... 2

*Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023) .................................. 4

*Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987) ......................................... 20

*Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830 (D.C. Cir. 2024) ........... 6

*Mistretta v. United States*, 488 U.S. 361 (1989) ............................................ 2

*Myers v. United States*, 272 U.S. 52 (1926) ................................................. 14

*Nat'l Lab. Rels. Bd. v. Noel Canning*, 573 U.S. 513 (2014) .......................... 8

*Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288 (2017) ...................... 8, 9

*Noel Canning v. Nat'l Lab. Rels. Bd.*, 705 F.3d 490 (D.C. Cir. 2013) ......... 13

*Sampson v. Murray*, 415 U.S. 61 (1974) ................................................. 19, 24

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) ....................................... 13, 14

*Service v. Dulles*, 354 U.S. 363 (1957) ........................................................ 24

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ..................................... 24

*Shurtleff v. United States*, 189 U.S. 311 (1903) .......................................... 13

*Steele v. Dep't of Def.,* No. 1:22-cv-03604, 2022 WL 22329872 (D.D.C. Dec. 8, 2022) .......................................................................................................... 12

*SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*, 796 F.3d 67 (D.C. Cir. 2015) ....... 22, 23

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ......................................... 24

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ................................................ 15, 16

*U.S. Inst. of Peace v. Jackson*, No. 25-5185 (D.C. Cir. June 27, 2025) ...... 15

*Vitarelli v. Seaton*, 359 U.S. 535 (1959) ..................................................... 24

*Wiener v. United States*, 357 U.S. 349 (1958) ............................................. 14

*Wilcox v. Trump*, No. 1:25-cv-00334, 2025 WL 720914 (D.D.C. Mar. 6, 2025)........................ 20

*Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973)................................................................. 7

*Williams v. Phillips*, 482 F.2d 669 (D.C. Cir. 1973)...................................................................... 7

## STATUTES

17 U.S.C. § 701 ............................................................................................................................... 11

2 U.S.C. § 136 ................................................................................................................................. 12

2 U.S.C. § 136-1 ............................................................................................................................... 5

2 U.S.C. § 171 ................................................................................................................................... 6

2 U.S.C. § 1801 ................................................................................................................................. 5

2 U.S.C. § 1812 ................................................................................................................................. 5

3 U.S.C. § 112 ................................................................................................................................... 4

39 U.S.C. § 201 ................................................................................................................................. 5

5 U.S.C. § 104 ................................................................................................................................... 2

5 U.S.C. § 105 ............................................................................................................................... 2, 4

5 U.S.C. § 3345 ................................................................................................................................. 2

5 U.S.C. § 4101 ................................................................................................................................. 3

5 U.S.C. § 701 ................................................................................................................................... 4

## OTHER AUTHORITIES

Authority of the President to Remove the Staff Director of the Civil Rights
    Commission and Appoint an Acting Staff Director, 25 Op. O.L.C. 103 (2001) .............. 10

Hillel Italie and Seung Min Kim, *Deputy Attorney General Who Defended Trump in
    Hush Money Trial is Named Acting Librarian of Congress*, Assoc. Press (May
    12, 2025), https://perma.cc/BK6F-4LCE .......................................................................... 23

Letter from Reps. Joseph D. Morelle, Rosa L. DeLauro, Adriano Espaillat, Terri A.
    Sewell, Norma J. Torres, and Julie E. Johnson, to Kimberly Benoit, Libr. of
    Cong. Inspector Gen. (May 12, 2025), https://perma.cc/QVF3-CYJ8 ............................ 18

Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter
    Dellinger, Assistant Attorney General, Office of Legal Counsel, Re:

Appointment of an Acting Staff Director of the United States Commission on
Civil Rights (Jan. 13, 1994), https://perma.cc/N7ZU-UWAR.................................. 10, 11

Press Release, Sen. Alex Padilla, *Ranking Members Padilla, Morelle Condemn
Trump Administration's Brazen Attempt to Take Over Library of Congress*
(May 12, 2025), https://perma.cc/72WU-SEQW ........................................... 23

S. Rep. No. 105-250 (1998) .......................................................................... 10

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2 ............................................................................. 11

**INTRODUCTION**

The President has attempted to seize control of the Library of Congress by purporting unilaterally both to appoint a new Librarian of Congress and to terminate Plaintiff, the lawfully appointed Register of Copyrights.  Defendants fail to identify any lawful authority, statutory or constitutional, for their actions.  The Federal Vacancies Reform Act (FVRA) does not authorize Defendants' takeover of the Library of Congress, so Defendants attempt an entirely novel constitutional theory, but neither the Appointments Clause nor the Take Care Clause supports Defendants' sweeping assertions of power.  Defendants similarly assert an unbelievable claim that the President has inherent Article II authority to directly remove the Register, an inferior officer, notwithstanding Congress's decision to vest the appointment and removal authority of the Register in the Librarian alone.

Defendants contend that even if Plaintiff is correct—and even if Defendants have *no legal basis* for their actions—this Court should stand idly by and do nothing while Defendants wield unprecedented, and unlawful, authority.  Neither the law nor common sense requires this result. Plaintiff will continue to suffer immediate and irreparable harm because her removal was unlawful, causes serious injury to Plaintiff, and threatens the Copyright Office's institutional prerogatives and ability to function in the manner that Congress intended.  The Court can and should act to preserve the status quo and to prevent Defendants from interfering with Plaintiff's exercise of the duties that Congress has entrusted to her.

I.      **Ms. Perlmutter Will Succeed on the Merits**

A.      **The Library of Congress is not subject to the FVRA**

Defendants' contention that the Library of Congress is an "Executive agency" subject to the FVRA is meritless.  The FVRA does not apply to the Library of Congress and does not authorize Mr. Blanche's appointment as acting Librarian.  Mr. Blanche's attempted removal of

Ms. Perlmutter is therefore unlawful.

Defendants acknowledge that the FVRA applies only to officers of an "Executive agency," 5 U.S.C. § 3345, a category that is defined and limited by statute to include any (1) "Executive department"; (2) "Government corporation"; or (3) "independent establishment." 5 U.S.C. § 105. Defendants concede that the Library of Congress is not an "Executive department" or "Government corporation," but instead, they argue—unpersuasively—that the Library of Congress is an "independent establishment." Defs.' Response in Opp'n to Prelim. Inj. ("Defs.' Opp.") at 10. But this argument is precluded many times over: by the plain text of the statute, the overall statutory scheme, and its history.

