# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SHIRA PERLMUTTER,

     Plaintiff,

  v.

TODD BLANCHE, in his official capacity as
Acting Librarian of Congress,

     Defendant.

Case No. 1:25-cv-1659 (TJK)

# DECLARATION OF ALVARO E. SIMAN

## *IN SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE*

I, Alvaro E. Siman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I am the proposed Amicus Curiae in this matter. I am over eighteen years of age and competent to testify to the matters stated herein. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently thereto.

2.    I am an architect, historian, and industrial manufacturer trained in historiography. My academic work focuses on eugenics, scientific racism, and their corresponding laws. I am also a luthier—a builder of stringed musical instruments—and the owner of A.E. Samaan LLC, which operates under the BERLEZ brand.

3.    Attached hereto as **Exhibit A** is a true and correct copy of my Affidavit entitled "*Same Hands / Unclean Hands — Civil Rights Affidavit Before the U.S. Copyright Office & the USPTO.*" This Affidavit was executed under oath before a notary public and has been filed with the United States Patent and Trademark Office.

RECEIVED
Mailroom

APR 15 2026

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

4. The Affidavit documents my direct experience with the United States Copyright Office and the United States Patent and Trademark Office. It sets forth the circumstances of my copyright applications, the denials I received under the "useful articles" doctrine, the civil rights violations I experienced across both agencies, and the historical origins of the doctrines under which those denials were issued.

## Relevance to This Proceeding

5. The Affidavit was created for my dispute with the Copyright Office and USPTO. I provide it to this Court not because that dispute is before this Court, but because it demonstrates the *character* of the Copyright Office as it actually operates.

6. As set forth in the accompanying Motion for Leave and proposed Brief, the employment question before this Court depends on antecedent determinations regarding the institutional character of the Copyright Office. If the Copyright Office merely registers property, it exercises ministerial power. If it adjudicates who qualifies as an author and what qualifies as protectable expression—applying doctrines it authored, under standards it devised, with consequences it administers—it exercises power that extends beyond registration.

7. The Affidavit provides direct evidence of that character. It documents an institution that denies constitutional rights under doctrines that have never been examined for constitutional infirmity, acquires works through compelled deposit after denying protection, and resists accommodation requests while maintaining procedures inaccessible to those it is obligated to serve. The Court's determination of the employment question will inevitably affect how this institution continues to operate.

8. I am one person. The Affidavit documents one case. But the doctrines at issue affect entire communities—Indigenous peoples whose collaborative cultural works are categorically excluded, disabled creators whose mediated expression is penalized, practitioners of non-Western art forms whose traditions do not conform to Victorian constructs of "romantic authorship." These communities have no voice in this litigation. They will live with its consequences.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____ 4/13 _____, 2026

_____
Alvaro E. Siman, *Pro Se*
221 Donax Ave – Unit 1
Imperial Beach, CA 91932

# BEFORE THE U.S. COPYRIGHT OFFICE & THE USPTO
## "SAME HANDS" / "UNCLEAN HANDS"
## CIVIL RIGHTS AFFIDAVIT:
### SYSTEMATIC EXCLUSION, AND THE CONSTITUTIONAL THRESHOLD
EDITED AND OPTIMIZED FOR SUBMISSION TO THE LIBRARY OF CONGRESS
THIS VERSION SUPPLEMENTS AND SUPERSEDES USPTO VERSION: N417: 75170979 OF 4/6/2026

In re Patent Application No. 17/461,021
In re Trademark Application Serial Nos. 98308517 (CAIRN),
In re Trademark Application Serial Nos. 98308550 (STELAE),
In re Trademark Application Serial Nos. 98308501 (MENHIR)
In re Copyright App. S.N.: 1-10838135591 (Sculptural Design for Guitar Body)
In re Copyright App. S.N.: 1-10903192001 (Sculptural Design for Stringed Instrument Body)
In re Copyright App. S.N.: 1-11494846251, July 8, 2022: Berlez Bass Font
DOJ Case. No.: 740459-NDX

# IDENTITY AND COMPETENCE
# SCOPE AND PURPOSE OF THIS AFFIDAVIT

I, Alvaro E. Siman, am the applicant in the above-referenced matter and have personal knowledge of the facts stated herein. This affidavit presents a documentary record of agency conduct following a Civil Rights complaint.

This affidavit also identifies the historical origins of legal frameworks that are the predictable cause of disparate outcomes. Peer-reviewed, education level controlled, studies document a 39-to-1 disparity in patent grants for African-American inventors, 24% lower grant rates for Black inventors generally, and reduced approval for feminine-sounding names.

Conscious racial animus by thousands of federal employees strains credulity. The inaccessible systems, exclusionary doctrines, procedural complexity are compounding barriers working across several layers that explain the marked disparity documented in the peer-reviewed studies.

- **Chapter I** documents the USPTO's adverse actions following the Petitioner's Civil Rights complaint: selective non-docketing of civil rights correspondence, unauthorized attorney appearance, record tampering, and potential conflicts of interest. These are examples of agency conduct, not the totality.

- **Chapter II** extrapolates the Constitutionality of the exclusionary legal frameworks: the "useful articles" and "romantic authorship" doctrines that control U.S. intellectual property law.

- **Exhibit A** substantiates that the same judicial hands which authored these discriminatory legal frameworks, also authored the now-condemned Native American wardship and Civil Rights Cases of their era.

## A Warning and a Question

The Petitioner does not ask the bench to take his word for the constitutional deficiencies of the doctrines at issue. Justice Oliver Wendell Holmes Jr. warned against them in 1903. Justice William Orville Douglas questioned them in 1954.

Justice Holmes's warnings went unheeded; Justice Douglas's question remains unanswered. The harm to at-risk communities has compounded across the intervening decades.

**A Note on Expertise:** The Petitioner does not claim expertise in jurisprudence. Legal standards are summarized so that affected communities — Native American, Pacific Islander, African-American, disability advocates — may understand the mechanisms of cultural exclusion. The Petitioner is an architect, historian, and industrial manufacturer trained in historiography. His academic work focuses on eugenics, scientific racism, and their corresponding laws. The late Garland E. Allen, founding editor of the *Journal of the History of Biology*, was his mentor.

# CHAPTER I
## RECENT FACTS AS EXAMPLES OF AGENCY CONDUCT

This chapter documents what occurred when an applicant with a visual impairment exposed the USPTO's non-compliance with longstanding Federal laws that otherwise ensure equal access to the less-able. The facts cited herein — USPS tracking numbers, N417 receipts, docket snapshots, email timestamps — are the agency's own records.

The sequence establishes two facts:

- The USPTO's public-facing systems lack rudimentary accessibility features required by Sections 504 and 508 of the Rehabilitation Act.

- Requesting accessibility accommodation demonstrably triggered escalating adverse action: record tampering, non-docketing of civil rights correspondence, retroactive reclassification, unauthorized attorney appearance, and senior attorneys and supervisors doubling down on the due process denials of their subordinates.

What this pattern reflects is preserved for judicial determination.

## The Documented Vacancy of Compliance

The USPTO maintains an $879 million reserve (2025 disclosure), projected to exceed $1.249 billion by 2026 per the agency's statements. Its budgets document allocations for travel, entertainment, and employee bonuses. They document zero dollars for public-facing Section 504/508 compliance so the less-able can have equal access to their systems.

Other similarly sized federal agencies prioritize accessibility compliance and advertise it.

USPTO text data and black-and-white diagrams — seemingly overwhelming in the 20th century — are minuscule by 21st-century standards. USPTO Trademark XML data fits on a $1 thumb drive. Combined Patent and Trademark XML data fits on a $150 portable hard drive. The Petitioner requested both as workarounds for non-compliant interfaces and offered to supply his own drive and pay for the shipping expenses.

Both should be a single, indexed, queryable XML file. Modern databases (BaseX, eXist-db) handle corpora orders of magnitude larger. The USPTO fragments its XML into 2,500+ separate files.

Concerted download attempts using advanced scripting by two independent AI systems each concluded the task was futile. The October 2025 FOIA Appeal, F-25-00502 and the November 10, 2025 AFFIDAVIT — Digital Access Denials (N417: 73116200) document the extent of USPTO digital system inaccessibility:

- TEAS presents 87+ navigation links per screen, exceeding Miller's Law cognitive limits by 1,240%. Patent search rates at a 47% compliance.

- Adobe Acrobat has provided one-click accessibility compliance for decades. The MPEP has 17,596 WCAG 2.1/ISO 14289-1 violations, including 8,274 missing alt-text descriptions.

- Patent search crashes after two queries. USPTO data is more accessible through Google.

**The Petitioner requested accommodation:** a $1 thumb drive onto which the agency could copy existing XML data. This is a fifteen minute task for an entry-level IT staffer. Instead, USPTO attorneys spent months finding reasons to deny the request. (FOIA Requests F-25-00502, F-25-00504, F-26-00027; Appeals A-26-00001, A-26-00003)

That first request was part of a July 2025 petition the Trademark legal department insisted the Petitioner pay for. That petition has never been answered. The USPTO has never disputed that this characterization of its non-compliance and barriers to rudimentary accessibility accurately describes its systems.

### An Impaired Person's Request for Help – Persistent Non-Response

A total of five petitions have been filed requesting assistance. Zero have received substantive response. Most of these petitions were reclassified and rerouted to departments with no authority to adjudicate Civil Rights complaints.

The Director-level Rehabilitation Act petition was filed under 37 C.F.R. § 1.181(a)(3) and classified PET.OP. The agency reclassified it to PET.SPRE — rerouting the Civil Rights complaint to a Technology Center with no Civil Rights jurisdiction, and whose staffers are named parties in the Civil Rights complaint. Applicants cannot select PET.SPRE. The reclassification was the agency's act. This affidavit will establish that the pattern and practice repeated with subsequent filings.

### Was it an Insult or a Policy Statement?

The Petitioner first disclosed his limitations via multiple USPTO satisfaction surveys in 2023 pursuant to 28 C.F.R. § 35.106. He disclosed his ethnic-minority, immigrant, *pro se* status via fax to Examiner Bodendorf for Patent Application No. 17/461,021 on May 12, 2023.

On May 22, 2024, when the Petitioner reiterated his limitations, Examiner Bodendorf replied by stating the Petitioner had a "better chance of successfully climbing Mt. Everest with nothing more than a bottle of water and flip flops" than successfully prosecuting the application. (Paraphrased)

Two years of prosecution proved this to be policy statement. A year of petitions and pleadings have cited this statement. Neither the USPTO nor Bodendorf have disputed it.

## UNAUTHORIZED ATTORNEY APPEARANCE

On March 3, 2026, Examiner Bodendorf conducted an interview listing Corey D. Hawse of Nixon Vanderhye as "Attorney of Record" for the Petitioner. The Petitioner did not authorize this appearance. A March 23, 2026 retrieved Patent Center docket confirms there is no Power of Attorney on file allowing Hawse to represent the Petitioner. The Petitioner learned of the meeting only upon receiving the Interview Summary via ordinary mail. (See Exhibit B - PTOL-413)

Nixon Vanderhye P.C.'s website identifies Hawse as a former USPTO patent examiner. USPTO records confirm Hawse and Bodendorf both worked within Technology Center 3700. TC Director Marivelisse Santiago-Cordero supervises TC 3700. Both Santiago-Cordero and Bodendorf are named parties in the pending Civil Rights complaint, a fact whose pertinence will be clarified below.

A cease and desist was sent to Hawse and senior partners H. Warren Burnam Jr. and John R. Lastova via email, fax, and USPS Certified Mail on March 23, 2026, requesting explanation within ten days. Email read receipts confirmed delivery. (N417: 75070117) No response was received.

Nixon Vanderhye claims thirty years representing Nintendo, which holds motion-tracking sensor and sports gaming patents competing with the Petitioner's applications.

## MATTERS REQUIRING USPTO CLARIFICATION

The USPTO employees that conducted the interview with Hawse were the subject of pending recusal requests which had been ignored. The Request for Recusal of Examiner Bodendorf and Art Unit 3715 was filed October 21, 2025 via Patent Center and USPS Certified Mail to SPE Xuan M. Thai (Tracking No. 9589 0710 5270 3273 0368 65) and Bodendorf (Tracking No. 9589 0710 5270 3273 0368 58). No response has been received.

Requests for neutral-party assignment were escalated through a November 10, 2025 Director-level Petition, a Supplemental Petition, and a Request for Reconsideration. All were silently reclassified after docketing without notice. The Director-level petition was rerouted to TC Director Marivelisse Santiago-Cordero of Technology Center 3700.

TC Director Santiago-Cordero's December 31, 2025 pleading purported to respond by fabricating

a deadline from an unrelated September 2025 Office Action Reply rather than the November 2025 Civil Rights petition. The Petitioner rebutted this in the February 23, 2026 REQUEST FOR RECONSIDERATION (N417 Receipt: 74583381). Santiago-Cordero has decades of experience as the Director for a Technology Center that oversees dozens of Art Units and thousands of employees. TC Director Santiago-Cordero has not contested the rebuttal challenging her lack of subject-matter authority over civil rights matters per MPEP § 1002.02(b); 37 C.F.R. § 1.181(a)(3); 28 C.F.R. § 39.170(f)(3).

A separate notice was issued by Vernon A. Towler, a Legal Instruments Examiner (OTOR), on the fabricated predicate that the Civil Rights complaint had not been signed. It had.

The Recusal Request for Supervisor Thai and Examiner Bodendorf was also silently reclassified after docketing. Filed as "Miscellaneous Incoming Letter," the docket now shows "Applicant Response to Pre-Exam Formalities Notice" — a code for ministerial deficiencies the Petitioner cannot select. A recusal invokes constitutional due process and 5 C.F.R. § 2635.502.

As of this date: 173 days since Recusal Request, 153 days since Director-level Civil Rights petition. 5 U.S.C. §§ 555(b) and 555(e) require response. Neither has received a substantive response.

**Docket Integrity as a Matter of Law**
The integrity of the record is not a procedural nicety. Federal law makes no distinction between the sanctity of a criminal court docket and an administrative agency record when it comes to alteration or falsification. A patent application docket is a federal administrative record. It is the documentary basis upon which property rights are adjudicated, appeals are evaluated, and judicial review proceeds.

- 18 U.S.C. § 1519 prohibits the alteration of records "in relation to or contemplation of any such matter or case."

- 18 U.S.C. § 1505 prohibits obstruction of "the due and proper administration of the law under which any pending proceeding is being had before **any department or agency**"

These are not allegations. They are comparisons between USPTO-generated N417 Receipts —

which document what the applicant filed — and subsequent docket entries retrievable from Patent Center. The discrepancies are the agency's own records contradicting each other.

## BROADER PATTERN OF DOCKETING ANOMALIES

The pattern is consistent across Patent and Trademark divisions. Each incident involved Civil Rights documentation that could not be mistaken as routine examination:

- **Post-Docketing Alteration — Director Petition Reclassified:** Filed November 10, 2025 as PET.OP. N417 confirms. Docket shows PET.SPRE. Applicants cannot select PET.SPRE. Routed to the accused office. Dismissed December 31, 2025 by TC Director Santiago-Cordero — without jurisdiction over civil rights claims.

- **Post-Docketing Alteration — September 2025 Filing Reclassified:** Filed September 23, 2025 as LET. N417 confirms. November 16 snapshot: LET. January 21 snapshot: REM. Same date, page count, file size — only classification changed.

- **Selective Docketing — tmfeedback Exchange:** September 19–23, 2025 email exchange with Trademark Petition Office attorney utilizing an anonymous email to transact Civil Rights claims absent from CAIRN, MENHIR, and STELAE dockets despite explicit docketing requests.