An "independent establishment" is defined in relevant part as "an establishment *in the executive branch*." 5 U.S.C. § 104 (emphasis added). The key question is therefore whether Congress designated the Library of Congress as an establishment "in the executive branch" for purposes of the FVRA. It did not. Nor do Defendants attempt to claim that Congress has characterized the Library of Congress as an establishment "in the executive branch." Instead, they implausibly contend that "executive branch" is a constitutional term that must be read into the "capacious statutory term 'establishment in the executive branch.'" Defs.' Opp. at 13. There is no evidence to support this contention. As Plaintiff has made clear, Congress can define statutory terms as it pleases. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (Congress has dispositive authority to determine whether an entity "is subject to statutes that impose obligations or confer powers upon Government entities."); *see also Mistretta v. United States*, 488 U.S. 361 (1989) (Scalia, J., dissenting). Against that backdrop, Defendants' opposition is most notable for what it lacks: any contrary evidence whatsoever that Congress has *ever* characterized the Library of Congress as part of the Executive Branch for statutory purposes.

**1.    The statutory scheme makes clear that the Library of Congress is not an "independent establishment in the executive branch"**

Defendants do not and cannot persuasively rebut the irrefutable evidence that Congress did not include the Library of Congress in the statutory definition of an "independent establishment." *See* Pl.'s Mem. in Supp. of Prelim. Inj. ("Pl.'s Br.") at 13–20.  Defendants fail to address the fact that Congress has—on numerous occasions—explicitly designated the Library of Congress as a "legislative branch agency."  *See id.* at 14–15.  Defendants' theory asks the Court to find that Congress considered the Library of Congress to be an "establishment in the executive branch" despite repeatedly describing the Library as a "legislative branch agency," and without *any* evidence to explain this discrepancy.  Defendants also fail to meaningfully engage with Plaintiff's evidence that (1) Congress has distinguished between the Library of Congress and an "Executive agency" in a dozen separate provisions under Title 5, *see* Pl.'s Br. at 15; and (2) Congress has distinguished between the Library of Congress and an "independent establishment," *see id*. at 15 (citing 5 U.S.C. § 4101(1)).  But if the Library of Congress were an "Executive agency" or "independent establishment" within the meanings of Sections 104 and 105, that would render each of these statutory provisions superfluous.

Defendants ask the Court to credit their "belt and suspenders" theory and thereby set aside the canon against superfluity.  Defs.' Opp. at 14–15.  There are two problems with Defendants' position:  First, courts do not ignore the rule against superfluity without good reason, and there is none here.  *See, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (explaining that courts may reject words as superfluous where they are "inadvertently inserted" or if a contrary reading is "repugnant to the rest of the statute" (cleaned up)).  Second, Defendants cannot explain why Congress believed that a "belt and suspenders" approach was necessary in a *dozen* other places in Title 5, but not in Section 105, or for that matter, the FVRA itself.

Likewise, Defendants' theory that Congress may have intended to "adopt[] a unique definition of the term 'agency,'" distinct from the APA's definition, when it passed the dozen separate provisions under Title 5 that distinguish between "Executive agency" and "Library of Congress," Defs.' Opp. at 15, is unpersuasive. On its face, the APA definition of "agency" applies only "for purposes of this chapter," *i.e.*, Chapter 7 of Title 5, *see* 5 U.S.C. § 701(b), so Congress would have had no need to repeatedly list the Library of Congress as a separate entity from an "Executive agency" in the other Title 5 provisions. Unsurprisingly, Defendants point to nothing in the legislative history or any other authority to back up their theory.[1] And, in any event, courts "cannot replace the actual [statutory] text with speculation as to Congress' intent." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023).

Nor do Defendants meaningfully engage with Plaintiff's assertion that Congress has expressly called other agencies an "independent establishment" in their organic statutes, but has not done the same for the Library of Congress. *See* Pl.'s Br. at 16–17. Defendants attempt to explain this away by suggesting that Congress did not use the term "independent establishment" in the Library's organic statute because the Library's creation predates the 1966 enactment of Title 5. Defs.' Opp. at 16–17. But Congress has since amended Title 2, Chapter 5 of the U.S. Code on numerous occasions, and therefore could have declared that the Library was an "independent establishment." For example, Congress designated the U.S. Postal Service—an entity which, in

---

[1] As Plaintiff explained in her opening brief, *see* Pl.'s Br. at 15, *Haddon v. Walters,* 43 F. 3d 1488 (D.C. Cir. 1998), is on all fours with Plaintiff's case. In *Haddon*, the D.C. Circuit concluded that the White House Executive Residence is not an "independent establishment" for purposes of 5 U.S.C. § 105 because a different statute, 3 U.S.C. § 112, distinguishes between an "independent establishment" and the Executive Residence. 43 F.3d at 1490. Defendants appear to contend— without any support—that *Haddon* is distinguishable because Congress did not have "every reason to adopt a belt-and-suspenders approach" for the Executive Residence. *See* Defs.' Opp. at 15–16. Even if that is true, Defendants' argument just proves Plaintiff's point: Congress recognizes the Library of Congress's unique status, and its failure to include the Library of Congress in the definition of "Executive agency" is no accident.

one form or another, is as old as the Republic itself—as an "independent establishment."  *See* 39 U.S.C. § 201.  Even so, what Congress *did* do speaks for itself:  Congress established the Library of Congress under Title 2, consistently treats it as a legislative agency, and consistently distinguishes it from an "Executive agency" or "independent establishment."  The inquiry should end there.

### 2.    Defendants' non-statutory arguments are unpersuasive

Unable to find support for their interpretation of the FVRA in the statutory text, Defendants turn to two extra-textual arguments to support their position.  Both are unavailing.