- **Selective Docketing — Molinoff Exchange:** August 22, 2025 correspondence regarding ignored sworn evidence and off-the-record examination. Exchange terminated by out-of-office reply minutes after substantive engagement.

- **Selective Docketing — Sanok Response:** March 4, 2026 correspondence regarding ignored sworn evidence and off-the-record examination containing Section 504 subject matter absent from CAIRN docket as of March 23, 2026.

- **Unauthorized Attorney Interview:** March 3, 2026 Interview Summary — listing unauthorized attorney and Examiner named in civil rights complaint — absent from Patent Center as of March 23, 2026.

- **Controlled Test:** February 2, 2026: Petitioner mailed handwritten affidavit titled "Weaponization of Reading Disability" (USPS Tracking No. 9589 0710 5270 3273 0479 60). Delivery confirmed February 11. February 22: docket showed 173 entries — none dated February 11. February 23: Petitioner filed affidavit documenting absence.

The submission then appeared. Docketed after its absence was documented — not after delivery.

- **Post-Docketing Alteration — Request for Reconsideration Reclassified:** Filed February 23, 2026 as "Miscellaneous Incoming Letter" (N417 #74583381). Docket shows TRAN.LET. A transmittal letter accompanies filings; this was a substantive pleading.

Whether these alterations constitute obstruction (18 U.S.C. § 1505) or record tampering (18 U.S.C. § 1519) is preserved for judicial determination.

### Citation Practices Following Disability Disclosure

The Petitioner's 2023 disclosure of his dyslexia per 28 C.F.R. § 35.106 was compliant with the requirement to put a Federal agency on notice of an applicant's limitations. These disclosures went ignored, so the Petitioner repeated them whenever the opportunity arose. The Petitioner contacted multiple USPTO employees to ask for the public-facing ADA or Rehabilitation Act coordinator. No answer was forthcoming.

After multiple disclosures per 28 C.F.R. § 35.106, Examiner Bodendorf's July 2, 2025 Office Action exhibited citation practices that compound the Petitioner's specific impairment.

The PTO-892 form — the official prior art listing the applicant must respond to — cites Connor US 2015/0075303 but the Office Action text utilizes Connor US 2016/0202755 without notice or explanation as to why the citation claimed is not the citation actually used. The applicant must determine which prior art forms the actual basis of rejection — a task the Examiner's own documents make impossible.

Krysiak appears as US 2011/0118062 on one document, US 2011/0118065 on another. One digit. Two patents. For an applicant with a documented number-transposition processing vulnerability, this practice transforms routine response into a minefield. (See AFFIDAVIT — Obfuscation via Misdirection, N417: 73116200, 11/10/2025.)

The Petitioner's reply documented these discrepancies. They were addressed in the Director-level Civil Rights complaint. Neither the Examiner nor the USPTO has answered.

## The CAIRN Trademark *Sua Sponte* Revival: Senior Attorney Doubles Down

Senior Attorney Advisors do not assume responsibility for routine trademark applications. They do not revive abandoned applications without petitions. They do not replace Office Actions unless something has gone wrong. Self-review is prohibited. Senior Attorney Sanok's involvement followed Civil Rights disclosures specifically documenting her office's failure to docket correspondence and comply with accessibility requirements.

Sanok revived the CAIRN application and replaced the Office Action that had effected an abandonment the Petitioner contested on the basis of due process. The original Office Action failed to address sworn affidavits, expert testimony, industry documentation, and controlling precedent: the LESLIE Cabinet (U.S. Reg. No. 668284) — a Class 015 "musical instrument" registration for a sound-modulating resonant chamber the USPTO has renewed for 47 years.



Sanok's replacement Office Action committed the same violations. No engagement with the sworn evidence. No mention of LESLIE or Roland. The same tangential argument elevated; the central legal issues ignored. The decades old controlling precedent comes from within the USPTO's own

Trademark database. Two Google AI queries demonstrate that the sworn affidavits containing expert testimony and industry write-ups that both Office Actions ignored were easily verifiable.

Dawn Marie Sanok has practiced Trademark law at the highest forum since the 1990s. She holds the title "Senior Attorney Advisor" in the Office of the Deputy Commissioner for Trademark Examination Policy. Court records document more than three decades of experience. (TTABVUE Opposition No. 91083625, filed Oct. 3, 1990)

A trademark attorney with thirty years of experience does not accidentally overlook controlling precedent from her own agency's database. She does not accidentally fail to address five sworn affidavits. She does not accidentally ignore *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) — the foundational requirement that agencies engage with the evidence before them. These are not oversights. These are choices.

Sanok's Office Action was docketed. The complaint the Petitioner provided Sanok — a Notice to Director containing Civil Rights subject matter — was not. The affirmative docketing obligations under 37 C.F.R. §§ 2.25 and 2.191, TMEP §§ 709.04 and 709.05, apply to all correspondence. A Senior Attorney Advisor knows to docket correspondence consequential to the prosecution of a contested application in the midst of a Civil Rights dispute where digital access to the docket is at issue.

**Deceptively Innocuous Behavior:** Both of the CAIRN Office Actions, Sanok's and the original Examiner's, rest on technical determinations about the product's functionality and utility. On what authority does a Trademark Examiner — or a Senior Attorney — make engineering determinations to deprive an applicant of property?

The answer involves doctrines whose constitutional legitimacy is the subject of this affidavit.

### Record Integrity Failure — A Missing Affidavit

MPEP § 716.01 is a binary test. Either the Examiner engages with sworn evidence traversing a rejection, or does not. No statutory interpretation is required to raise concern over due process.

The AFFIDAVIT — Inadequacy of Instant Replay is identified by all pleadings as central to

Patent Application No. 17/461,021. It addresses the heart of the invention: line-of-sight technologies cannot see through human bodies. This is elementary physics. The USPTO — the single greatest concentration of technical knowledge in human history — should not require an affidavit to establish it. Yet Examiner Bodendorf's analysis necessitated supplementing the record with the science his Office Actions conflicted with.

The affidavit failed to upload with its batch, but it was cross-referenced in at least six submitted documents over fourteen months. Anyone encountering repeated references to "AFFIDAVIT — Inadequacy of Instant Replay, filed concurrently" who checked the file would have discovered its absence immediately. The Petitioner's sequencing disorder explains why he the Petitioner didn't notice.

Two explanations exist as to why a seasoned USPTO Examiner did not:

- **First:** the Examiner did not read the submissions.
- **Second:** the Examiner read them but did not engage with their substance.

Neither is acceptable. Both constitute failure to provide meaningful examination. A decade of GAO audits substantiate this assessment. (GAO-16-479, GAO-16-490, GAO-16-478SP, GAO-25-107218.) These studies were cited across multiple pleadings addressed to the Director. (See AFFIDAVIT — Rules-Constrained Compliance Study, N417: 74412050, Feb. 10, 2026; USPS Certified to General Counsel Tiberi: 9589 0710 5270 3273 0480 42; Chief Compliance Officer Covey: 9589 0710 5270 3273 0480 04.)

This evidence is necessary for judicial determinations on why or how the Petitioner's Patent application was derailed by seemingly inexpert analysis of the invention. The Examiner's argument failed to recognize or comprehend, either because he failed to read or understand, that line-of-sight dependent technologies are physically incapable of seeing through solid objects. The rules and statutes commanding that Examiner "consider" sworn affidavits traversing rejections were written to prevent deprivation of due process for lack of diligence or information.

### Evasion of Due Process

When Senior Attorneys replicate the same pattern of non-engagement, the outcomes are predictable. Evasion of due process can only result in the deprivation of due process.

The volume of the Petitioner's submissions was responsive. When Office Actions read as if sworn affidavits, expert testimony, and controlling precedent do not exist, the applicant must restate, supplement, and document.

The record's size reflects the Examiner's non-engagement, not the Petitioner's litigiousness. Throughout the examination, Office Actions do not acknowledge, address, or engage any sworn affidavit submitted under 37 C.F.R. § 1.132. No petition has ever been answered.

## CONTINUED ASSIGNMENT OF NAMED PARTIES

The following issues arise from the current personnel assignment and are preserved:

1. The questions of recusal — why any of the staffers that are named parties in the Civil Rights complaint remain assigned to the complainant's applications and petitions?

2. Vernon A. Towler signed the December 16, 2025 Notice as "Legal Instruments Examiner, OTOR" — a GS-0963 administrative support position capped at GS-9. GS-9 corresponds to roughly 2–4 years of federal experience. Decades of experience typically qualifies for GS-12 through GS-15 positions. USPTO Patent Public Advisory Committee Annual Reports and White House records document Towler's service as NTEU Chapter 243 representative since at least 2012. Why was such a position assigned to issue notices on Director-level petitions rather than supervisory or attorney personnel with commensurate delegated authority?

3. Multiple legal directories list Andrew F. Bodendorf (Reg. #39537) as operating a private patent practice; the D.C. Bar confirms he remains an active member. (See Exhibit C.) His 16-series application examinations indicate the term of employment. USPTO practitioner records never set the Government Employee flag during his roster presence. (October 2019–January 2022). Do 18 U.S.C. §§ 203 and 205, 35 U.S.C. § 4, 5 CFR § 2635.802, and 37 CFR § 11.10 govern an examiner listed as a private practitioner during case assignment?

4. Why would a sophisticated intellectual property law firm, which has for decades

represented a major corporation that routinely files intellectual property overlapping with this application 17/461,021, maintain silence rather than issue a prompt disclaimer of involvement — when such a disclaimer would eliminate all liability exposure if the appearance were truly unauthorized?

## PERSISTENT FAILURE TO APPLY CONTROLLING LAW & PRECEDENT

The following issues arise from the pattern and practice of failing to apply controlling law, controlling precedent and/or to respond to affidavits traversing rejections or Office Actions as required by statute:

1. If the *sua sponte* CAIRN revival reflects good faith, why does the replacement Office Action fail to address the sworn affidavits and controlling LESLIE Cabinet precedent entirely?

2. If the *pro se* Petitioner is mistaken about the applicability and centrality of the LESLIE Cabinet precedent, does it not stand to reason that a Senior Attorney at the Trademark Division would engage and articulate precisely why?

3. Whether a *sua sponte* revival followed by a substantively identical refusal constitutes "conscious avoidance" — an agency "entirely failing to consider an important aspect of the problem" — is preserved for judicial determination. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); *Department of Commerce v. New York*, 588 U.S. 752 (2019).

The procedural questions above are posed here for the reader or a court to see the pattern and practice by which the USPTO deprived rights after an applicant pointed out systemic non-compliance with longstanding Civil Rights law.

The remaining questions concerns the constitutional framework itself. The Trademark Examiner and Senior Attorney rejected CAIRN on personal technical analysis of device functionality — without engineering training, without engaging the sworn affidavits containing industry expert testimony:

4. On what authority does a Trademark Examiner — or the Senior Attorney who replaced

13 / 77  Pat. App. No. 17/461,021 - Omnibus Civil Rights Affidavit - DOJ Case. No.: 740459-NDX

him — make technical determinations about the functionality and utility of novel engineering in order to deprive an applicant of the registration of a Trademark already in use; "property" as defined by controlling law?

## THE ARBITRARY DEMARCATIONS OF "USEFUL ARTICLES" & "ROMANTIC AUTHORSHIP"

The question raised above — the propriety of deprivation of property on the basis of an inexpert assessment of a mark's functionality — implicates the "useful articles" doctrine and its companion "romantic authorship" construct.

The lingering questions as to why seasoned USPTO Patent Examiners fail to apply rudimentary science consistent with observable reality raises questions as to the doctrine's Constitutionality.

Their Constitutional deficiencies are the central issue of this affidavit: their inconvenient and uncomfortable history is substantiated in **Exhibit A**.

### Proximate and Predictable Causes

The Petitioner's experience illustrates discriminatory operation. He sought copyright registration for the sculptural shape of a guitar body. The Library of Congress denied registration; the design allegedly constituted a "useful article" whose aesthetic features are inseparable from utilitarian function. (17 U.S.C. § 101; *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405 (2017).)

Directed to Patent: the device was "artistic design."

Directed to Trademark: the Petitioner sought only to register CAIRN — the name of the sound modulator — and to Copyright only the decorative elements unique to his authorship. The Trademark Examiner and Senior Attorney rejected CAIRN on personal technical analysis of device functionality and without addressing the controlling precedent. The Copyright Office rejected the custom logos on the opinion that they were fonts; fonts are deemed functional under American intellectual property law per the "useful articles" doctrine.

The Petitioner has refrained from filing between six and twelve additional trademark and copyright applications — including product configuration marks and sculptural copyrights granted by El Salvador for identical works — due to the deterrent effect of the doctrines and procedural barriers

documented herein. The chilling of these applications is itself a constitutional injury preserved for adjudication.

Multiple avenues. Multiple rejections. Contradictory rationales. No path forward.

### Contradictory to Established Scientific Principles & Observable Reality

The Petitioner is a naturalized ethnic-minority, trained as an architect and historian, practiced as an industrial manufacturer and musician — combined expertise he applied to designing instruments expressive of his ethnic origins. The harm is not hypothetical. Pending applications before the USPTO and those rejected by the Copyright Office were directly affected by these doctrines.

The "romantic authorship" and "useful articles" constructs are neither neutral nor subtle. History has passed judgment on the figures who employed them and the paradigms they emerged from.

The doctrine's premise — that sculptural form and utility are separable, in this instant case, a musical instrument — is physically false. Per Helmholtz, the sculptural shape of an acoustic resonant chamber and the frequency it produces are a single physical system, mathematically inseparable. **Exhibit A** will prove that Helmholtz is an empirical metric that describes a grander recurrence of conjugacy in nature. The notion that sculptural form (art) and function (utility) are separable is dogma carried forth from a history Americans do not want to revisit and no longer want to be party to.

The prosopographic method and citation history in **Exhibit A** reveal that these constructs lived long past the time the era's contentious paradigms were discredited and discarded. The discriminatory constructs are not grounded in the Intellectual Property Clause's founding-era legislative intent. The citation trail leads to historical and judicial events that justifiably cause discomfort. This affidavit documents that history.

The discomfort is inevitable.

# CHAPTER II
## STRUCTURAL ANALYSIS

Chapter I documents a sampling of what transpired over several years — context for the pattern, not the totality of the record. The question is whether these facts represent individual failures correctable by administrative reform, or the inevitable output of a structurally defective system.

It is the latter.

It is not credible to assert that the USPTO's non-compliance with disability access laws, its persistent denial of due process in response, and the discriminatory operation of the governing legal doctrines exist in isolation. These elements do not arise independently; they function together. Barriers to access, barriers to redress, and exclusionary legal standards reinforce one another in sequence and effect. The resulting pattern is systemic, not incidental, and any characterization of these failures as unrelated requires disregarding their documented interaction and cumulative impact.

### Section II.A
### Time is not on our side

The clock has run out. The time when intellectual property could be adjudicated at the speed of parchment and quill ended in the 20th Century. The USPTO's digital systems remain parchment procedures rendered in pixels — forms mimicking paper petitions. This is a fact-based assessment of and aspect of the Trademark Division's TEAS system non-compliance that was the proximate cause of real and attributable harm.

Disabled applicants who cannot use the non-compliant TEAS system must pay a $400–$500 paper filing premium — a federally-imposed surcharge for disability.

If a less-able applicant complains, their applications and petitions go unanswered. The TEAS non-compliance was the subject of a petition the Trademark Division Petition Office insisted the Petitioner pay for and file in order to fix the abandonment of the MENHIR and STELAE marks TEAS dysfunction caused; a petition the Division's attorneys later refused to answer on the record. TEAS created the legally impossible transfer of ownership from the Petitioner to the Petitioner.

**The urgency is not abstract. It is real.**

Technologies that once matured over decades now reach obsolescence in two to three years. A patent examination that routinely extends four to six years examines inventions whose commercial viability has already expired.