*First*, Defendants argue that the Library of Congress must be an agency within the Executive Branch because the Librarian of Congress is appointed by the President, with the advice and consent of the Senate.  *See* Defs.' Opp. at 10–11; 2 U.S.C. § 136-1.  But, as discussed above, whether the Library of Congress is in some respects part of the Executive Branch for constitutional purposes has no bearing on its status under the FVRA.  Congress did not write the FVRA to track the President's appointment authority.[2]

*Second*, Defendants lean heavily on *Intercollegiate Broadcasting Systems v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), to support their claim that the Library of Congress is an agency within the Executive Branch because it "exercises quintessential executive powers."  Defs.' Opp. at 11–12.  But Defendants' reliance on *Intercollegiate* is misplaced.  As a preliminary matter, *Intercollegiate* does not mean that the Library of Congress is part of the Executive Branch for *all* purposes.  *See* Pl.'s Br. at 19–20 (explaining that the D.C. Circuit concluded in

---

[2] For instance, the Architect of the Capitol was appointed by the President with the advice and consent of the Senate until 2023.  2 U.S.C. § 1801(a)(1) (2022) (repealed).  On the Defendants' theory, because the President appointed the Architect of the Capitol—a position whose primary responsibility is "the care and superintendence of the Capitol," *see id*. § 1812—the Office of the Architect of the Capitol too must have been an "Executive agency" for purposes of the FVRA.

*Intercollegiate* that the Library of Congress was a component of the Executive Branch for a particular purpose: the Librarian's power to appoint Copyright Royalty Judges); *see also Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 840 n.4 (D.C. Cir. 2024) (the Library of Congress is a "component of the Executive Branch *in its role as a copyright regulator*") (emphasis added). Indeed, the D.C. Circuit has previously identified the Library as a "congressional agency." *See Keeffe v. Libr. of Cong.*, 777 F.2d 1573, 1574 (D.C. Cir. 1985) (citing 2 U.S.C. § 171(1)). But in any event, as Plaintiff explained in her opening brief, *see* Pl.'s Br. at 19–20, *Intercollegiate* does not bear on the *statutory* definition of "Executive agency" in the FVRA, and instead addresses the separate question of whether the Library of Congress is a component of the Executive Branch for purposes of the Appointments Clause.

And, as Plaintiff previously explained, Congress had every reason to want to treat the Library of Congress as a part of the Legislative Branch, rather than a part of the Executive Branch, for statutory purposes. The Library performs a number of important and sensitive functions for Congress, and it is therefore not surprising that Congress would not have cut itself out of the process of identifying acting leadership for the Library of Congress.

## B.    The Take Care Clause does not authorize the President to appoint Mr. Blanche without the Senate's advice and consent

No court has ever accepted Defendants' argument that the President can resort to the Take Care Clause to appoint acting officers. To the contrary, last month, the D.C. Circuit confirmed that "it is unlikely that the Take Care Clause gives the President unfettered discretion to designate acting principal officers with neither Senate confirmation nor a Senate recess nor even statutory authorization through the FVRA." *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *2 (D.C. Cir.

June 5, 2025) ("*Aviel II*"); *accord id.* at *4 n.1 (Rao, J., dissenting); *see also Williams v. Phillips*, 360 F. Supp. 1363, 1371 (D.D.C. 1973) ("*Williams I*").[3]

Defendants attempt to minimize *Aviel II*, describing it as an "interlocutory" decision.  But they cannot deny that *three* D.C. Circuit judges—Judges Pillard, Katsas, and Rao—as well as Judge AliKhan and Judge Leon have rejected the same argument the government advances here. *See Aviel II*, 2025 WL 1600446, at *2 (Katsas, J., with Pillard, J., concurring); *id.*, at *5 (Rao, J., dissenting) ("[T]he President has no inherent authority to appoint officers of the United States, like IAF Board members, outside the strictures of the Appointments Clause."); *Aviel v. Gor*, No. 1:25-cv-00778, — F. Supp. 3d. —, 2025 WL 1009035, at *9 (D.D.C. Apr. 4, 2025) ("*Aviel I*"); *Rural Dev. Innovations Ltd. v. Marocco*, 1:25-cv-01631, at *10–11, 12 (D.D.C. July 1, 2025) ("While defendants argue that the President has inherent Article II power to appoint acting principal officers, there is little hope for defendants that this argument will win the day.").  Nor can they offer the Court any authority in support of their contrary position.

For good reason.  The Appointments Clause expressly forecloses the President from unilaterally appointing principal officers by requiring the President to obtain the Senate's advice and consent.  The Recess Appointments Clause then addresses situations in which the President needs to fill a vacancy but is *unable* to obtain advice and consent because the Senate is in recess, thereby providing a narrow "exception" to the Appointments Clause that enables the President to

---

[3] Defendants contort *Williams* to argue that it provides support for "the President's need for a limited authority to appoint acting principal officers."  Defs.' Opp. at 20.  To the contrary, the district court in *Williams* concluded that the President lacked the authority to appoint an acting director of the Office of Economic Opportunity.  The D.C. Circuit agreed, denying the defendant's request for a stay pending appeal, and finding that the plaintiff was likely to succeed on the merits because "Art. II, § 2 of the Constitution unequivocally requires an officer of the United States to be confirmed by the Senate unless different provision is made by congressional statute."  *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973) ("*Williams II*").  The court's dicta that theorizes that it "*could be argued*" that the Take Care Clause provides some appointment authority cannot prop up Defendants' otherwise unsupported position.  *Id.* (emphasis added).

unilaterally appoint a principal officer for a limited time. *Nat'l Lab. Rels. Bd. v. Noel Canning*, 573 U.S. 513, 519, 523 (2014). Considered in tandem, the Appointments Clause and the Recess Appointments Clause leave no doubt that the Constitution gives the President authority to appoint a principal officer when the Senate is in session *only with the Senate's advice and consent*. *See id*. at 524 (the President has no "authority routinely to avoid the need for Senate confirmation" of principal officers). While Defendants assert that the Recess Appointments Clause addresses the "very specific" situation of a Senate recess, and the Take Care Clause provides free-ranging authority to unilaterally appoint a principal officer at any other time, Defs.' Opp. at 21, that argument makes no sense. If the Take Care Clause provided that sweeping authority, there would have been no need for the Recess Appointments Clause. And the Appointments Clause's advice-and-consent requirement would be a nullity. The Supreme Court has rejected this extreme position repeatedly. *See Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 317 (2017) (Thomas, J. concurring) ("We cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency"); *see also Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991).