The USPTO is the single greatest concentration of technological expertise in human history. The record establishes — unrebutted — that the agency cannot implement a rudimentary search bar or author an accessible PDF.

Artificial intelligence makes this problem existential.

An agency that cannot apply its own procedural rules, that refuses to respond to civil rights complaints, will not become more efficient with AI. Its failures will be automated — discriminatory outcomes magnified while cloaked in technological neutrality.

## Section II.B
### The Doctrines Function as Qualification Standards

**Exhibit A** traces the origins of the controlling legal frameworks through citation history and biographical network analysis. The "romantic authorship" and "useful articles" doctrines were British injections into American law via opinions authored by the same justices, in the same years, who delivered the Civil Rights Cases and Native American wardship decisions now universally condemned.

The Constitution contains no requirement that intellectual property bifurcate art and utility. The Founders' legislative intent contains no Victorian definition of authorship. The art world of the era rejected these notions vociferously.

## Section II.C
### The "Romantic Genius" Construct as Selective Gatekeeping

The "romantic authorship" doctrine presumes that protected creative work flows from a solitary "mastermind" author without technological mediation. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991), codified this framework.

The doctrine contradicts human experience.

Beethoven did not perform his symphonies. The musicians who performed them did not thereby become authors of his work. Frank Lloyd Wright employed draftsmen at Taliesin; modern architects use CAD. No technological mediation has produced another Wright. The author remains the author. "Mediation" is an inadequate measure for art.

Every modern word processor incorporates AI-assisted functions — auto-complete, grammar correction, predictive text. Under the doctrine's own terms, every creator now produces "mediated expression."

Humanity answered these questions centuries before the doctrine was invented. The doctrine does not describe how authorship works. It describes how Victorian jurists imagined it should.

## Art Expressed in Function

The Copyright Office deemed the Petitioner's art too functional for Copyright:

- 1-10838135591, Sept. 13, 2021: Sculptural Design for Guitar Body
- 1-10903192001, Oct. 11, 2021: Novel Sculptural Design for Stringed Instrument Body
- 1-11494846251, July 8, 2022: Berlez Bass Font

Both instrument applications explicitly disclaimed functional components — "Standard Guitar Functional Parts and Dimensions" (SR# 1-10838135591) and "Stringed Instrument Neck" (SR# 1-10903192001). Both only identified the sculptural qualities as the sole subject matter under "Author Created" and "New material included in claim."

The rejection of the fontography is dispositive. 37 CFR 202.1(e) excludes fonts from copyright. *Eltra Corp. v. Ringer*, 579 F.2d 294 (4th Cir. 1978), affirmed the refusal to register a typeface design. The Copyright Office's 1988 Policy Decision states:

> "The Office refused to register claims in typeface designs or in the drawings of the letters and typefont characters because the design choices were responsive to the **functional characteristics of typefonts** used in high-speed printing. That is, no work of authorship existed separate from the utilitarian aspects of typefonts and letterforms."

Yet the Copyright Office has awarded protection to decorative inlays for guitars. *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405 (2017), held that decorative surface designs on useful articles are copyrightable when imaginatively extractable as standalone artwork.

Paul Reed Smith built a guitar for Peter Frampton in 1976 with decorative bird inlays. PRS successfully registered them as both copyright and trademark, though the bird silhouettes were anatomically correct depictions — flight silhouettes that would not be out of place in a biology textbook. They came from a standard bird identification guide:

> *"When it came time to put inlays on the fretboard,* **I didn't even have to think about it,** *I just went down to the store, bought a bird guide, and started designing inlays."* — *Paul Reed Smith, The Story of the PRS Bird Inlays, Official PRS Guitars Company Blog*

The "romantic authorship" doctrine grafted from Britsh law *Nottage v. Jackson* (1883) into the American *Burrow-Giles* (1884) requires an "inventive or mastermind" author whose "original mental conception" warrants protection.

"Didn't have to think about it" does not satisfy this standard.

The Petitioner's font-based logos were meant to serve the identical decorative function on a fretboard. A custom designed font artfully expresses in precisely the same way. Both are communicative aesthetics — as is all art.

Paul Reed Smith's bird inlays merit every protection they received. The deficiency lies in a doctrine that protects Smith's spontaneous craftsmanship while excluding the Petitioner's intentional typographic design for identical decorative application. The anatomically correct flight silhouettes became expression when the aesthetics of movement were juxtaposed by ingraining them in the functional part of the instrument that inspires imagery of flight.

The function expressed the art.

Berne Convention signatories treat fonts as protectable. The United States does not. The only reason fonts lack international copyright protection is that the United States refused to sign the Vienna Agreement for the Protection of Type Faces on June 12, 1973.

### "A Dangerous Undertaking"

Consider the proximate and predictable effects of the notion that the "inventive" mind is the standard by which to rule out "mediated" or assisted expression. The Petitioner is an ethnic-minority creator who relies on assistive technologies that constitute "mediated expression" under the "romantic authorship" doctrine's definition, and which the doctrine intended to weed out. His

instrument's sculptural forms and decorative elements embody non-Western aesthetic traditions — First Amendment expression documented in evidence submitted with his Trademark's Statements of Use.

The doctrine's selective invocation against creators whose disabilities require assistive technologies — while identical mediation by neurotypical creators passes unexamined — constitutes differential treatment under *Alexander v. Choate*, 469 U.S. 287 (1985). Whether this framework can be administered without discriminatory effect is preserved for review.

An agency created to serve as registrar has no constitutional authority to dictate how creators express themselves. Justice Holmes addressed this proposition directly:

> *"It would be* **a dangerous undertaking** *for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At the one extreme, some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke." — Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903).*

Holmes's rejection of institutional gatekeeping stands as constitutional counterpoint to the "useful articles" doctrine. History vindicates his use of a charged term such as "dangerous."

The Soviets deemed video games decadent Western indulgence. Graphics processing developed for video games now underpins medical imaging computation and real-time CAD rendering.

The Smithsonian Institution contracted with an infringing defendant to "prove" their own former Secretary had achieved flight first while the Wright Brothers were locked in patent litigation — the two bicycle mechanics beat the credentialed experts by nine days. The trajectory of WWI and WWII would have been altered had the Smithsonian's gatekeepers prevailed.

Holmes was justified in his characterization. The question is not whether gatekeepers have been wrong — they have been catastrophically wrong, repeatedly — but whether the Constitution authorizes them to gatekeep at all. It does not.

## Section II.D
### A Recurring Conjugacy: Inseparability as Physical Law

The "useful articles" doctrine's central premise is not merely culturally dubious — it fails to

comport with observable reality. The Helmholtz resonance formula establishes that the acoustic properties of any resonant body are functions of its geometry. Change the sculptural shape; change the frequency. Lord Rayleigh's *The Theory of Sound* (1877) formalized the principle: the acoustic behavior of any enclosed volume is entirely determined by its boundary conditions.

The two dimensions are not "separable." The shape is the sound. The form is the function.

$$f = \frac{c}{2\pi} \sqrt{\frac{A}{V \cdot L_{eff}}}$$

This conjugacy is not limited to musical instruments or acoustics. Helmholtz documented but one aspect of a recurring conjugacy in observable reality. A circle's radius and its circumference are not separable. They are variables in the same equation. One cannot exist without determining the other.

| Principle | Domain | What Geometry Determines |
|---|---|---|
| **Helmholtz Resonance** | Acoustics | Sculptural cavity volume $\rightarrow$ frequency |
| **Chladni Figures** | Structural Acoustics | Plate shape + thickness $\rightarrow$ vibrational modes |
| **Particle in a Box** | Quantum Mechanics | Box dimensions $\rightarrow$ energy levels |
| **Antenna Resonance** | Electromagnetics | Conductor length $\rightarrow$ resonant frequency |
| **Waveguide Cutoff** | Microwave Engineering | Cross-section $\rightarrow$ propagation threshold |
| **Whispering Gallery Modes** | Photonics | Resonator circumference $\rightarrow$ light wavelengths |
| **Organ Pipe Resonance** | Musical Acoustics | Pipe length $\rightarrow$ pitch |

## This is not analogy. This is recurrence.

The "useful articles" construct creates category error. The doctrine encodes a model of reality in which aesthetic and functional properties can be cleanly partitioned, but in the physical world, properties are almost always interdependent. Geometry affects behavior. Structure affects

performance. Form is not an overlay; it is often a parameter in the governing equations of the system. It is false.

The doctrine does not need a musical instrument exception. The doctrine needs to confront that its foundational model of reality is false.

A category error is not just a mistaken fact. It is the application of a framework that does not map onto the structure of the thing being analyzed. Either the doctrine tracks something real in the object, in which case it must be explained in terms consistent with how the object operates or it does not and is an arbitrary measure upon which fundamental rights hinge.

A legal test whose application requires imagining a physical impossibility cannot constitutionally serve as the mechanism for denying intellectual property protection. A law premised on a category error — that objects fall upward, that acoustic resonance is separable from the cavity that produces it — supplies no real standard.

Controlling case law circles this problem but never lands. The various controlling decisions address three fault lines:

- **Category A: Evidentiary vacuum** — the government has little or no evidence.
- **Category B: Contested science** — experts disagree on the underlying claim.
- **Category C: Foundational impossibility** — the legal rule assumes as true something the relevant field treats as physically impossible or conceptually incoherent.

Existing case law conflates these categories. No court has articulated a freestanding principle that a law built on a premise structurally impossible within the physics of the domain is void for vagueness or arbitrary as a matter of constitutional law.

*Hall v. Florida*, 572 U.S. 701 (2014), provides the closest precedent. Florida's statute treated an IQ score of 71 as definitively establishing non-intellectual disability. The Court held that this application contradicted the test's own mathematical properties: the standard error of measurement produces ranges, not points.

The irony is not lost: *Hall* relied on the mechanics of Lewis Terman's IQ testing — itself a eugenic construct whose exclusionary effects the Petitioner's mentor, Garland E. Allen, extensively

documented. But the holding does not validate IQ testing as a measure of human worth. It holds that *even accepting the construct on its own terms*, Florida's application violated the construct's own internal logic. The constitutional defect was not that the test was wrong, but that the statute ignored what the test itself said.

While the Trademarks and Copyrights filed for the Petitioner's musical instrument ventures are not related to the Patent Application No.: 17/461,021, the coherent application of rudimentary science, observable reality, and/or fundamental technological concepts is what derailed the Patent application. Whether the derailment was intentional or not is left for judicial determination. The unauthorized appearance by the Nixon Vanderhye attorney leaves that question unanswered.

## Section II.E
### The 19th Century Genealogy:
### Professional Specialization as Historical Invention

The word "scientist" was coined in 1833. Thomas Jefferson died in 1826. He died in an intellectual world where the professional categories upon which the art/utility distinction depends had not yet been invented — a world that had not yet fractured into disjointed professionalization.

Leonardo da Vinci and Michelangelo are commonly termed "Renaissance men." The label is anachronism. Specialization is a deviation from generalism, not the other way around. Jefferson and Franklin operated before that deviation and exemplify the Founding generation's inventors.

## Section II.F
### The PHOSITA Construct: Administrative Operationalization of the Taxonomy

The PHOSITA standard — the "person having ordinary skill in the art" — entered patent law only recently, through *Graham v. John Deere Co.*, 383 U.S. 1 (1966). It now dominates Patent law. Obviousness is evaluated from the perspective of a hypothetical person with ordinary skill in the pertinent art. The standard was presented as neutral and objective.

What the Court did not interrogate: What is "the pertinent art"? Who defines it? On what authority?

The pertinent art is not a fact of nature. The PHOSITA construct inherits every structural defect of the taxonomy that defines it.

## The Circularities

- **Self-reference.** The system uses PHOSITA to validate the Art Unit assignment, but the Art Unit assignment defines PHOSITA.
- **Bootstrap.** The invention's true nature cannot be known until understood. But the framework for understanding is fixed before understanding occurs.
- **Inverted criterion.** If exceeding the standard is meritorious, then the standard is not measuring merit. It is measuring deviation from a norm. The system's declared criterion is ordinary skill. Its actual criterion is extraordinary insight. This is not a paradox. It is a confession that the construct is a fiction.
- **Collapse.** In practice, PHOSITA collapses into the examiner's self-projection. The examiner determines what PHOSITA would know by reference to their own knowledge. The hypothetical person becomes a mirror.

The USPTO's Art Unit system is based on the PHOSITA taxonomy. The Art Unit assignment determines the field. The field determines the PHOSITA. The PHOSITA determines what the examiner treats as obvious.

If the assignment is wrong, every obviousness determination against that standard is Constitutionally defective — not procedurally curable, but Constitutionally defective, because due process requires application of the correct legal standard.

The Goodman & Patterson study (2024), published in the *Vanderbilt Law Review*, documented how cultural bias embedded in the PHOSITA standard disproportionately burdens ethnic minority inventors. Under *In re Clay*, 966 F.2d 656 (Fed. Cir. 1992), prior art is "analogous" only if from the same field or reasonably pertinent to the problem faced. The PHOSITA of Field A is presumed not to know Field B. What the system presents as neutral is administered by biased humans applying a fictional benchmark.

Yet the system awards patents for cross-field synthesis — recognizing that crossing boundaries is an inventive achievement.

Both positions cannot be consistently held. If PHOSITA does not know Field B, then knowledge of Field B is extraordinary. If extraordinary knowledge produces patentable invention, then the

standard of ordinary skill is not the criterion. The system measures against a fictional person, then rewards inventors for being someone that person is not.

Paradoxically, controlling case law provides that paradigm inversions and inventions that counter what the PHOSITA "teaches away from" are strong evidence of nonobviousness. (See *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983); *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1552 (Fed. Cir. 1983); *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986); *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).)

The examiner's self-projection as PHOSITA produces exactly the gatekeeping Justice Holmes warned would cause "works of genius" to "miss appreciation" because "their very novelty would make them repulsive." This is the "dangerous undertaking": persons trained in law — or in a single technical subspecialty — constituting themselves final judges of worth.

These facts are not offered as academic or abstract judicial interpretation. That is reserved for court. These facts are a potential explanation as to why the Petitioner's Patent Application No.: 17/461,021 was derailed by seemingly inexpert analysis of the technology. The observations are directly applicable: the application bridged professional specialization, and reversed a conventional PHOSITA's paradigms. No single PHOSITA accurately captured the invention's core concepts.

The experience exposed that this precarious framework is ripe to be shattered by AI.

## Section II.G — The AI & PHOSITA:
### The Hyper Specialization Origins of the PHOSITA Construct

Reality has inverted the PHOSITA paradigm. AI is not waiting for the law to catch up.

A large language model trained on the full corpus of human recorded knowledge has no field boundary. It does not know acoustics instead of architecture, or games instead of musical instrument physics. It knows all of it simultaneously, organized by conceptual relationship rather than professional taxonomy. The USPTO Art Unit system is invisible to it. It knows all of it simultaneously, organized by conceptual relationship rather than professional taxonomy. AI-assisted invention produces solutions derived from multiple technical domains within a single inventive act. Nothing is nonobvious to intellectual omniscience.

The PHOSITA construct approximated reality when professional specialization meant practitioners genuinely lacked knowledge from adjacent fields. A mechanical engineer in 1966 — when *Graham v. John Deere* was decided — did not know what a biochemist knew. The journals were different. The conferences were different. The education was different. Cross-disciplinary knowledge required deliberate effort, and that effort was itself evidence of inventive insight.

That functional reality has dissolved. An AI-assisted inventor can query systems trained on every paper in biochemistry, materials science, acoustic engineering, and military sensor technology simultaneously. The knowledge barriers that made the professional community a proxy for the state of the art no longer exist. Applied to AI-assisted cross-disciplinary invention, the PHOSITA construct produces only asymmetric outcomes.