Equally unavailing is Defendants' argument that they are not seeking an "unfettered" Presidential right to unilaterally appoint acting officers, but only a right to unilaterally appoint acting officers "for a reasonable time." Defs.' Opp. at 21. That supposed limiting principle is nowhere in the Take Care Clause or any other part of the Constitution. Instead, it is drawn from dicta in a 1973 D.C. Circuit decision. *See supra* note 3. But the fundamental point discussed above bears repeating: the Constitution already anticipates that the President might have an emergent need to appoint a principal officer for a "reasonable time." And the Constitution provides two mechanisms that, together, fully address that exigency. During the Senate's session, the President can do so by seeking advice and consent. U.S. Const., Art. II, sec. 2. And during a

recess, when the Senate is not available to provide its advice and consent, the President may employ the Recess Appointments Clause.  There is no third constitutional source of authority that would permit the President to ignore both appointments clauses.  This Court should swiftly reject Defendants' manufactured rule which would, without any constitutional or statutory support, create an immense new presidential power, purportedly constrained only by a "reasonable time" limitation that also finds no support in constitutional or statutory text.

Historical practice confirms that the President lacks any inherent authority to fill vacancies in principal offices.  The Appointments Clause's requirement of Senate confirmation for principal officers means that the functions of a principal office "may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement."  *SW Gen.*, 580 U.S. at 292.  "Congress"—not the President alone—"has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation."  *Id*. at 293 (emphasis added).  "Since President Washington's first term," therefore, "Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval" only through a series of statutory grants—including, most recently, the FVRA.  *Id*. at 294 (emphasis added).

The unbroken historical practice of Congress conferring limited temporary appointment authority on the President confirms that the President has never been understood to have inherent Article II authority to appoint officers to principal offices.  Indeed, the government does not identify a single lawful example of a President unilaterally appointing an acting official to a principal office outside of then-governing statutory temporary-appointment frameworks.  That "lack of historical precedent" is a "telling indication of the severe constitutional problem" with the

9

government's claim of sweeping presidential authority. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (cleaned up).

Absent a statutory grant of authority, therefore, the President has only the power expressly given to him by the Appointments Clause and the Recess Appointments Clause, and no more. *Aviel I*, 2025 WL 1009035, at *7 ("The only exceptions are if another 'statutory provision expressly' authorizes the President or another official to make such an appointment . . . or if the President validly makes a recess appointment under Article II."); *Aviel II*, 2025 WL 1600446, at *2 ("[T]he Constitution provides only one express exception to the Senate-confirmation requirement for principal officers, which applies only when the Senate is in recess."); S. Rep. No. 105-250, at *4–5 (1998) (in enacting the FVRA, Congress emphasized that "the President lacks any inherent appointment authority for government officers"). Because the FVRA does not confer authority on the President to appoint an officer to temporarily perform the functions of the Librarian of Congress, the President's appointment of Mr. Blanche was *ultra vires*.

Notably, the only authority Defendants can muster for their contrary position comes from the Executive Branch itself. *See* Defs.' Opp. at 19 (citing Office of Legal Counsel opinions). But of the four cited opinions, two do not concern constitutional officers at all (let alone principal officers). *See* Authority of the President to Remove the Staff Director of the Civil Rights Commission and Appoint an Acting Staff Director, 25 Op. O.L.C. 103, 105 (2001); Memorandum for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights (Jan. 13, 1994), https://perma.cc/N7ZU-UWAR ("Dellinger Memo"). And a third was written roughly three months ago in an attempt to justify the President's firing of the board of the Inter-American Foundation and purporting to appoint acting board

members.  *See Aviel I*, 2025 WL 1009035, at *8 (noting that a "suspiciously timed" opinion contravenes general OLC practice).

To the extent that OLC could be said to have asserted a consistent position, that assertion was premised exclusively on the ground that the President's Take Care Clause authority must include the ability to "keep the government running" when vacancies arise.  Dellinger Memo at 2. That justification manifestly does not apply here, where the President created the vacancy by firing the Librarian of Congress.  While the President had authority to fire the Librarian, he may not use the resulting vacancy to arrogate to himself untrammeled authority to bypass the Senate's constitutional role in appointments.  The OLC opinions are therefore not controlling, nor are they persuasive.  For precisely those reasons, "[t]he separation of powers does not depend on the views of individual Presidents."  *Free Enter. Fund*, 561 U.S. at 497 (cleaned up).

## C.    The President lacks direct removal authority

The President's supervisory powers do not include direct removal of inferior officers—a rank that Defendants concede includes the Register of Copyrights—unless Congress supplies the corresponding appointment power to "the President alone."  U.S. Const. art. II, § 2, cl. 2.  Congress has not done so here, but instead has vested the power to appoint the Register of Copyrights in a Head of Department—the Senate-confirmed Librarian of Congress.  17 U.S.C. § 701.

Congress's choice must be given effect by adherence to the well-established rule that the power to remove follows the power to appoint.  *Free Enter. Fund*, 561 U.S. at 493; *see also Kennedy v. Braidwood Mgmt., Inc.*, No. 24-316, 2025 WL 1773628, at *9 (U.S. June 27, 2025) ("[W]hen as here Congress vests appointment of inferior officers in 'heads of departments,' 'it is ordinarily the department head . . . who enjoys the power of removal.'").  As two courts in this District recently concluded, "the law is that an inferior officer is removable by the authority that appointed him, *but nobody else*—unless Congress alters that default rule."  *Aviel I* (quoting Tr. of

11

TRO Hr'g at 9:5–9, *Brehm v. Marocco*, No. 1:25-cv-00660 (D.D.C. Mar. 11, 2025) (emphasis added). Defendants do not dispute that uniformly accepted principle, but instead propose an exception, such that "if the President is unable to appoint an acting officer upon removal of the principal officer," he can "oversee and supervise the inferior officer until a new principal officer is confirmed by the Senate." Defs.' Opp. at 23. That theory is baseless.