Can the construct be adapted to produce non-discriminatory outcomes, or can it only select which population bears the disadvantage?

This returns to where the constitutional question began.

In *Mazer v. Stein*, 347 U.S. 201 (1954), Justice Douglas observed that the constitutional materials defining "writings" and "authors" were "quite meager" and that "much research is needed." He called for reargument. The majority declined. The question was left unanswered.

Seventy-two years later, the research has not been done.

### Section II.H
### Same Hands – Multiple Actors – Multiple Layers

The administrative failures documented above — the digital inaccessibility, the record tampering, the convoluted paper processes translated to pixels without efficiency gains, the selective docketing, the non-response to civil rights correspondence — do not merely coexist with the doctrinal exclusions examined in this affidavit. They are layers of a single system. The same institutional architecture that has allocated zero dollars to Section 504/508 compliance across fifty-one years administers legal frameworks imported from the racial hierarchists of the Victorian era.

The "useful articles" doctrine and the "romantic authorship" construct entered American law through *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). That decision adopted, nearly

verbatim, language from the British law, *Nottage v. Jackson*, 11 Q.B.D. 627 (1883) — including the requirement of an "inventive or mastermind" author. The British court itself invented what the British statute did not provide. The statute had the legislative intent of commercial anti-fraud protection.

The transmission occurred without constitutional analysis. American courts imported the gloss without examining the statute it purported to interpret. No court asked whether the Progress Clause authorized aesthetic hierarchy. No court examined whether Jefferson's documented practice contradicted the separability requirement these doctrines impose. The Petitioner can find no record of courts basing their legal inventions on the opinions of the experts whose work they claimed to govern.

Now consider the judicial hands that fabricated these frameworks.

*Burrow-Giles* was authored by Justice Miller. *United States v. Kagama*, 118 U.S. 375 (1886), which established Native American tribes as "dependent wards" subject to plenary federal power — without citing any constitutional source for that authority — was also authored by Justice Miller.

Justice Bradley authored *Baker v. Selden*, 101 U.S. 99 (1879), the foundation of the useful articles doctrine. Justice Bradley also authored the *Civil Rights Cases*, 109 U.S. 3 (1883), which gutted the Civil Rights Act of 1875 and opened the door to Jim Crow.

These were not separate judicial projects. They emerged from the same minds, in the same years, within the same intellectual climate that produced Galton's coinage of "eugenics" in 1883. The same justices who fabricated IP doctrines, never examined for constitutional validity, dismantled Reconstruction civil rights.

## The Romantic Authorship Doctrine as the Source of Compelled Disclosure

The "romantic authorship" doctrine does not merely create theoretical barriers to protection. Every aspect of the law downstream from it inherits its slant towards disparate outcomes.

The doctrine requires identifying the "mastermind" individual — the singular genius whose "original mental conception" warrants protection. That doctrinal requirement manifests as 37 C.F.R. § 1.63, the USPTO's disclosure mandates: every patent application must identify the inventor by legal name and, if pro se, physical residential address. Represented clients receive

USPTO correspondence via their attorney's P.O. Box. Pro se applicants receive no equivalent protection.

Pen names, trusts, and limited liability companies — the ordinary instruments through which Americans have conducted their affairs since before the Founding — are categorically prohibited as filing vehicles.

Robert Livingston, in 1790, warned that requiring inventors to identify themselves would create "a mere baptismal register" rather than a system that promoted innovation. The rights these structures protect predate the Constitution. The Founders practiced pseudonymous authorship. Madison wrote *The Federalist Papers* as "Publius." Jefferson authored pamphlets anonymously. They would not have conditioned IP protection on surrendering the very anonymity they exercised.

Now observe the contradiction.

The Copyright Office permits pseudonymous registration under 17 U.S.C. §§ 101, 302(c), and 408. The USPTO categorically prohibits it. Both systems derive authority from the same constitutional clause: Article I, Section 8, Clause 8.

Both cannot be constitutionally mandated. If pseudonymous registration is permissible for "Authors" under the Progress Clause, it cannot be constitutionally forbidden for "Inventors" under the same clause. The text does not distinguish between them. The agencies do.

The Supreme Court answered this question in 1926. In *Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583 (1926), the Court held that the government:

> *"may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."*

The intimate association doctrine confirms these are constitutional rights, not mere preferences. *Meyer v. Nebraska*, 262 U.S. 390 (1923), through *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), established that family structures receive the highest protection. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), held that the right to privacy in one's associations includes the right

to refuse disclosure when the practical effect is exposure to retaliation. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), confirmed that anonymous speech is protected by the First Amendment.

The Petitioner created A.E. Samaan LLC, a Utah limited liability company formed August 7, 2023, owned by trusts established between March and August 2023. These trusts have family beneficiaries. They were created for multi-generational intellectual property transmission — the same purpose trust law has served since the English Chancery courts. *Griswold v. Connecticut*, 381 U.S. 479 (1965), established that family autonomy exists in a penumbral zone of constitutional protection. *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), extended that protection to extended family arrangements.

The system requires the Petitioner to choose: exercise Article I, Section 8, Clause 8 rights, or preserve First and Fourth Amendment protections and the intimate association rights the Founders themselves exercised.

The Constitution does not permit that choice to be imposed.

### The Documented Justification

A reasonable person with an ethnic-sounding name would have rational basis to seek protective measures when engaging with the USPTO. The Petitioner's identity-relevant requests were repeatedly denied. This is pertinent evidence preserved for judicial review.

The Petitioner's adoption of a pen name and trust-based ownership was defensive, not evasive. The documented discrimination justifies — indeed, compels — the very protective measures the "romantic authorship" doctrine seeks to prohibit.

The various peer-reviewed academic studies cited herein have examined USPTO examination outcomes across demographic groups. They employ different methodologies. They examine different time periods. They arrive at different disparity figures.

Even after controlling for educational disparities, Black inventors experienced 24% lower patent grant rates. Hispanic inventors experienced 9% lower grant rates. Applications with feminine-sounding names faced measurably reduced approval rates. The Iams study (2023), published in the University of San Francisco Intellectual Property and Technology Law Journal, documented raw

population-level disparity of 39-to-1.

These are not allegations. They are peer-reviewed findings published in legal journals across multiple institutions over multiple years. The conclusion is uniform: USPTO examination outcomes correlate with applicant demographics rather than application merit.

The statutory framework requires identity-blind examination. The peer-reviewed evidence documents identity-correlated outcomes. Both cannot be accurate. Either the system is malfunctioning — or the statute is a fiction:

- MPEP § 2107.01: Patent eligibility based on claim, not applicant.
- 35 U.S.C. § 131: Examination on merits alone.
- 15 U.S.C. § 1052 (Lanham Act Section 2): Grounds for refusal based on characteristics of the mark itself, not the applicant.
- *Application of Glass*, 492 F.2d 1228 (CCPA 1974): Patentability based on disclosure, not applicant identity.
- *In re Vaeck*, 947 F.2d 488 (Fed. Cir. 1991): Improper to assume limitations from inventor credentials.

These studies were documented by the Petitioner in several affidavits to substantiate that the Petitioner is not an isolated complainant:

- AFFIDAVIT — Institutional Discrimination Evidence & Supervisory Notice (N417: 72323101, September 16, 2025)
- AFFIDAVIT — Gamesmanship Artifice (N417: 73116200), filed in support of the Petition Before the Director of the USPTO on November 10, 2025
- AFFIDAVIT — Structural Exclusion & National Origins (N417: 74288883, February 2, 2026)

These affidavits also cited GAO-25-107218: "Patent Office Should Strengthen Its Efforts to Address Persistent Examination and Quality Challenges" (2025). If the agency's position is that these marked disparities can be blamed on employee misbehavior, then the United States Federal government has thoroughly failed in its mission to root out racial animus from amongst its ranks. Is that explanation satisfactory in the second quarter of the 21st Century? If the answer is "yes",

what does it say about the Constitutionality of knowing discriminatory deprivations by major Federal agencies?

**Isolation in the Idea Economy**

If the world felt like it shrunk with the invention of the Internet, it will feel minuscule in the aftershock of Artificial Intelligence.

The incoherence between United States intellectual property law and that of every other signatory nation to WIPO treaties will become an increasing point of contention. Until now, American law has been a wall of text that even native English speakers can barely parse. That barrier is dissolving. AI will be the vehicle by which foreign filers — and their governments — will become increasingly aware of any disparate outcomes.

If USPTO examination outcomes correlate with applicant demographics domestically, then it stands to reason that they correlate with national origins for foreign filers. The peer-reviewed studies documented above employed name-based proxies for ethnicity. Those proxies do not distinguish between domestic minorities and foreign nationals. If their finding was that Examiners treats "Hispanic-sounding" names less favorably, then that Examiner will treat Mexican nationals less favorably. An Examiner who treats "Asian-sounding" names less favorably treats Japanese, Chinese, and Korean nationals less favorably.

This is not just a civil rights violation. It would also be a treaty violation.

The United States bound itself to the Paris Convention, the Patent Cooperation Treaty, and the Berne Convention. These instruments require national treatment — foreign applicants must receive the same treatment as domestic applicants. If domestic examination is identity-blind, foreign examination must be identity-blind. If domestic examination produces demographically correlated outcomes, foreign examination violates the treaty.

Other nations do not claim to guarantee color-blind legal systems. The United States does.

The United States marketed this promise to every treaty partner. If that promise is false — if examination outcomes have always correlated with the identity characteristics — then the United States has been in material breach of its international obligations for as long as the disparity has

existed.

Now consider how one of the doctrines that produces these disclosures compares to international practice.

No pre-modern non-Western tradition organizes itself around the art/utility distinction. Japanese *mingei*, West African Kente cloth, Navajo weaving — in every case, aesthetic and functional dimensions are unified. If the doctrines disfavor non-Western European cultural traditions, then the United States will be exposed as adjudicating fundamental rights upon ethnicity and religion.

The American approach is historically contingent and not conceptually necessary, as demonstrated by divergent approaches among Berne signatories. France explicitly rejected any such demarcation through its *unité de l'art* doctrine. The European Union has been systematically eliminating heightened thresholds for applied art since *Cofemel* (2019). In November 2013, the German Federal Court of Justice expressly abandoned the *Stufentheorie* and held that the copyright protection of works of applied art is not subject to requirements other than those applied to works of non-utilitarian fine art or of literary or musical creation. Germany's historical threshold concerned the level of originality — not separability. The German approach never required the aesthetic to be "separable" from the functional. Post-*Cofemel*, even this heightened originality threshold has been eliminated.

The AI-assisted collapse of language barriers will expose paradigms hiding in the thicket of hyper-professionalization and jurisdictional territoriality. The question is not whether foreign governments will notice. The question is when.

### Exposure of the Indecent

Apply the requirements of the "useful articles" or "romantic authorship" legal tests to Indigenous cultural works — tribal chants, traditional dances, communal textile patterns — and the outcome is categorical exclusion. These works are collaborative. They are inherited. They are unified in form and function. They fail every test the Victorian constructs impose.

This exclusion is not incidental. The generation that fabricated these constructs — the 1880s cohort that also produced Galton's eugenics and the *Civil Rights Cases* — simultaneously outlawed

Native American cultural and religious practices. The Code of Indian Offenses (1883) criminalized traditional dances, ceremonies, and spiritual practices.

Now observe the contradiction the doctrine produces:

Pornography receives copyright protection under 17 U.S.C. § 101 on the basis that editorial collaboration constitutes copyrightable authorship. Indigenous sacred chants are denied protection precisely because they are collaborative, inherited, and thus lacking the singular "mastermind."

PornHub's content receive federal protection. Navajo sacred chants do not.

The same characteristic — collaborative authorship — serves as the basis for granting protection in one case and denying it in the other. The distinction is not principled. It is cultural. Federal courts extended copyright protection to pornography on the ground that elaborate collaboration—scripts, performers, technicians, capital, formal fixation—demonstrated artistic merit, while excluding communal and culturally embedded forms. (See *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), *Roth v. United States*, 354 U.S. 476 (1957), *Miller v. California*, 413 U.S. 15 (1973), *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979))

When a tribal tattoo pattern or ritual chant is denied intellectual property protection, the predictable result is commercialization the originating community cannot control. The culture is diminished. The imagery is trivialized. The sacred becomes a screen-print on a mass-produced t-shirt. This is not a side effect of the doctrine. It is the operation of the doctrine.

The United States government has acknowledged this history. The December 9, 2024 White House Proclamation establishing the Carlisle Federal Indian Boarding School National Monument recognized that:

> *"for more than 150 years, the Federal Government removed American Indian, Alaska Native, and Native Hawaiian children from their families, Tribes, and homelands — often by force or coercion — and transported them to institutions that aimed to strip them of their languages, religions, and cultures."*

## Section II.I
## The Reliance Interest Defense

The anticipated defense — that the "useful articles" and "romantic authorship" doctrines are so

entrenched that dismantling them would cause greater harm than maintaining them — has been raised and rejected in every major Civil Rights challenge in American history.

It was raised for *Plessy v. Ferguson's* separate-but-equal doctrine. It was raised for *Loving v. Virginia's* prohibition of interracial marriage. It was raised against overruling *Chevron* in *Loper Bright Enterprises v. Raimondo* itself. In each case, the Court's answer was the same: incorrect legal interpretations do not become correct through the accumulation of reliance. The error compounds; it does not cure itself.

## CONSTITUTIONAL FRAMEWORK

### Judicial Supremacy: Courts Decide What the Law Is

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), Chief Justice Marshall declared: It is emphatically the province and duty of the judicial department to say what the law is." This holding established that written constitutions exist to limit governmental power, and that if those limits may be passed at any time by those intended to be restrained, the distinction between a government with limited and unlimited powers is abolished.

For forty years, *Chevron* deference created an exception to this foundational commitment — agencies, not courts, determined statutory meaning when Congress had been ambiguous. The Supreme Court eliminated that exception in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

Seventy-two years of avoidance end when *Loper-Bright* meets Justice Douglas's unanswered question in *Mazer v. Stein*, 347 U.S. 201 (1954).

### Registry vs. Tribunal

The Progress Clause empowers Congress to "secure" exclusive rights to authors and inventors. "Secure" implies protecting something that pre-exists. The Founders' word choice is dispositive: rights are *secured*, not *granted*. The Framers understood intellectual property rights as pre-constitutional in nature, rights the governmental system would recognize, register and protect.

Article I, Section 8, Clause 8 empowers Congress to promote "the Progress of Science and useful Arts" by securing the work of authors and inventors via a "registrar". The "romantic authorship" and "useful articles" construct invite intrusion into the creative act far beyond the mere registration of property:

- A **registry** exists to record and secure pre-existing rights. It is ministerial. The applicant files, meets formal requirements, and receives protection. A registry does not judge if it is art or "utility." It *registers*.

- A **tribunal** makes substantive value judgments. It evaluates WHO qualifies as an "author" (the mastermind requirement), WHAT qualifies as protectable (the art/utility bifurcation), and applies aesthetic hierarchies to determine worthiness.

Justice Holmes warned against precisely the "dangerous" deviation from Constitutionality in *Bleistein*. The USPTO and the Copyright Office have constituted themselves as exactly the tribunal Justice Holmes said persons trained only to the law should never become. "Dangerous" is not a neutral choice of terms.

# THE CONTEXT THIS ALL TRANSPIRES IN

**Multiple Layers of Friction**

The 39-to-1 disparity of patent grants found by the 2023 Iams study is explained by systemic discrimination calcified across several layers. They operate in parallel:

(a) legal frameworks that exclude certain creative traditions;

(b) non-functioning and non-compliant digital systems; and

(c) increasing adverse acts of retaliation after the protected activity of requesting equal access and equal treatment.