In all events, there *is* by operation of statute and regulation an acting Librarian. *See Braidwood Mgmt.*, 2025 WL 1773628, at *9; *see also* 2 U.S.C. § 136; LCR 1-120 (providing the line of succession for Acting Librarian). That person is Mr. Newlen—a reality Defendants ignore when asserting that if Mr. Blanche does not hold the post, there is an "absence of a principal officer between the President and Plaintiff," such that the "chain of command is broken." Defs.' Opp. at 24–25 & n.10 (quoting *Aviel II*, 2025 WL 1600446, at *5 (Rao, J., dissenting)). To the contrary, there is a clear chain of command, with an acting Librarian that is able to supervise the Register. And, equally obviously, if the President prefers not to work with within the line of succession, he can nominate and seek confirmation of any Librarian he chooses. He has not done so.

Defendants' claimed need for sweeping inherent Article II authority to remove inferior officers, notwithstanding Congress's placement of that authority in the Head of Department rather than the President, is thus entirely self-inflicted. *See Steele v. Dep't of Def.,* No. 1:22-cv-03604, 2022 WL 22329872, at *1 (D.D.C. Dec. 8, 2022) ("[S]elf-inflicted injuries do not constitute irreparable harm."). The President may not simply ignore the lawful supervisory mechanisms provided by the Appointments Clause and the Library of Congress's statutory and regulatory framework and then insist that the resulting exigencies demand that the courts recognize an unprecedented Article II authority. Courts need not "accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and

equally remediable by—the executive . . . branch." *Noel Canning v. Nat'l Lab. Rels. Bd.*, 705 F.3d 490, 511 (D.C. Cir. 2013); *accord Bowsher v. Synar*, 478 U.S. 714, 736 (1986).

Unsurprisingly, Defendants are unable to locate in the Constitution any "background rule," Defs.' Opp. at 23, that the President may directly remove an inferior officer any time he has created the purported need for such direct supervision by failing to properly appoint a principal officer or acting principal officer. Defendants point to *Free Enterprise Fund, Collins v. Yellen*, and *Seila Law LLC v. Consumer Finance Protection Board*, but are not helped by those cases. *Cf.* Defs.' Opp. at 22–23. Those cases simply reaffirm that the President must be able to supervise agencies— but the President has that ability here, as explained above.

*First*, *Free Enterprise Fund* stands for the proposition that officers of the United States must be removable by *either* the President "or a subordinate he could remove at will"—*i.e.*, a principal officer. 561 U.S. at 495. Here, that condition is satisfied: there is no restriction on the President's ability to remove the Librarian of Congress, a principal officer, or for the Librarian to remove the Register of Copyrights, an inferior officer.

*Second*, *Collins v. Yellen* reaffirms the President's power "to remove the *head* of an agency with a *single top officer*." 594 U.S. 220, 250 (2021) (citing *Seila Law LLC v. CFPB*, 591 U.S. 197, 228 (2020)) (emphasis added). It does not purport to affect the removal procedure as to inferior officers. Nor does the precedent upon which *Collins* relies. For example, *Shurtleff v. United States* makes clear that the President has removal power as to "an inferior office created by statute" only where "Congress has regarded the office as of sufficient importance to make it proper to fill it by an appointment to be made by the President and confirmed by the Senate." 189 U.S. 311, 315 (1903). In other words: the removal power is coextensive with the congressionally assigned appointment power, which here is not vested in the President.

Third, Seila Law acknowledges that under certain circumstances inferior officers may be insulated from Executive removal.  591 U.S. at 217.  It also reaffirms "the landmark decision Myers v. United States."  Id. at 204 (citing Myers, 272 U.S. 52, 47 (1926)).  Myers, in turn, held that "[t]he authority of Congress given by the excepting clause to vest the appointment of such inferior officers in the heads of departments carries with it authority incidentally to invest the heads of departments with power to remove," which the President holds only where Congress "does not exercise that power."  Myers, 272 U.S. at 161.  Seila and Myers are therefore inapposite here, where Congress has vested the power to appoint the Register in the Librarian of Congress.

In short, no case cited by Defendants supports their extraordinary claim that the President has sweeping Article II authority to disregard the supervisory mechanisms that Congress has provided in the exercise of its own constitutional authority to provide for appointment and removal of inferior officers.

## II.    Ms. Perlmutter Will Continue to Suffer Immediate and Irreparable Harm Absent Preliminary Relief

In this case, as in similar recent cases addressed by the D.C. Circuit, Ms. Perlmutter's irreparable harm flows directly from the fact that her purported removal by the President was contrary to law.  See, e.g., Harris v. Bessent, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc) ("irreparable injury" turned on whether the plaintiffs' removal was proper under Humphrey's Executor v. United States, 295 U.S. 602 (1935), and Wiener v. United States, 357 U.S. 349 (1958)); Aviel II, No. 2025 WL 1600446, at *2 n.2 ("Although the Supreme Court issued a stay in Harris and a companion case, its merits ruling rested on the proposition that the removals at issue in those cases were likely lawful."); English v. Trump, 279 F. Supp. 3d 307, 333 (D.D.C. 2018) (Kelly, J.) ("Courts have held that the presence of irreparable harm can depend on whether the movant is likely to succeed on the merits.").  Ms. Perlmutter's purported ouster is part

14

and parcel of the President's unlawful assault on the institutional independence and integrity of

the Library, in derogation of Congress's specific choices about how the Library should function.

She has every right to assert it as a basis for equitable relief. It is therefore impossible in this case,

as it was in *Aviel II* and other similar cases, to assess Perlmutter's irreparable harm separately from

the merits of her claims, and Defendants are wrong in contending that this Court should ignore the

merits in its consideration of irreparable harm. Defs.' Opp. at 25.