The Petitioner's documented concerns arise in the context of the two agencies under scrutiny and exposure — not in isolation.

On February 14, 2024, the Commerce Department's Office of Inspector General found that the USPTO and exposed potential conflicts of interest by USPTO patent examiners. (OIG Report No. OIG-24-013-I) The OIG estimated that roughly 30% of the USPTO's examiners had potential conflicts of interest.

On February 25, 2026, the Department of Justice announced its first enforcement action. Director Squires acted swiftly within five days of the announcement. On March 2, 2026, he issued a memorandum to all employees reducing the examiner financial interest threshold from $15,000 to zero for any listed applicant — concurring with every OIG recommendation. His statement:

*"For patents to be born strong, and the public to have confidence that they are, we must ensure strict adherence to USPTO's ethical standards and* **avoid (real or apparent) conflicts of interest.***"*
— *Director Squires, March 2, 2026*

The Petitioner's Civil Rights complaint pending before Director Squires invokes the Director's non-delegable supervisory authority under 37 C.F.R. § 1.181(a)(3), names specific examiners, requests recusal, and cites the Ethics Reform Act of 1989, 5 C.F.R. § 2635.802, and 18 U.S.C. §§ 203 and 205 — the same statutory framework underlying the DOJ enforcement actions. The petition received no substantive response or swift action.

Instead, it was silently reclassified and rerouted to TC Director Marivelisse Santiago-Cordero. It was was also rerouted to Vernon A. Towler whose December 16, 2025 Notice claimed the Petitioner had failed to sign Civil Rights complaint. That was materially and demonstrably false. The Petitioner's /s/ signature complied with 37 C.F.R. § 1.4(d)(2).

Mr. Towler has served as Vice President of NTEU Chapter 243 on the congressionally-mandated Patent Public Advisory Committee for over a decade, reviewing USPTO operations, examination quality, and public service standards. His experience far exceeds the Federal GS-9 empolyment ceiling of the office his notice claims he occupies. An /s/ signature is first-week training. The question is whether the error was mistake or mechanism.

### The Perlmutter Litigation and Its Downstream Consequences

While this affidavit was being prepared, a federal lawsuit reached the question of the Copyright Office's institutional character directly. In *Perlmutter v. Blanche*, Case No. 1:25-cv-1659 (D.D.C.), the terminated Register of Copyrights challenged her removal by the Acting Librarian of Congress. The case remains pending. The underlying question — whether the President possesses authority to remove the Librarian and the Register — has not been decided on the merits.

The parties litigate whom has the power to fire whom. The consequences extend to everyone else.

The institutional posture is already established. On May 13, 2025, when Justice Department officials arrived at the Library of Congress with a White House letter purporting to install a new Register, LOC General Counsel Margaret Williams and Capitol Police turned them away. The officials left willingly after Williams informed them they were not authorized to access the Copyright Office. The D.C. Circuit subsequently issued an injunction on September 10, 2025,

allowing Perlmutter to remain in her position pending resolution.

The Supreme Court deferred action on the government's request to stay that injunction until after it rules on *Trump v. Slaughter* (FTC) and *Trump v. Cook* (Federal Reserve). In those proceedings, Perlmutter argued — and the Library of Congress's conduct asserts — that the institution is not an executive agency but part of the legislative branch. Senate Rules ranking member Alex Padilla and House Administration ranking member Joseph D. Morelle agreed: "The President of the United States has no authority to appoint an acting Librarian of Congress or terminate the Register of Copyrights."

Neither party in *Perlmutter* has framed the downstream constitutional obligations that attach to either answer. Both positions produce consequences for applicants who are not parties to that litigation.

**If the Register exercises executive power**, then the regulatory framework she administers is subject to de novo judicial review under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The Copyright Office has publicly acknowledged that it "introduced the modern separability test to copyright law" through regulation, and that Congress "essentially lifted" that language into 17 U.S.C. § 101. Under *Loper Bright*, courts must now examine whether that framework has independent constitutional foundation. Neither party has briefed this consequence.

**If the Register is independent of the executive**, then the Copyright Office is an institution that authors its own governing framework, administers the resulting statutory scheme, and claims immunity from presidential oversight. This raises a different question: On what constitutional authority does the Copyright Office exercise substantive independence in control over property rights?

The distinction is functional. The Constitution empowers Congress to "secure" exclusive rights to authors and inventors. U.S. Const. art. I, § 8, cl. 8. "Secure" implies protecting something that pre-exists. A registrar records. A registrar administers a system whose substantive standards are defined by law enacted through constitutional processes. A registrar does not author those standards, submit them to Congress for ratification, and then administer the resulting statute while claiming independence from oversight.

That is not registration. That is a tribunal.

The Smithsonian Institution is also created by Congress, also housed outside the executive branch, and also claims a form of institutional independence. But the Smithsonian is a museum. It is an archive, a tourist attraction, an educational institution. It does not grant, deny, or deprive fundamental rights.

The Copyright Office does. When it applies the "romantic authorship" construct to determine who qualifies as an author, it exercises the power to exclude individuals and communities from the economy of creative expression. When it applies the "useful articles" doctrine to determine whether a work is eligible for protection, it exercises the power to define what counts as culture.

These are not administrative functions. They are the powers of a tribunal — deciding not merely what is registered, but who is fit to seek registration.

There is no Constitutional category in which an institution exercises substantive power over cultural and economic participation while remaining immune from both executive oversight and judicial accountability. If the Copyright Office is an executive agency, it is subject to *Loper Bright* review. If it is independent of the executive, it must be accountable through some other Constitutional mechanism. A third category — legislative fiefdom with the power to determine who participates in culture and the economy — does not exist in the tripartite constitutional structure.

The power to decide who may participate in the system of secured rights is the power to decide who enjoys the right to "life, liberty, and the pursuit of happiness." Participation in cultural life and economic activity encompasses everything else. Whatever the *Perlmutter* court decides about employment, the downstream constitutional obligations follow.

This affidavit presents the claims of an applicant who encountered both institutions. The Copyright Office rejected his sculptural instrument designs under the "useful articles" doctrine — a doctrine the Copyright Office authored. The USPTO's digital systems remain non-compliant with accessibility requirements — a pattern of exclusion documented across fifty-one years. The Library of Congress holds the founding-era evidence contradicting both doctrines. It holds the scholarship documenting their disparate impact. It continued administering the cause while

cataloging the effects.

The *Perlmutter* litigation will decide who may fire the Register of Copyrights. The constitutional question this affidavit presents is what authority either the Register or the Acting Librarian possesses to administer doctrines that have no founding-era predicate and documented discriminatory operation.

### Here-and-Now Constitutional Injury

- *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982): The right to use adjudicatory procedures is a species of property protected by the Due Process Clause. The government cannot destroy that right through its own procedural failure.

- *Axon Enterprise, Inc. v. FTC*, 598 U.S. ___ (2023): Parties asserting a "here-and-now injury" from subjection to unconstitutional agency authority may proceed directly to district court. The injury is not the outcome; the injury is the compelled submission.

- *United States v. Arthrex, Inc.*, 594 U.S. ___ (2021): The Supreme Court applied this principle to the USPTO. Every interaction with the agency since first disclosure has been a discrete constitutional injury — compelled submission to an authority whose adverse pattern is documented.

- *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000): A class of one states an Equal Protection claim where she is treated differently without rational basis. The USPTO has offered none.

- *Mt. Healthy City School District v. Doyle*, 429 U.S. 274 (1977): Where protected activity was a substantial or motivating factor in an adverse decision, the burden shifts.

- *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006): Actionable retaliation is conduct that would dissuade a reasonable person from engaging in protected activity.

- The administrative record documents escalating adverse action following each civil rights disclosure — actionable under *Gonzalez v. Trevino*, 602 U.S. ___ (2024).

## EXPRESS DISAVOWAL PROVIDED IN CONTEXT

The Petitioner declares under penalty of perjury: He has never filed a Power of Attorney or authorized any person to represent him before the USPTO in this application. He had no knowledge of the March 3, 2026 interview and had never heard of Corey D. Hawse until receiving the interview summary. His only communication with Nixon Vanderhye P.C. has been a Cease and Desist letter.

The Petitioner expressly disavows any actions, statements, amendments, arguments, or representations made by Corey D. Hawse or any person purporting to act on his behalf. Such actions were taken without authority and are void ab initio.

## JURISDICTIONAL DIRECTION – UNIFIED SUBMISSION

This affidavit, together with the Petition and Supplemental, constitutes a unified submission directed to the Director under 37 C.F.R. §§ 1.181(a)(3) and 2.146(a)(3). These provisions reserve supervisory review for matters not appropriately resolved at the examining level or by the personnel at issue. The matters raised are not delegable to offices implicated in the underlying conduct.

The agency's post-docketing reclassification routed this submission to Vernon Towler and Marivelisse Santiago-Cordero — neither possesses authority to adjudicate civil rights claims or supervise the named examiners. Both divisions are disqualified under 5 C.F.R. § 2635.502(e).

Mandatory response: 37 C.F.R. § 1.132; MPEP § 716.01(b)–(c); 5 U.S.C. §§ 555(b), (e).

## CONGRESSIONAL NOTICE

This affidavit serves as advance notice under 28 U.S.C. § 2403: a constitutional challenge to this framework is being prepared. Administrative remedies have been exhausted. The predicate for federal court jurisdiction is established.

# CONCLUSION & DECLARATION

For seventy-two years, courts have avoided Justice Douglas's constitutional question in *Mazer*. For one hundred twenty-three years, agencies have ignored Justice Holmes's warning in *Bleistein*. This affidavit presents the evidence that compels both to be addressed.

## Accommodation Renewal

The Petitioner recognizes that his limitations are not as pronounced as those of those with more extensive disabilities such as the fully blind or wheelchair bound. The non-functionality of the Trademark TEAS system is such that the Petitioner, even with less limitation, that it has detrimental impact when attempting to engage with it.

Thus, the accommodation request in the Petition (November 2025) and Supplemental (December 2025) applies to any response and are extended here. Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, any USPTO response must be:

1. **Written** — Oral communications are inaccessible and unreviewable.
2. **Docketed** — Filed in Patent Application No. 17/461,021 and Trademark Application No. 98308517.
3. **Certified Mail** — USPS Return Receipt to address of record.

These are reasonable accommodations, not procedural preferences. They impose negligible burden — standard legal correspondence. Failure to comply is a continuing Section 504 violation documented for federal court review.

## Declaration

I, Alvaro E. Siman, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, with awareness that willful false statements are punishable under 18 U.S.C. § 1001.

Alvaro E. Siman, Pro Se
On behalf of himself, A.E. Samaan LLC, and the beneficiary trusts
Date of Receipt: APRIL 10, 2026
2/2 ORIGINALS

41 / 77  Pat. App. No. 17/461,021 - Omnibus Civil Rights Affidavit - DOJ Case. No.: 740459-NDX

## NOTARIZATION OF COMPLAINANT'S ACKNOWLEDGMENT

State of ___California___ County of ___SanDiego___

Subscribed and sworn to (or affirmed) before me on this __10TH__ day of __April__, 20__26__, by ___Alvaro E. Siman___, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and who acknowledged that he executed this instrument solely to certify receipt of the executed Certificate without conditions, and that the Section 6 negotiation period is thereby initiated as stated herein.

_____
Notary Public

12/26/2027
_____
My Commission Expires:



BLANCA L. AVILA
COMM. #2477587
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
My Commission Expires
DECEMBER 26, 2027

[SEAL]

# EXHIBIT A

---

## 1883 — SAME HANDS / UNCLEAN HANDS

Prosopography Study for
"Romantic Authorship" and "Useful Articles"
Legal Constructs

---

# 1883

## SAME HANDS – UNCLEAN HANDS

THE ORIGINS AND PERSISTENCE OF THE
'ROMANTIC AUTHORSHIP' AND 'USEFUL ARTICLES' DOCTRINES
IN AMERICAN INTELLECTUAL PROPERTY LAW

*A Prosopographical Study of Constitutional Discontinuity*
*Prepared March 28, 2026*

## INTRODUCTION:
## THE PROBLEM OF CONSTITUTIONAL ANCESTRY

Native American, Pacific Islander, and African American craft traditions did not merely decline under these doctrines—they were systematically dismantled, their practitioners excluded from the protections afforded to artists whose work fit the European mold. Scholars do not debate the devastation of non-Western cultural production in the United States; only its magnitude is still measured.

In April 2017, an attorney-advisor in the Copyright Office's own Office of General Counsel published an official institutional analysis acknowledging that the Copyright Office itself "introduced the modern separability test to copyright law" through its regulation implementing *Mazer v. Stein*, 347 U.S. 201 (1954), and that Congress "essentially lifted" that regulation "and placed [it] into § 101 of the 1976 Act." Rachel E. Fertig, *U.S. Supreme Court Clarifies Separability Analysis in Its Ruling on Star Athletica, LLC v. Varsity Brands, Inc.*, U.S. Copyright Office Blog, Library of Congress (Apr. 6, 2017), blogs.loc.gov/copyright/2017/04.

The LOC is not a storage facility. It employs approximately 3,000 staff, including research scholars, policy analysts, and legal specialists. It operates fellowship programs — including the Kluge Center — specifically designed to produce scholarly synthesis of the founding-era record for contemporary policy purposes.

The LOC's Congressional Research Service and Law Library employ research staff specifically tasked with analyzing this class of Constitutional question. The Register of Copyrights is required by statute to advise Congress on copyright's Constitutional dimensions.

The academic scholarship on the disparate cultural impact of the "useful articles" doctrine has been cataloged in the LOC's own systems for decades. The LOC has actively researched and published some of that scholarship. The institution cannot now claim ignorance of work it commissioned.

The LOC's own Collections Policy Statement acknowledges that "copyright and publishing mechanisms" are insufficient "to preserve Indigenous histories." The American Folklife Center's Ethnographic Collections guide states that its Native American holdings are "the intellectual property of the communities of origin." This is institutional recognition of communal IP rights — rights the Copyright Office's "romantic authorship" doctrine categorically denies.

The left hand formally recognizes Indigenous intellectual property. The right hand administers doctrine that excludes it.

The National Congress of American Indians has identified a potential cause for this failure:

> "The United States Patent and Trademark Office has taken positions in negotiations at the World Intellectual Property Organization more aligned with corporations that want to access and use Indigenous Peoples' genetic resources, traditional knowledge, and cultural expressions than with the United States' role as trustee for Tribal Nations." — Native American Rights Fund, January 12, 2024

In May 2025, Margaret Williams, General Counsel for the Library of Congress, asserted that the LOC operates independent of Executive Branch authority. The Library of Congress admits it has always possessed the independence to correct course.

The LOC cannot claim clean hands. It holds the historical record. It claims it authored the doctrine. It documented the harm. It continued administering the cause while cataloging the effects.

### The history the Library of Congress holds:

The discriminatory legal frameworks emerged from movements whose architects stated their purposes without euphemism. Captain Richard Henry Pratt, founder of the Carlisle Indian Industrial School, declared the objective in 1892. The stated goal of the "Kill the Indian, Save the Man" policy does not require deep analysis or introspection. The doctrine of "useful articles" was the administrative arm of a broader project—one that defined artistry itself in terms calculated to

exclude those whose traditions thought to be inferior.

The history does not itself decide the constitutional question, but it destroys the presumption that these doctrines are natural, inevitable, or founding-era requirements.