### A. The unlawful removal of Ms. Perlmutter is causing serious injury to Ms. Perlmutter and the Copyright Office

Defendants principally rely on *Wilcox* to support their argument that a President's ouster

of a federal official can never inflict irreparable harm on the ousted official, Defs.' Opp. at 27, but

that reliance is wholly misplaced. To be sure, the question in *Wilcox* was, as it is here, whether

the President has the authority to interfere in the agency's operations by firing the official in

question. *Wilcox* made clear that if the President does possess that power (in other words, if the

President is likely to succeed on the merits), then the harm to the President of being saddled with

an executive officer he does not want poses a greater risk of harm than "an order allowing a

removed officer to continue." *Trump v. Wilcox*, 145 S. Ct. 1415 (2025); *accord* Per Curiam Order

at 4, *U.S. Inst. of Peace v. Jackson*, No. 25-5185 (D.C. Cir. June 27, 2025) (granting the

government's requested stay because the government was likely to succeed on the merits, and as

such "[t]he President face[d] irreparable harm from not being able to fully exercise his executive

powers" (citing *Wilcox*, 145 S. Ct. at 1415)). But *Wilcox* does not remotely support Defendants'

extraordinary assertion that an improperly ousted federal official can never establish irreparable

harm. To the contrary, the Court's analysis of irreparable harm in *Wilcox* was derivative of its

analysis of the merits. As the D.C. Circuit has made clear in *Aviel II*, irreparable harm *can* be

shown where the ouster of an official threatens an agency's institutional prerogatives and ability

to function in the manner that Congress intended. In such cases, the harm to the individual officeholder and to the institution itself are one and the same. Indeed, in weighing the claimed harms to the parties, the Supreme Court in *Wilcox* expressly considered *institutional* harm to the President. The harm to the President flowing from "an order allowing a removed officer to continue exercising the executive power," 145 S. Ct. at 1415, is harm to the *office* of the President, not merely harm to the President personally. The D.C. Circuit followed suit in *Jackson*, weighing the "irreparable harm" to the President from "not being able to fully exercise his executive powers." Just as the central harm from the President's perspective in such unlawful-removal cases concerns the institutional prerogatives of the President, so too does the central harm from the officer's perspective concern the institutional prerogatives of the office and the agency. That sort of institutional harm to the agencies in question (the NLRB and MSPB) was not present in *Wilcox*—and was outweighed by likely harm to the President's institutional prerogatives—because the President likely does possess the authority to remove the officials in question and therefore no disruption of the agencies' institutional prerogatives occurred when he exercised that authority. But this case is the polar opposite.

Indeed, Ms. Perlmutter's purported ouster inflicts precisely the kinds of harms that courts in this District have found sufficient to justify preliminary equitable relief. The effort to oust her directly threatens the Library's and the Copyright Office's institutional prerogatives and ability to function in the manner Congress intended. Congress provided that the Register would be supervised directly by the Librarian—not the President. Because the Librarian is subject to Senate confirmation, the person who holds that office will, by definition, be someone acceptable to (and vetted by) the Legislative Branch. By unlawfully installing his own Librarian of Congress and then purportedly firing the Register, the President is harming both the Library and the Copyright Office's ability to perform their assigned functions as Congress intended. And Congress's

purposeful choice to locate the Library in the Legislative Branch, and to place the Copyright Office within the Library, heightens those institutional concerns.

When Defendants posit that cases such as *Aviel I* and *Berry v. Reagan* require that an agency must be becoming "virtually or literally non-existent" in order for its leaders to secure preliminary relief, Defs.' Opp. at 34, they betray a crucial misunderstanding of irreparable harm as viewed across branches of government. Whether or not a deprivation of Ms. Perlmutter's personal "statutory right to function" is *by itself* irreparable, the harm to the ability of the Library and the Copyright Office to function as non-partisan advisors to Congress (as Congress intended) is irreparably compromised by the President's attempt to oust Ms. Perlmutter as Register as part of the Executive's unprecedented effort to assert complete control over the Library's functions and operations.

Congress has not ceded to the Executive Branch unilateral authority to appoint an official to lead the Library, in view of the Library's many sensitive responsibilities to Congress. Nor is Congress likely to confirm a high-ranking Justice Department official such as Mr. Blanche to lead a legislative entity charged with the provision of neutral, technical advice to the legislature that stores confidential "Congressional correspondence and other materials relating to work performed in response to or in anticipation of Congressional requests." *See* Pl.'s Br. at 31–32. Viewed through this lens, what Defendants dismiss as speculative harm—*e.g.*, "unlawful[] access [to] the Library of Congress's confidential records" and the deposits of copyrighted "works safeguarded in the Copyright Office," Defs.' Opp. at 35—is *per se* unlawful. Access to the Copyright Office's files by unconfirmed Executive officials outside the established line of succession must not be permitted because Mr. Newlen and Ms. Perlmutter are their lawful stewards; this is true whether the Court prevents their access now or months from now. Interim Justice Department access will damage the credibility and reliability of the institution as a non-partisan advisor, jeopardize the

security of the copyright registration system and the value of the deposited works, place confidential congressional correspondence and work product at risk, and preclude Ms. Perlmutter's effective return to the institution she is charged with safeguarding.[4] *See Harris v. Bessent*, 1:25-cv-00412, 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025), *reh'g en banc denied*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (harm to the officer is irreparable where "the inability to pursue her 'statutory mission'" is "such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief").

Contrary to Defendants' contentions, this case is also on all fours with numerous other cases in this District finding irreparable harm when an officer is improperly removed. *See, e.g.*, *Grundmann v. Trump*, No. 1:25-cv-00425, — F. Supp. 3d. —, 2025 WL 782665, at *17 (D.D.C. Mar. 12, 2025) (Sooknanan, J.) (concluding that the removed chair of the Federal Labor Relations Authority had established irreparable harm); *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (concluding the same regarding the removal of members of the United States Commission on Civil Rights); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 1:25-cv-00542, 2025 WL 1454010, at *1 (D.D.C. May 21, 2025) (Walton, J.) (concluding the same for members of PCLOB). Defendants contend that such cases are distinguishable because they concerned Senate-confirmed appointees to non-partisan roles. Defs.' Opp. at 29–30. That misses the point. Those decisions recognize that the President's unlawful removal of officials can inflict an institutional injury to the agencies' ability to function as Congress intended, and that injury is