### On the failure to identify the mechanisms of systemic cultural erasure:

The term "systemic racism" has achieved a paradoxical effect: it diffuses accountability rather than concentrating it. It names no defendant. It identifies no mechanism. It indicts everything, which in practice indicts nothing. The system at issue in this record is not abstract. It is the Federal government of the United States, operating through specific statutory constructs, administered by a specific agency, producing documented disparate outcomes across identifiable protected classes. That precision is not rhetorical narrowing. It is the difference between an accusation and a case.

### Different focus – Different missions

The oversight is not limited to the jurisprudence. Historians who specialize in eugenics and scientific racism — the Petitioner has worked in this field for decades — train their attention on flash points. The Holocaust. The Trail of Tears. The lynching record. Advocates for Native American and Pacific Islander communities do the same. Both concentrate on visible acts of violence: legible, documentable, morally unambiguous. The slow mechanism escapes notice precisely because it produces no single atrocity to commemorate.

Historians looked backward at what was destroyed. Advocates looked outward at who was harmed. Jurists looked inward at what the doctrine said.

### The Method

Prosopography is a method of historical investigation that studies a defined group of actors not as isolated individuals but as a collective — mapping their shared education, affiliations, intellectual commitments, and networks of influence. Where biography traces one life linearly, prosopography traces the channels through which ideas move between lives.

Legal doctrines do not emerge from constitutional text by spontaneous generation. Specific human beings create them — educated in specific institutions, trained by specific mentors, exposed to specific intellectual currents, affiliated with specific networks.

Intellectual transmission leaves datable traces in the lives of transmitters. When Justice Samuel Miller constructed the romantic authorship standard in *Burrow-Giles Lithographic Co. v. Sarony* (1884), he drew verbatim from British Lord Justice Cotton's opinion in *Nottage v. Jackson* (1883). The transmission is not inference; it is documented. The question is what shaped his understanding of what "Author" meant — and whether that understanding derived from 1787 or from 1883.

The same method applies across the doctrinal landscape. The legal paradigms that now control American intellectual property law were never intended to be neutral, any more than the era's eugenics statutes were meant to be benign. Those statutes were drafted to *read* neutral — they too had to survive Fourteenth Amendment scrutiny. The prosopography of the men who wrote them proves otherwise. Their papers survive in archives, and document intent.

### The Comfortable Narrative

The Fourteenth Amendment did not abolish racial hierarchy in American law. It forced racial hierarchy to adopt new legal vocabularies — vocabularies sophisticated enough to survive constitutional scrutiny while achieving the same exclusionary outcomes. This is not revisionist history. It is what Reconstruction proved.

The facile grade school version of American history — presents the Civil War as a moral settling of accounts, after which the only remaining task was to contain unreconstructed Southerners: the federal government is the protagonist. The Union won. The Constitution was amended. Racism became a regional pathology, a Southern problem, a matter of enforcement rather than structure.

The prosopographic record tells a different story. The men who built the intellectual property doctrines at issue in this case — judges, legislators, treatise writers — were not Southern reactionaries. They were Northern elites, educated at the nation's most prestigious institutions, operating at the highest levels of federal power. They were steeped in the same currents of Victorian scientific racism, the same "white man's burden" ideology, the same civilizational hierarchies — and the same elevation of racial-ranking to science that eugenics provided.

The term "pseudo-science" is a retrospective comfort; a historically false whitewash of Victorian era notions of progress. The developments of Civil War and Reconstruction-era America did not unfold in isolation from the ideological movements reshaping Europe. They cross-pollinated.



STOPS AT MAZER

*Does NOT cite Burrow-Giles or Nottage*

Consider what the conventional telling obscures. Historians who celebrate the Scopes Monkey Trial rarely acknowledge that *A Civic Biology* — the textbook at the center of that controversy — was authored in its offending chapters by Charles B. Davenport of Harvard, the leading figure of the American eugenics movement and the most celebrated scientist of his generation. Fewer still acknowledge that Darwin himself endorsed his cousin Francis Galton's eugenics in the foreword to *The Descent of Man*. The forces that shaped an era do not move in straight lines. They converge from unexpected directions, carried by men whose reputations have since been sanitized or compartmentalized.

The ornamental/useful bifurcation entered American law in 1842. The "fine arts" copyright category entered American law in 1870 — the same year the Fifteenth Amendment was ratified, mid-Reconstruction, two years after the Fourteenth. Galton's *Hereditary Genius* had appeared in

1869. Darwin's *The Descent of Man*, with its endorsement of Galton's hereditary theories appeared in 1871. The intellectual movements that would circumvent the Amendments emerged in the same historical breath.

## Legilative Intent Behind the Intellectual Property Clause

Thomas Jefferson drafted the Patent Act of 1790 and administered the first Patent Board as Secretary of State. His documented practice as the nation's founding patent examiner is the constitutional record of how the founding generation understood intellectual property protection. That record is unambiguous. Robert Leslie's patent for "Construction and Tone of Bells," approved February 2, 1793, granted protection for sculptural construction and acoustic tone in a single instrument — without separating the bell's form from its function.

Jefferson also approved the first piano patent in American history, Patent X116 for John Isaac Hawkins's "Claviol," followed by additional piano patents through 1800. The original Patent Office classification system maintained a "FINE ARTS" category encompassing musical instruments, sculpture, architecture, paints, and varnishes. No ornamental/useful bifurcation appears in the founding-era record.

Jefferson was a lifelong student of the Classical and Neo-Classical. He built from Vitruvius: *firmitas, utilitas, venustas* — strength, utility, beauty — as inseparable aspects of a single act of creation. The domes of Monticello, the Virginia State Capitol, and the University of Virginia are Vitruvian structures whose sculptural volumes were designed to produce specific acoustic effects.

Jefferson was also an avid musician who owned a collection of violins, practiced up to three hours a day in his youth, and played the cello. He knew — as does any first-year student of the bowed instrument family — that the sculptural volume of the body determines the acoustics. The spectrum of instruments that evolved from the *viola da braccio* differentiates upon the Helmholtz formula — from violin to viola, viola to cello, and cello to contrabass.

The author of the Patent Act designed buildings and was a musician; expertise combined that foreclose on the notion that Jefferson would have agree with the artificial or arbitrary bifurcation of sculptural form and acoustic function. He could not have. His life's work depended on their unity.

"Form follows function" may be a Modern Architecture aphorism, but it is an observation about creative design that the founding generation knew intuitively long before Helmholtz provided the scientific formula. The contention that Thomas Jefferson would have agreed with the separability of form and function is built on quicksand. It violates Constitutionality grounded on the legislative intent of the democratically elected representatives of the people.

## THE BRITISH TRANSMISSION VECTOR: NOTTAGE V. JACKSON AND VICTORIAN RACIAL HIERARCHY

*Nottage v. Jackson* is the doctrinal origin. It was decided by the English Court of Appeal in 1883. The citation history of American case law traces the "romantic authorship" construct to these British origins. Lord Justice Bowen, quoting Lord Justice Cotton, articulated the standard that would cross the Atlantic:

> *"The object is, not merely to preserve or create copyright in works of nature or of mechanical or chemical process, but to preserve or create a copyright in the production of some work in which there is novelty of design, and in which there is some merit—merit in the sense that there is some design—some invention, as Cotton L.J. has called it, or that the producer was the person who was the **inventive or mastermind.**"*

The statute protects not mechanical process but "novelty of design," "some invention," the work of "the inventive or mastermind." The vocabulary is not neutral. It emulated specific intellectual paradigms of its era. It paralleled Galton's conception of "eminence" in *Hereditary Genius*. Cotton and Galton emerged from the same Victorian intellectual ecosystem. Drew from the same intellectual well. Cotton moved in precisely the circles Galton studied.

### The 1862 British Copyright Act and Parliamentary Intent

The British statute that American courts would later invoke — the Fine Arts Copyright Act of 1862 — presents a question the courts never asked: What did Parliament intend?

The 1862 Hansard debates provide the answer. Parliament's purpose was commercial anti-fraud protection. The Act addressed a specific market problem: the unauthorized reproduction of photographs and engravings that deprived their creators of sales. Britain's Parliament did not intend to construct a philosophical framework of "romantic authorship". Parliament did not intend to establish a hierarchy by which judges would rank-order the cultural value of creative

works. Parliament intended to prevent fraud, and nothing more.

## The Experts Weighed In

The very figures the courts were supposedly protecting were offended by the constructs. The bisection of art and utility was resoundingly rejected by the dominant artistic movements overlapping with Victorian, Reconstruction, *fin de siècle* and the world war years. Arts & Crafts, Art Deco, Modern Art and Architecture were all unifying function and art; championing the observation that "form follows function."

Even the era's most racially polarizing musician, Wagner, was offended by the arbitrary demarcations. Wagner's concept of *Gesamtkunstwerk* ("total work of art") was a direct repudiation of the categorical separation between art forms; Wagner saw it as his mission to reunite the arts — music and fiction, enhanced by dance and gesture, were to be fully developed, and on an equal basis.

What appeared twenty-one years later in *Nottage v. Jackson* was not interpretation. It was invention. Lord Justice Cotton's "mastermind" requirement — the standard that would be grafted into American law — had no warrant in the parliamentary record. The romantic authorship construct is not a faithful reading of the 1862 Act. It is judicial gloss that exceeded, and contradicted, parliamentary purpose.

Justice Miller injected *Nottage*'s language into American constitutional law in *Burrow-Giles v. Sarony*. It had no founding-era predicate. It had no parliamentary predicate. It had no predicate at all.

## Cotton's Network Position:
## The Pre-Raphaelite Connection & Galton's "Judges of England"

The same generation that produced "scientific" racial hierarchy also produced "scientific" aesthetic hierarchy. The calendar year 1883 presents a convergence: Galton's "eugenical" hereditary hierarchy, *Nottage v. Jackson* establishing the "mastermind" standard, and the Code of Indian Offenses, criminalizing Native American culture. This is not a claim of causation. It is a claim of intellectual climate.

The logic was identical: innate capacity determines rank-order position; hierarchy is natural, not socially constructed; those with superior capacity occupy superior positions and superior

"mastermind" and "eminence" were the metric. A capacity for "high civilization" was the measure upon which eugenic worth was predicated.

Lord Justice Bowen's fellowship in the Royal Society (1885–1894) overlapped by nine years with Francis Galton's membership in that tight-knit institution. Lord Justice Cotton was one degree of separation from the Ruskin family circle. Ruskin's views on racial hierarchy were explicit. "Race is precisely of as much consequence in man as it is in any animal," he wrote. His *Two Paths* (1859) articulated the aesthetic-racial hierarchy that would become doctrine.

The Petitioner's mentor, Garland E. Allen, used the phrase "rank-order racial hierarchies" to characterize the supremacist philosophies of this era. What the courts imported into American intellectual property law was not neutral doctrine. It was the juridical residue of that hierarchy — arriving via British case law that had no founding-era American predicate and no parliamentary warrant even in Britain.

## Carlyle's "Hero" = Galton's "Eminence" = Cotton's "Mastermind"

The Scottish author Thomas Carlyle exerted profound influence on American Civil War and Reconstruction-era intellectuals. Carlyle gave form and an aura of respectability to ideas that would have been more easily dismissed if they came from the perceived backwater of the rural South. His European stature provided transnational legitimacy to pro-slavery arguments, allowing Southern intellectuals to position racial hierarchy not as a provincial peculiarity but as part of a sophisticated international critique of liberal capitalism.

Carlyle's views on race were not incidental to his philosophy; they were structural to it. In *On Heroes, Hero-Worship, and the Heroic in History* (1841), Carlyle articulated a philosophy in which innate "genius" elevates certain individuals — the Hero as Divinity, as Prophet, as Poet, as Man of Letters — above the mass of humanity. History, for Carlyle, was the biography of great men. Democracy was error; hierarchy was nature.

In *Occasional Discourse on the Negro Question* (1849), Carlyle applied the identical architecture to race. Black laborers in the British West Indies, he argued, should be compelled to work under white supervision because they lacked the innate capacity for self-governance. They lacked "mastermind" or "genius". Those without capacity must be governed by those with it. The structural

isomorphism is precise:

- **Aesthetic domain**: Some possess inherent creative genius; others are mere mechanical operators. The law should protect the productions of genius and exclude mechanical reproduction.
- **Racial domain**: Some possess inherent civilizational capacity; others are incapable of self-governance. The law should establish relations of guardianship and subordination.

Carlyle's "hero" is Galton's "eminence" is Cotton's "mastermind." Coincidence lacks credulity when the era was markedly obsessed over racial hierarchies.

## AMERICAN JURISPRUDENCE DISCONTINUITIES OF 1842 AND 1870

### A. The Design Patent Act of 1842: Creating the Ornamental/Useful Divide

Jefferson's Patent Acts of 1790 and 1793 protected "any useful art, manufacture, engine, machine, or device" without distinguishing between functional and ornamental features. The founding-era Patent Office classified subject matter into categories that reflect a unified conception of intellectual property protection. Category XIV is dispositive: "FINE ARTS — Musical instruments, paints, varnishes, gildings, sculpture, architecture and gardening." The legislative intent classified sculpture and musical instruments together under "Fine Arts" as patentable — not as mutually exclusive categories. American jurisprudence has adopted the inverse.

The ornamental/useful divide entered American law via Henry Leavitt Ellsworth's 1842 alterations to the Patent Act. He was the first to hold the title of Commissioner of Patents and the son of Oliver Ellsworth, the third Chief Justice of the United States. He personally recommended the statutory language that Congress adopted.

Ellsworth's work as Commissioner did not occur in a vacuum. Before his appointment as Commissioner of Patents, Ellsworth served as Commissioner to the Indians under Andrew Jackson (1832). In that capacity, he superintended the forced removal of Indian tribes.

Ellsworth's attitudes toward Native Americans combined paternalism, pragmatism, and firm belief in the inevitability of the federal government's "civilizing" mission. The same institutional and

political networks that positioned Ellsworth to implement Indian removal policy subsequently positioned him to architect the 1842 Design Patent Act.

## The Copyright Act of 1870

Professor Robert Brauneis of George Washington University Law School has documented the significance of the 1870 deviations from original intent: the 1870 Act "aligned copyright with the 'fine arts' as being explicitly distinct from the 'mechanical arts,' a revision of the earlier understanding that copyright would cover 'Science' as opposed to the 'Useful Arts.'"

This was an explicit revision of founding intent. The Copyright Act of 1790 had protected "books, maps, charts" without hierarchical distinction. The cartographers of Jefferson's era were not mechanical laborers; the artistry of their maps speaks for itself. The 1870 statute introduced a hierarchical distinction with no foundation in the original constitutional framework.

## C. The Glass Armonica: Franklin's Own Refutation

Benjamin Franklin was the preeminent inventor among the Founders and echoes Jefferson. His practice, his explicit statements, and his contemporaries' assessments all point to the same conclusion: Franklin would not have recognized a strict separation between art and utility.

His favorite invention proves the point: The glass armonica. Mozart and Beethoven composed for it. Yet Franklin invented it through mechanical problem-solving: he observed that wet fingers on glass rims produced musical tones, then engineered a device to produce them systematically. The armonica embodies the unity of the mechanically functional and the beautiful.

Franklin's philosophy of invention confirms the framing. Despite creating some of the most consequential inventions of the modern world — the lightning rod, the Franklin stove, bifocal lenses — he never patented a single one. When Governor Thomas offered Franklin a patent on the Franklin Stove, Franklin declined. His statement in the *Autobiography* is conclusive:

> *"As we enjoy great advantages from the inventions of others, we should be glad of an opportunity to serve others by any invention of ours; and this we should do freely and generously."*

Franklin's view of authorship and invention was the structural antithesis of the romantic authorship construct. Franklin saw creative production as flowing from common inheritance and

properly returning to a common pool. No mystical spark of individual genius justifying exclusive monopoly. No hierarchy of creative types. Utility for the commonwealth was the governing value.