---

[4] Indeed, Members of Congress have expressed significant concern related to the possibility of unlawful access to the Library of Congress's systems, including that "the Department of Government Efficiency (DOGE) or other executive branch entities have requested or otherwise attempted to access or review Library data, including but not limited to communications between the Congressional Research Service and congressional offices." *See* Letter from Reps. Joseph D. Morelle, Rosa L. DeLauro, Adriano Espaillat, Terri A. Sewell, Norma J. Torres, and Julie E. Johnson, to Kimberly Benoit, Libr. of Cong. Inspector Gen. (May 12, 2025), https://perma.cc/QVF3-CYJ8; *see also* Pl.'s Br. at 32 n.10.

remediable by reinstatement.  The institutional injuries in those cases arose from the officials'
statutory right to independence, but the decisions did not suggest that statutory independence is
the *only* possible source of such injury.  Here, as discussed above, Congress has purposefully
ensured that the President may not exercise unilateral authority over the Register: the Register of
Copyrights is supervised by the Librarian of Congress, who is a Senate-confirmed appointee to a
non-partisan role (or an officer in the congressionally directed line of succession), and the office
of the Librarian is not subject to the executive authority conferred by the FVRA.  By disregarding
that legal framework, the President has interfered with the Library's institutional prerogatives, just
as clearly as in the decisions discussed above.

### B.    Ms. Perlmutter's removal is an "extraordinary situation"

For all the foregoing reasons, this is precisely the type of "extraordinary situation"
contemplated in *Sampson v. Murray*.  415 U.S. 61, 92 n.68 (1974).  *Sampson* dealt with the
termination of an Executive line employee, not an officer whose firing raises significant separation
of powers and institutional concerns.[5]  Here, by contrast, the harm to Ms. Perlmutter is not
monetary and cannot be remedied by the recovery of lost income, as might be the case in garden-
variety employment disputes.[6]  *See Harris v. Bessent*, No. 1:25-cv-00412, 2025 WL 521027, at *6
(D.D.C. Feb. 18, 2025) (*Sampson*'s consideration of giving the government the "widest latitude in
the dispatch of its own internal affairs" is "minimized in the context of an action that at this stage
appears to be nakedly illegal, such that the Government's range of options is necessarily

---

[5] It is not clear that *Sampson* is even the relevant framework here, where Ms. Perlmutter is
decidedly *not* an Executive Branch employee.  This fact, too, weighs in favor of a determination
that preliminary injunctive relief is warranted here.

[6] While at earlier stages in this litigation Defendants argued that Plaintiff "can obtain monetary
relief in the form of back pay" upon a finding that her removal was unlawful, *see* ECF No. 7 at 20,
Defendants appear to have abandoned that argument.  Conspicuously, Defendants present no
explanation as to how, under their theory, Plaintiff's harm *is* remediable.

constrained."); *Berry*, 1983 WL 538, at *5 n.4 ("In *Sampson*, the Supreme Court considered the disruptive effect of the grant of injunctive relief on the administrative process. However, it is equally important to examine the disruptive effect of a denial of such relief.").

### C.    Ms. Perlmutter has a statutory right to function as Register

Notwithstanding Defendant's objections, the deprivation of Ms. Perlmutter's statutory right to function as Register of Copyrights would also be, by itself, sufficient to establish irreparable harm. Her inability to carry out a congressionally directed mission transcends the loss of income or reputational harm involved in the typical employment action,[7] as underscored by the position's "high importance," *see Wilcox v. Trump*, No. 1:25-cv-00334, — F. Supp. 3d at —, 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025), and "weighty responsibility" requiring the application of the Register's expertise, *see LeBlanc*, 2025 WL 1454010, at *30. Ms. Perlmutter is irreparably harmed by her inability to lead and direct the important work of the Copyright Office in a position of unique importance. *See* Perlmutter Decl. ¶¶ 7, 14, ECF No. 24-3 (listing statutorily mandated duties of Register of Copyrights).

As demonstrated above, Defendants misread the Supreme Court's non-precedential order in *Wilcox* to "reject" the "statutory right to function" "theory of injury as a sufficient basis for preliminary injunctive relief." *See supra* at 15–16. In a similar vein, Defendants deny that the D.C. Circuit decided what it did following *Wilcox*: *i.e.*, reject the government's stay request in

---

[7] In their response, Defendants repeat their previous claim that "the deprivation of a unique, singular, or high-level position is [not] somehow a more irreparable injury." ECF No. 7 at 19; Defs.' Opp. at 28. But, as Plaintiff previously explained, *see* ECF No. 9 at 16–17, the plaintiffs in the cases cited by Defendants do not allege any harm beyond the traditional harm an employee suffers by loss of employment that can later be remedied at law. *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998) (alleging loss of income and reputation); *Farris v. Rice*, 453 F. Supp. 2d 76 (D.D.C. 2006) (alleging loss of income, forced retirement, and difficulty obtaining other employment); *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987) (alleging loss of ability to gather information in support of litigation).

*Aviel II* and conclude that the *Wilcox* Court "did not separately address the question whether reinstatement would have been an appropriate remedy if the removals at issue were unlawful," such that this Circuit's "*en banc* order is the last word on that question."[8]   *Aviel II*, 2025 WL 1600446, at *2; *see also* Defs.' Opp. at 29.  *Aviel II* therefore leaves available in this Circuit a post-*Wilcox* statutory-right-to-function theory of irreparable harm, which is particularly apt in the wake of a blatantly improper removal.

### D.    The equitable factors strongly favor preliminary relief

For the above reasons, the balance of the equities and the public interest heavily favor an injunction.  And on the other side of this balance, Defendants will not be harmed by the maintenance of the *status quo ante*,[9] in which Plaintiff, who has faithfully served as the Register of Copyrights for nearly five years, continues to fulfill her statutory role as an advisor to Congress and steward of the copyright system.

Defendants contend that preliminary relief here will "mark a severe intrusion into the President's authority to exercise 'all of' the 'executive Power' of the United States."  Defs.' Opp.

---

[8] The D.C. Circuit's stay decision three months ago in *Dellinger* similarly does not mean that the President always prevails in the assessment of irreparable harm.  In *Dellinger*, the court concluded that the risk of "the potential injury to the government of . . . having its designated [acting official] sidelined" was greater than the risk that the plaintiff "[a]t worst, . . . remain out of office for a short period of time."  *Dellinger v. Bessent*, 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025).  The balance of the equities is different here, where the President does not have the authority to appoint (or remove) the Register of Copyrights, and there is no indication that Ms. Perlmutter would remain out of office for a short period of time—absent preliminary relief, Ms. Perlmutter would remain unable to function for the pendency of this suit.