The "romantic authorship" doctrine would have struck Franklin as both philosophically incoherent and morally backwards. Franklin is thus instrumental as the diagrammatic opposite of the Victorian hierarchies.

### Carlyle's Aristocratic "Hero":

- Creativity descends from a transcendent realm through specially endowed individuals
- Hierarchical ordering based on innate capacity for perception ordinary mortals lack
- The Hero is set apart — a different kind of being
- Genius is quasi-mystical, cannot be taught, cannot be acquired
- Justifies differential treatment as natural and proper
- The great mass of humanity properly defers to the superior few

### Franklin's "Free and Generous" Improver:

- Creativity emerges from common inheritance and returns to common pool
- Democratic sharing — "as we enjoy great advantages from the inventions of others"
- The inventor is continuous with ordinary humanity, just more industrious
- Problem-solving is empirical, demonstrable, shareable, improvable
- Justifies free circulation as the proper disposition of creative work
- The inventor serves the commonwealth, not the reverse

These are not merely different emphases. They are incompatible ontologies of creative production.

### The Directional Metaphor

- **Carlyle's creativity flows downward:** from the transcendent, through the specially capacious soul of the Hero, to the grateful masses below. It is a vertical hierarchy with the genius at the apex.

- **Franklin's creativity flows horizontally:** from predecessors, through the improver, to successors and contemporaries. It is a network of mutual obligation where no one stands above.

## THE AMERICAN JUDICIAL INJECTION: BURROW-GILES AND THE SAME HANDS THESIS

In two landmark opinions — *Trade-Mark Cases* (1879) and *Burrow-Giles Lithographic Co. v. Sarony* (1884) — Justice Samuel Freeman Miller articulated the constitutional boundaries of congressional power over intellectual property and established the "romantic authorship" construct that persists to the present day.

When Miller wrote that copyright protection requires evidence of the author's "original mental conception," he was operationalizing a framework traceable through Victorian intellectual networks to Carlyle's hero-worship, Galton's eminence hierarchy, and Lord Justice Cotton's "mastermind" formulation.

The anti-slavery Miller is exemplary of his era: The same Union Army that freed the slaves was immediately deployed to forcibly corral the Native Americans into Reservations. Miller, the Justice who held genuine antislavery convictions also authored *United States v. Kagama* (1886), the decision establishing plenary power doctrine over Native American tribes.

In *Kagama*, Miller wrote that tribes were "wards of the nation" — "communities dependent on the United States" — over whom Congress possessed authority not enumerated in the Constitution but derived from the "duty of protection" that guardianship implies. The opinion cited no constitutional text. Miller derived congressional power from the relationship itself.

The pattern extends. Justice Joseph P. Bradley authored *Baker v. Selden* (1879), establishing the idea/expression distinction in copyright law. The same Justice Bradley authored the *Civil Rights Cases* (1883), gutting the Civil Rights Act of 1875 by holding that the Fourteenth Amendment prohibited only state action, not private discrimination — the constitutional framework that enabled racial segregation for the next eighty years. The same hands wrote both. Justice Miller and Bradley were both products of and forces behind the Reconstruction Era.

The Carlisle Indian Industrial School in 1879 and their annual Lake Mohonk conferences, starting in 1883, were the intellectual engine for the efforts to "civilize" the Native Americans via legislation like the Dawes Act of 1887, which aimed to cleanse these populations of their cultural and religious practices by eliminating tribal life.

# THE 1883–1887 "SAME HANDS" CONVERGENCE

| Year | Instrument | Domain | Target/Effect | Author/Initiator |
|---|---|---|---|---|
| 1883 | Galton coins "eugenics" | Scientific ideology | Heritable racial hierarchy systematized | Francis Galton |
| 1883 | Nottage v. Jackson (Q.B.D.) | British IP law | "Inventive or mastermind" requirement | Cotton LJ and Bowen LJ |
| 1883 | Code of Indian Offenses | Ceremony (spiritual) | Communal religious practice criminalized | Henry M. Teller (initiator) / Hiram Price (promulgator) |
| 1883 | First Lake Mohonk Conference | Assimilation policy | Protestant dissolution of tribal bonds | Albert Kellogg Smiley (Quaker) |
| 1883 | Civil Rights Cases | Racial civil rights | Reconstruction enforcement ended | Bradley J. (majority); Miller J. (concurred) |
| 1884 | Burrow-Giles v. Sarony | Intellectual property (cultural) | Communal/mechanical authorship excluded | Miller J. |
| 1886 | United States v. Kagama | Federal Indian law | Tribes as "dependent wards" under plenary power | Miller J. |
| 1887 | Dawes Severalty Act | Real property (material) | Communal land tenure dissolved | Henry Dawes (drafted); supported by Lake Mohonk network |

The "kill the Indian in him, and save the man" directive was first famously delivered by Captain Richard Henry Pratt in the 1892 Lake Mohonk conference. It became the slogan of what the Code of Indian Offenses (1883); the Code that criminalized traditional Native practices such as the Sun Dance, the Scalp Dance, the War Dance, all related ceremonies, and the work of "medicine men" and jailing those that violated them or the withholding their rations.

In the speech, Pratt referenced a common saying of the time—"the only good Indian is a dead one"—and countered it by saying he agreed only in the sense that the "Indian", the cultural and identity, should be "killed" so the "man", the individual, could be saved through assimilation.

The *United States v. Kagama* (1886) ruling provided the unrestricted legal authority Pratt needed to expand his assimilationist mission at the Carlisle Indian Industrial School. The Kagama decision fundamentally redefined the legal relationship between Native Americans and the Federal government. Kagama provided Pratt with "Plenary Power" over Native tribes, essentially stating that tribes were "wards" of the nation. *Kagama* legalized Forced Removal.

Before *Kagama*, the legality of forcibly removing children from sovereign tribal nations for education was a gray area. By stripping tribes of their sovereignty, the Court cleared the path for

the compulsory education and off-reservation boarding school system intended for cultural cleansing. These powers as "guardian-ward" relationship endowed Pratt with administrative immunity, allowing Pratt and the Bureau of Indian Affairs to justify total control over students' lives—including cutting their hair, changing their names, and forbidding their languages—under the guise of "protection" and "civilization".

Justice Samuel Freeman Miller, Justice Joseph P. Bradley and Captain Richard Henry Pratt were connected through the overlapping legal and social networks of late 19th-century Indian reform, part of a cohesive Gilded Age establishment.

## EUGENIC INFLUENCE:

"Romantic authorship" carried explicit eugenic premises. Eugenics was a British invention which the American Ivy League researched and developed into a then-respected science, and subsequently a set of "model laws" adopted by Hitler's government.

Galton's eugenics measured evolutionary worth by individual accomplishment. As was the case with Carlysle, individuals who contributed culturally without demonstrating "hereditary genius"— the title of Galton's foundational text—were characterized as "dysgenic"; "atavisms" regressing the race toward the primitive. Evolution regressing. The antithesis of the era's stated goal of "progress".

The inverse followed necessarily: Works of collective or tribal authorship, lacking an identifiable individual genius, explicitly fell outside of Galton's measure for what constituted viable breeding stock. This belief permeated all of American and British culture, and was not confined to scientific journals. It permeated all of academia, politics and culture.

The Ripper murders and *fin de siècle* urban disorder were publicly attributed to allowing "defectives" to breed—something, eugenicists noted, no animal breeder would permit. The fervor pitch of these emergent scientific beliefs culminated with Max Nordau's *Degeneration*, where art, literature and music was diagnosed from a pathological and medical framing. The cruel irony of history had the Zionist's pathologization culminate in Hitler's Degenerate Art Exhibit.

## UNANSWERED FOR 75 YEARS:
## FROM MAZER TO STAR ATHLETICA

American jurisprudence itself has identified the overarching problem. Justice William O. Douglas, concurring in *Mazer v. Stein* (1954), stated what remains the central constitutional deficiency of the romantic authorship and useful articles doctrines:

> *"The constitutional materials are quite meager... and much research is needed."*

Douglas compiled the list of categories the Copyright Office had utilized for registrations — objects whose nature called into question whether federal agencies observed any principled demarcation between art and utility: "statuettes, book ends, clocks, lamps, door knockers, candlesticks, inkstands, chandeliers, piggy banks, sundials, salt and pepper shakers, fish bowls, casseroles, and ash trays." The implications were clear. Their function was their aesthetic.

The doubts Douglas raised have never been answered. No subsequent decision has traced the useful articles doctrine to founding-era practice. None could. No such practice existed. *Star Athletica, L.L.C. v. Varsity Brands, Inc.* (2017) is the current apex of the useful articles doctrine. Justice Clarence Thomas, writing for the majority, traced the doctrine to *Mazer* — "this has been the rule since Mazer." The citation chain terminates at mid-twentieth century.

*Star Athletica* did not trace the doctrine to founding-era constitutional grounding because it could not. The American side of the citation chain breaks at the Copyright Act of 1870 and fails to reach Jefferson.

## THE DECIMATION OF FENDER & GIBSON

Racial animus is not a precondition for the harm such laws predictably cause. Law that is arbitrary and without Constitutional grounding has a wide cone of fire.

The American musical instrument industry has been devastated by these arbitrary demarcations and bifurcations. Two of the nation's most lauded inventors, Leo Fender and Les Paul, could not secure adequate intellectual property protection for their guitar body shapes in the United States. Leo Fender, the rightful designer of the iconic gem of American culture that is the Fender Stratocaster, was denied protection under the "useful articles' functionality doctrines. The market acknowledges the rightful inventor by using the terms "Frankencaster" and "Partscaster" as

nicknames for the now dominant and overwhelming amount of knockoffs and cheap Chinese imitations.

Both men nonetheless built enterprises. They built them because geographic distribution, manufacturing complexity, and information asymmetry provided structural protections that compensated — however imperfectly — for the law's failure. To acquire a genuine Fender instrument in the mid-twentieth century, a consumer engaged with a domestic distribution network that did not yet have a global counterpart. To copy and manufacture a guitar body shape at scale required industrial capacity that was not commercially available to private actors. Information about the design itself was asymmetric — the specifications were not globally published and accessible within hours of a product's release. Those structural conditions are gone.

The global e-commerce marketplace has eliminated geographic authentication entirely. A design published today can be manufactured overseas and listed on global platforms within days — in practice, within hours. Intellectual property protection is not one layer among many available to craftspeople in the current marketplace. It is the only layer in an "Idea Economy".

The temporal inadequacy of existing protection categories is not speculative. Antonio Stradivari made violins during his Golden Period between 1700 and 1720 that remain in active professional use today, 300 to 350 years later. Design patents provide protection for 15 years — approximately 5% of a Stradivarius's current productive lifespan. The lifespan of a Fender Stratocaster as a cultural artifact has not yet been determined, but it is trending in the same direction.

The legal regime treats instruments as seasonal products while granting stronger protection to fashion items designed for annual, and in practice seasonal, obsolescence. The disparity has no rational basis. The art rightfully belongs to the realm of copyright.

## STARE DECISIS

The invocation of *stare decisis* to preserve these two transplanted doctrines warrants examination in light of how the same courts have historically treated precedent.

The phrase "Separation of Church and State" appears nowhere in the Constitution. It entered constitutional law through a private letter Thomas Jefferson wrote to the Danbury Baptist Association in 1802 — correspondence Jefferson ordered destroyed and never introduced as

legislative posture. In *Everson v. Board of Education*, 330 U.S. 1 (1947), the Supreme Court elevated that private metaphor, "wall of separation of church and state", to the status of near-canonical Constitutional dictate.

Corporate personhood, the doctrine that extends constitutional rights to corporations, traces not to any holding but to a headnote written by a court reporter in *Santa Clara County v. Southern Pacific Railroad Co.*, 118 U.S. 394 (1886). That editorial note carried no precedential force. It became doctrine regardless — conferring constitutional rights on corporations before women's suffrage and before meaningful enforcement of African Americans' constitutional rights.

The doctrinal flexibility courts have applied when extending rights to commercial and corporate entities has not been applied with equal flexibility when confronting claims arising from minority ethnicity, national origin, collective authorship, or functional art.

## CONSTITUTIONAL IMPLICATIONS TODAY: LOPER BRIGHT AND DE NOVO REVIEW

*Loper Bright Enterprises v. Raimondo (2024)* overruled *Chevron* deference. Agency interpretations lacking constitutional ancestry are now subject to de novo judicial review. Under de novo review, courts must ask: Does the Constitution require the "romantic authorship" construct and the "useful articles" doctrine? The historical record answers: No.

### The Predicted and Intended Harm

This study substantiates that the harm was not just predictable, but the intended effect of the "romantic authorship" and "useful articles" constructs". The proximate consequences are measurable.

The 2023 Iams study documented a disparity of patent grants at a ratio of approximately 39:1; a disparity of outcomes that is difficult to internalize and accept.

The findings seem elevated until the multiple layers of friction are considered as the strata of a single system at-risk applicants must contend with; the digital dysfunction and non-compliance, the structurally discriminatory legal frameworks and persistent due process denials employed to defend the status quo.

## CONCLUSIONS

The title of this study invokes two legal constructs. "Same hands" describes the prosopographic finding: Justice Miller authored both *Burrow-Giles* (1884), which embedded romantic authorship in constitutional doctrine, and *Kagama* (1886), which embedded Native American wardship. Justice Bradley authored both *Baker v. Selden* (1879), which established copyright's idea/expression distinction, and the Civil Rights Cases (1883), which dismantled Reconstruction civil rights enforcement. These were not separate judicial projects pursued by different minds in different eras. They were the work of the same hands, during the same years, within the same intellectual climate.

"Unclean hands" invokes the equitable doctrine that denies relief to parties who come to court having engaged in wrongful conduct. The judges who constitutionalized "romantic authorship" and "useful articles" doctrine did not approach the constitutional questions as neutral arbiters. They came to those questions while simultaneously defining wardship, dismantling civil rights, and operating within an intellectual climate saturated with hierarchical theories of innate capacity. The hands that wrote these doctrines were not clean.

This is not historiography. The question this study poses is a Constitutional question. The question is justiciable. The evidence is in the documentary record. What remains is whether any court will examine it.

The "romantic authorship" doctrine is unconstitutional because it conditions the exercise of protected expression and property rights on compliance with an invented ideological model of authorship—one that compels disclosure of identity, penalizes mediated or collaborative creation, and imposes a singular "mastermind" requirement foreign to both lived creative practice and First Amendment protections. It operates as a gatekeeping construct that burdens speech, association, and anonymity.

The "useful articles" doctrine is unconstitutional for a different but equally severe reason: it conditions protection on a distinction that, in many classes of objects, does not exist in reality. Where form and function are physically coupled, the doctrine requires adjudicators to deny the nature of the object itself, eliminating any principled standard and reducing adjudication to

discretionary selection.

They are orthogonal constitutional failures:

- One violates rights by imposing an illegitimate ideological filter on *who qualifies* and *how expression is recognized.*

- The other violates due process by eliminating any coherent rule for *what qualifies.*

Both doctrines are constitutionally defective, but in different and equally impermissible ways: the "romantic authorship" construct imposes an ideological model of creation that conditions protection on identity, authorship form, and compelled disclosure in violation of First Amendment and associational rights, while the "useful articles" doctrine goes further by requiring adjudicators to apply a distinction between form and function that, in many classes of objects, does not exist in reality—thereby eliminating any governing standard and converting adjudication into pure discretion; one burdens fundamental rights through imposed ideology, the other nullifies due process by substituting fiction for rule, and neither can be reconciled with a constitutional system grounded in reality and constrained decision-making.