[9] Contrary to Defendants' characterization, Defs.' Opp. at 9, 26, 36, Plaintiff does not seek a mandatory injunction that would alter the status quo.  "The status quo is the last *uncontested* status which preceded the pending controversy."  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).  "Courts also have awarded preliminary injunctions when it is necessary to compel defendant to correct injury already inflicted by defining the status quo as 'the last peaceable uncontested status' existing between the parties before the dispute developed."  *Id.* at 733–34. Plaintiff simply seeks relief that would confirm the state of affairs before this dispute developed.

at 36.  But as explained above, the President does not have the authority to unilaterally appoint an acting Librarian of Congress nor to appoint or remove the Register of Copyrights, and therefore faces no "intrusion" to his "executive Power."  As another judge in this District found in *Rural Development Innovations Limited*, a preliminary injunction is not an "intrusion" on the President's authority where "the President has likely exceeded his authority" in making an unlawful appointment.  *Rural Dev. Innovations Ltd.*, 1:25-cv-01631 at *14.  Defendants also posit that a preliminary injunction "would only serve to muddy the waters," Defs.' Opp. at 36 (quoting *English*, 279 F. Supp. 3d at 337).  However, in *English*, an injunction that would install the plaintiff as the acting Director would not have provided additional clarity because "the CFPB has recognized [the defendant] as the acting Director, and it is operating with him as the acting Director."  *English*, 279 F. Supp. 3d at 337.  That is not the case here.  Because "[t]here is little question that there is a public interest in clarity here," *id.* at 336–37, so that the Copyright Office may continue its important work without impediment, and so that there is no question as to the validity and reliability of the Copyright Office's actions, the balance of the equities and public interest cut decisively in favor of Plaintiff.

## III.    Ms. Perlmutter Is Entitled to Relief

### A.    Ms. Perlmutter need not proceed by writ of quo warranto

This Circuit's precedent forecloses Defendants' argument that Plaintiff must proceed by writ of quo warranto.  *SW Gen., Inc. v. Nat'l Lab. Rels. Bd.*, 796 F.3d 67, 81 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017); *Andrade v. Lauer*, 729 F.2d 1475, 1497 (D.C. Cir. 1984).  "In its traditional form, the de facto officer doctrine" entirely barred "'collateral' attacks" on an officer's *actions* but permitted "direct attack[s]" on an officer's *qualifications* "via writ of quo warranto only."  *SW Gen.*, 796 F. 3d. at 81.  "A collateral attack challenges government action on the ground that the officials who took the action were improperly in office."  *Id.* (cleaned up).  "A direct attack,

by contrast, challenges the qualifications of the officer, rather than the actions taken by the officer." *Id.* (cleaned up).

The D.C. Circuit "has *rejected* the traditional version of the de facto officer doctrine" and has "disapprove[d] of any interpretation of the de facto officer doctrine that would render legal norms concerning appointment and eligibility to hold office unenforceable." *Id.* (cleaned up, emphasis added). Under this Circuit's precedent, "collateral attacks on an official's authority are permissible when two requirements are satisfied: First, the plaintiff must bring his action at or around the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office." *Id.* at 81–82 (cleaned up).

Here, Plaintiff's challenge is a "collateral attack." Plaintiff challenges Mr. Blanche's *actions*—his purported ratification of the President's attempt to remove Plaintiff from her position. *See Andrade,* 729 F.2d at 1480, 1497 (construing as a collateral attack a challenge to a "reduction in force" ordered by officials allegedly "occupying their offices in violation of the Appointments Clause of the Constitution"). And Plaintiff meets both requirements to collaterally attack Mr. Blanche's attempt to remove her. First, Plaintiff has brought her challenge 11 days after Mr. Blanche's action. Second, Defendants had notice of the defect in Mr. Blanche's claimed right to office. *See* ECF No. 2-3 at 3–4 (Mr. Blanche's purported appointees were never given access to the Library or Copyright Office); *see also* Press Release, Sen. Alex Padilla, *Ranking Members Padilla, Morelle Condemn Trump Administration's Brazen Attempt to Take Over Library of Congress* (May 12, 2025), https://perma.cc/72WU-SEQW; Hillel Italie and Seung Min Kim, *Deputy Attorney General Who Defended Trump in Hush Money Trial is Named Acting Librarian of Congress*, Assoc. Press (May 12, 2025), https://perma.cc/BK6F-4LCE.

### B.      Ms. Perlmutter has demonstrated that she is entitled to the requested relief

Plaintiff is not seeking reinstatement to her office, as she has never properly been removed. Rather, she requests that the Court maintain the status quo—in which she remains the Register of Copyrights—and allow her to fulfill her duties as such.  But even if she were seeking reinstatement, courts are empowered to issue injunctions that require subordinate Executive officials to treat a wrongly removed official as the *de facto* holder of their position.  *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *44 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting), *vacated on reconsideration en banc*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ("Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are well known to the law."); *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *see also Sampson*, 415 U.S. at 71; *Service v. Dulles*, 354 U.S. 363, 370, 389 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant the requested preliminary injunction.


Dated: July 1, 2025                                         Respectfully submitted,

                                                                        */s/ Allyson R. Scher*
                                                                        Brian D. Netter (D.C. Bar No. 979362)
                                                                        Allyson R. Scher (D.C. Bar No. 1616379)
                                                                        DEMOCRACY FORWARD FOUNDATION
                                                                        P.O. Box 34553
                                                                        Washington, DC 20043

(202) 448-9090
bnetter@democracyforward.org
ascher@democracyforward.org

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
donald.verrilli@mto.com
ginger.anders@mto.com

Kuruvilla J. Olasa (admitted *pro hac vice*)
James R. Salzmann (admitted *pro hac vice*)
Miranda E. Rehaut (admitted *pro hac vice*)
Adeel Mohammadi (admitted *pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100
kuruvilla.olasa@mto.com
james.salzmann@mto.com
miranda.rehaut@mto.com
adeel.mohammadi@mto.com

*Counsel for Plaintiff*