# METHODOLOGY NOTE

This synthesis document was prepared using exclusively the data contained within the prosopography study database files:

- UNIFIED_PERSONS.json
- UNIFIED_CITATIONS.json
- UNIFIED_DOCTRINES.json
- PROSOP_EXTRACTS_C1-C4.json
- CASELAW_EXTRACTS_D1-D4.json
- PHASE_EXTRACTS_CONSOLIDATED.json
- RESEARCH_MEMO_EXTRACTS_E1.json

All factual assertions derive from the indexed and verified contents of these source files. No external sources were consulted beyond the data mined and structured within the prosopographical database from research conducted across this project from these primary authoritative sources:

## AMERICAN CASE LAW

- **Justia** (justia.com) — All American case law including *Burrow-Giles, Baker v. Selden, Trade-Mark Cases, Kagama, Civil Rights Cases, Mazer v. Stein, Star Athletica, Loper Bright*

## BRITISH CASE LAW

- **BAILII** (bailii.org) — British and Irish Legal Information Institute; *Nottage v. Jackson* (1883)

## PARLIAMENTARY RECORDS

- **Primary Sources on Copyright (1450-1900)** (copyrighthistory.org) — 1862 Hansard debates on the Fine Arts Copyright Act; specifically showRecord.php?id=record_uk_1862e

## CARLYLE PRIMARY TEXTS

- **The Encyclopaedia of Encyclopedia of encyclopedias Thomas Carlyle Scholarly Archive** (cruel.org) — *On Heroes, Hero-Worship, and the Heroic in History* (1841); *Occasional Discourse on the Negro Question* (1849)

## MUSEUM/ARCHIVAL EVIDENCE

- **Smithsonian National Museum of American History** (americanhistory.si.edu) — Hawkins Upright Piano Serial #6; collection object nmah_605881

## SUPREME COURT BIOGRAPHICAL

- **Oyez** (oyez.org) — Supreme Court justice biographies, appointment dates, notable opinions

## ROYAL SOCIETY FELLOWSHIP RECORDS

- **Royal Society** (royalsociety.org) — FRS fellowship dates for Bowen, Galton, Acland; verification of overlapping membership periods

## FEDERAL AGENCY HISTORICAL RECORDS

- **Bureau of Indian Affairs Historical Records** — Code of Indian Offenses (1883)

## LEGAL SCHOLARSHIP

- **SSRN** (ssrn.com) — Professor Robert Brauneis (GWU), Professor Jane Ginsburg (Columbia), Professor Shyamkrishna Balganesh (Penn)
- **HeinOnline** — Law review articles on copyright history and authorship doctrine

## FOUNDING-ERA PATENT CLASSIFICATION

- **Google Books / Internet Archive** — Historical patent office classification manuals; Category XIV documentation

## BIOGRAPHICAL ENCYCLOPEDIAS

- **Oxford Dictionary of National Biography** (oxforddnb.com) — British figures including Cotton LJ, Bowen LJ, Acland, Ruskin
- **American National Biography** (anb.org) — American figures including Ellsworth, Miller, Bradley

The prosopographical method employed here—the collective study of lives within historical networks—follows established historiographical practice. The figures examined are not isolated biographies but nodes within institutional, intellectual, and social networks whose interactions shaped doctrinal development.

# BIBLIOGRAPHY

## Primary Legal Sources

### United States Supreme Court Cases

- Baker v. Selden, 101 U.S. 99 (1879).
- Bleistein v. Donaldson Lithographing Co., 188 U.S. 239 (1903).
- Brown v. Board of Education, 347 U.S. 483 (1954).
- Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53 (1884).
- Civil Rights Cases, 109 U.S. 3 (1883).
- Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991).
- Gorham Manufacturing Co. v. White, 81 U.S. (14 Wall.) 511 (1871).
- Loper Bright Enterprises v. Raimondo, 603 U.S. ___ (2024).
- Mazer v. Stein, 347 U.S. 201 (1954).
- Plessy v. Ferguson, 163 U.S. 537 (1896).
- Star Athletica, L.L.C. v. Varsity Brands, Inc., 580 U.S. 405 (2017).
- Trade-Mark Cases, 100 U.S. 82 (1879).
- United States v. Kagama, 118 U.S. 375 (1886).

### British Cases

- Nottage v. Jackson, 11 Q.B.D. 627 (C.A. 1883).

### United States Statutes

- An Act for the encouragement of learning, by securing the copies of maps, Charts, and books, to the authors and proprietors of such copies, during the times therein mentioned (Copyright Act of 1790), 1 Stat. 124.

- An Act to promote the Progress of useful Arts (Patent Act of 1790), 1 Stat. 109.
- An Act to promote the progress of useful Arts, and to repeal the act heretofore made for that purpose (Patent Act of 1793), 1 Stat. 318.
- An Act to promote the Progress of the useful Arts, and to repeal all Acts and Parts of Acts heretofore made for that Purpose (Design Patent Act of 1842), 5 Stat. 543.
- An Act to Revise, Consolidate, and Amend the Statutes Relating to Patents and Copyrights (Copyright Act of 1870), 16 Stat. 198.
- Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (codified as amended at 17 U.S.C. §§ 101 et seq.).

**British Statutes**

- Fine Arts Copyright Act 1862, 25 & 26 Vict. c. 68.

**Congressional Materials**

- H.R. Rep. No. 94-1476 (1976).

**Administrative Materials**

- Code of Indian Offenses, Rules Governing the Court of Indian Offenses (1883), in Annual Report of the Commissioner of Indian Affairs (1883).

**Parliamentary Debates**

- Hansard Parliamentary Debates, House of Lords, 22 May 1862 (Fine Arts Copyright Bill debate).

# Primary Historical Sources

## Historical Documents and Correspondence

- Jefferson, Thomas. Letter to James Dinsmore, 5 April 1800. The Papers of Thomas Jefferson, vol. 31, p. 495.

## Founding-Era Patent Office Records

- Patent Office Classification System, Category XIV: "Fine Arts—Musical instruments, paints, varnishes, gildings, sculpture, architecture and gardening."

# Secondary Sources

## Books

- Carlyle, Thomas. On Heroes, Hero-Worship, and the Heroic in History. London: James Fraser, 1841.
- Carlyle, Thomas. "Occasional Discourse on the Negro Question." Fraser's Magazine for Town and Country 40 (December 1849): 670–79.
- Galton, Francis. Hereditary Genius: An Inquiry into Its Laws and Consequences. London: Macmillan, 1869.
- Galton, Francis. Inquiries into Human Faculty and Its Development. London: Macmillan, 1883.
- Herrnstein, Richard J., and Charles Murray. The Bell Curve: Intelligence and Class Structure in American Life. New York: Free Press, 1994.
- Reynolds, Joshua. Discourses on Art. London: Royal Academy of Arts, 1769–1790.

## Journal Articles

- Brauneis, Robert. "The Transformation of Originality in the Progressive-Era Debate Over Copyright in News." Cardozo Arts & Entertainment Law Journal 27 (2009): 321–73.
- Du Mont, Jason J., and Mark D. Janis. "The Origins of American Design Patent Protection." Indiana Law Journal 88 (2013): 837–80.

# Archival Sources

## Museum Collections

- Hawkins, John Isaac. Upright Piano, Serial #6 (1800). Collection of the Smithsonian National Museum of American History, Washington, D.C.

## Note on Sources

This bibliography documents the primary and secondary sources supporting the prosopographical analysis. All case law citations, statutory references, and quotations were verified using Python extraction methodology to ensure verbatim accuracy pursuant to the project's 100% Verbatim Fidelity Standard.

Biographical birth and death dates for historical figures were obtained from standard reference works and have been omitted from this bibliography as supplementary information not central to the legal and doctrinal analysis.

# EXHIBIT B

## 03/05/2026 UNAUTHORIZED APPOINTMENT OF COUNSEL

Interview Summary documenting
Examiner Bodendorf's unilateral appointment of
Corey D. Hawse as "Attorney of Record"
without Petitioner's authorization or consent.



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/461,021 | 08/30/2021 | Alvaro E. Siman | | 5709 |

174249    7590    03/05/2026
Alvaro E. Siman
221 Donax Ave - Unit 1
Imperial Beach, CA 91932

| EXAMINER |
|---|
| BODENDORF, ANDREW |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3715 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/05/2026 | PAPER |

Please find below and/or attached an Office communication concerning this application or proceeding.

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. 17/461,021 | Applicant(s) Siman, Alvaro E. | | |
|---|---|---|---|---|
| | Examiner ANDREW BODENDORF | Art Unit 3715 | AIA (First Inventor to File) Status Yes | Page 1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ANDREW BODENDORF | Examiner | Telephonic |
| Xuan Thai | SPE | |
| Corey D. Hawse | Attorney of Record | |

Date of Interview: 03 March 2026

**Issues Discussed:**

**35 U.S.C. 112**

Reviewed Applicant's proposed amendments for claims 1-20 submitted with agenda (see attached). The Examiner indicated the proposed amendments to claims 1-20 appear to overcome the rejections under 112(b).

**35 U.S.C. 103**

Discussed references Koo and Kim with regard to proposed amendment to claim 1 submitted with agenda (see attached). Examiner explained interpretation of claim 1 with regard to these references. Applicant's representative discussed both Koo and Kim, pointing out claim language the he argued was not taught be these references. No agreement was reached. The Examiner will consider any further amendments/remarks when officially submitted.

**Objections**

Reviewed Applicant's proposed amendments for claims 1-20 submitted with agenda (see attached). The Examiner indicated the proposed amendments to claims would overcome the objections to the claims. In addition, the Examiner suggested some additional clarifying language for claim 6.

**Proposed Amendment(s)**

Reviewed Applicant's proposed amendments for claims 1-20 submitted with agenda (see attached) with regard to objections and rejections under 112 and 103. Agreement was reached with regard to the objection and 112 rejections. No agreement was reached with regard to the rejections under claim 103. The Examiner will consider any further amendments/remarks when officially submitted.

☑ Attachment

| Applicant-Initiated Interview Summary | Application No. 17/461,021 | Applicant(s) Siman, Alvaro E. | | |
|---|---|---|---|---|
| | Examiner ANDREW BODENDORF | Art Unit 3715 | AIA (First Inventor to File) Status Yes | Page 2 of 2 |

| /ANDREW BODENDORF/ Examiner, Art Unit 3715 | /XUAN M THAI/ Supervisory Patent Examiner, Art Unit 3715 |
|---|---|

Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04

Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

Applicant recordation instructions: The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

Examiner recordation instructions: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

Organization ___TO2000___ Bldg/Room ___15F___
**United States Patent and Trademark Office**
P.O. Box 1450
Alexandria, VA 22313-1450°
If Undeliverable Return in Ten Days

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

AN EQUAL OPPORTUNITY EMPLOYER

US POSTAGE AND PITNEY BOWES

ZIP 22314   $ 001.03°
02 1W
0000355069 MAR 05 2026

919328193B 0003

# EXHIBIT C

## CONFLICT OF INTEREST — AGENCY CLARIFICATION REQUESTED

Documentation of public records reflecting an active patent law practice
"Law Office of Andrew Bodendorf" operating within four miles of USPTO
while USPTO Examiner of same name is assigned to Application No. 17/461,021

### Contents:

C-1: DC Bar Registration — Andrew F. Bodendorf
C-2: USPTO Patent Center — 16-series Patent Screenshot
C-3: Google Search Results — Multiple Directory Listings

Statutes potentially implicated if same individual:

18 U.S.C. §§ 203 and 205 • 35 U.S.C. § 4 • 5 CFR § 2635.802 • 37 CFR § 11.10



## Member Details

**Full Name**
Mr. Andrew F Bodendorf

**Business Address**

**Business Email**

**Business Phone**

**DC Bar Member Status**
GOOD STANDING

**Member Type**
Active

**Admit Date**
12/3/2001

Return

74 / 77  Pat. App. No. 17/461,021 - Omnibus Civil Rights Affidavit - DOJ Case. No.: 740459-NDX



C-2: USPTO Patent Center — 16-series Patent Screenshot



C-3: Google Search Results — Multiple Directory Listings

# CERTIFICATE OF SERVICE

I hereby certify that on or about April 8, 2026 the foregoing Affidavit will file electronically through USPTO Patent Center and entered on the official docket of Patent Application No. 17/461,021, including the relevant correspondence to the Library of Congress and its Copyright Office.

**Electronic Filing Constitutes Legal Service**

Under 37 C.F.R. § 1.8(a)(1)(i) and MPEP § 502.05, documents filed through Patent Center are officially received by the USPTO as of the date and time of electronic submission. Once docketed, all USPTO personnel with responsibility for the application are charged with constructive notice of its contents. See MPEP § 704 (examiner duty to review file before action); MPEP § 1705 (supervisory review requirements). Once received by a legal representative of the Library of Congress and/or its Copyright Office all relevant personnel with responsibility are charged with constructive notice of its contents.

Under established principles of agency law, knowledge possessed by the agency is imputed to its officers acting in their official capacity. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986). An employee's claim of personal ignorance regarding docketed documents does not excuse non-response; deliberate avoidance of information available through normal channels constitutes willful blindness equivalent to actual knowledge. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

Accordingly, electronic filing of this affidavit constitutes legal service upon all USPTO, Library of Congress and Copyright Office personnel implicated in the matters raised herein. Service has been satisfied as a matter of law regardless of whether any individual employee receives or reviews a courtesy copy.

## Copies

To foreclose any claim of personal non-receipt, hard copies of this affidavit will be mailed via USPS Certified Return Receipt service, on or about the same dates, to the following recipients:

1. **Federal Supplementation:** A copy of this affidavit will be transmitted to the U.S. Department of Justice, Civil Rights Division, to supplement DOJ Case No. 740459-NDX.

2. **Dawnmarie Sanok**, Senior Attorney Advisor, Office of the Deputy Commissioner for Trademark Examination Policy, USPTO, 600 Dulany Street, Alexandria, VA 22314

3. **Margaret Williams,** General Counsel, Library of Congress, 101 Independence Avenue SE, Washington, DC 20540

4. **Todd Blanche,** Acting Librarian, Office of the Librarian, Library of Congress, Thomas Jefferson Building, 10 First Street SE20540

5. **Emily Chapuis,** General Counsel, Copyright Office, U.S. Copyright Office — OGC, P.O. Box 7040020024-0400

These courtesy copies do not alter the legal effect of electronic service, which was accomplished upon docket entry. Direct service to Senior Attorney Sanok and the appropriate parties at the Library of Congress and its Copyright Office forecloses any claim that cross-divisional and cross-agency filing prevented actual knowledge of the civil rights disclosures.

Dated: April 8th, 2026



P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

UNITED STATES
PATENT AND TRADEMARK OFFICE

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>17/461,021 | RECEIPT DATE / TIME<br>**04/13/2026 03:07:19 PM Z ET** | ATTORNEY DOCKET # |
|---|---|---|

## Title of Invention

Incorporation of Computing Hardware that Captures and Conveys the Shape and Relative Position of Sporting Equipment Without Affecting its Required Physical Performance

## Application Information

| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | |
|---|---|---|---|
| CONFIRMATION # | 5709 | FILED BY | Alvaro Siman |
| PATENT CENTER # | 75271884 | FILING DATE | 08/30/2021 |
| CUSTOMER # | 174249 | FIRST NAMED INVENTOR | Alvaro E. Siman |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | - |

## Documents

## TOTAL DOCUMENTS: 1

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| AFFIDAVIT-NOTARIZED_SameHands_LOCV56.pdf | 77 | Affidavit-traversing rejections or objections rule 132 | 5494 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| AFFIDAVIT-NOTARIZED_SameHands_LOCV56.pdf | 81106417BE3E83088CD97B13414FE5D4B453D2219C3A502D4B229A264FDE33E758BC0A9BA8EA3AFD9EBC74DDB012F1D4508618F6F935C95B5B8B0598C86660ED |