# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHIRA PERLMUTTER, et al.,

    *Plaintiffs,*

v.

               Case No. 1:25-cv-1659 (TJK)

TODD BLANCHE, in his capacity as

Acting Librarian of Congress, et al.,

    *Defendants.*

---

## AMICUS CURIAE BRIEF
### ON THE CONSTITUTIONAL OBLIGATIONS INCIDENTAL TO THE REGISTER OF COPYRIGHT'S INSTITUTIONAL CHARACTER

---

Amicus Curiae Alvaro E. Siman respectfully submits this brief in support of neither party, taking no position on the employment question before this Court—whether the Register of Copyrights is removable at will by the Librarian of Congress or only for cause. Amicus presents the constitutional consequences that follow from either answer.

The *Perlmutter v. Blanche*, No. 25-5285 (D.C. Cir. Sept. 10, 2025) order granting injunction pending appeal issued by this Court held that Perlmutter satisfied the irreparable harm requirement based on "genuinely extraordinary" circumstances under *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

The question of the LOC's independence from the Executive extends beyond the employment determination. The question of employment is determined by the character of the institution as part of the Federal government. The at-risk communities affected by

1

RECEIVED
Mailroom

APR 15 2026

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

the determination must live with the constitutional consequences that follow from either answer.

Neither party has framed the question in these terms. Amicus is positioned to do so.

### The Chain of Necessary Determinations

This case arises from the Executive's effort to use copyrighted works in the Library of Congress's collection to train artificial intelligence. The Register opposes this use. But the question of who controls that corpus—and whether the Register's control is constitutionally valid—depends on antecedent determinations this Court has not been asked to make.

### The chain is as follows:

First, AI training rights depend on who owns the corpus. The Library of Congress claims ownership. That ownership has been challenged.

Second, ownership depends on whether acquisition was constitutional. *Valancourt Books, LLC v. Garland*, No. 21-5203 (D.C. Cir. Aug. 29, 2023), held that mandatory deposit without just compensation constitutes a taking. The Copyright Office denies registration under doctrines it claims it authored, then acquires the work through compelled deposit.

Third, the constitutionality of those doctrines—"useful articles" and "romantic authorship"—depends on whether they comport with the Intellectual Property Clause and the Berne Convention. The doctrines have never been examined for constitutional infirmity at their source.

Fourth, the institutional authority to administer those doctrines depends on what kind of power the Copyright Office exercises. If it merely registers property, it is ministerial. If it adjudicates who qualifies as an author and what qualifies as protectable expression, it exercises power beyond registration.

Fifth, the classification of that power determines the employment question before this

Court. The character of the institution determines the character of the employment.

The parties litigate step five. The affected communities must live with steps one through four.

**A Note on Expertise:** Amicus does not claim expertise in jurisprudence. Legal standards are from the perspective of, and are summarized for the at-risk communities affected by this case — Native American, Pacific Islander, African-American, disability advocates.

Amicus is an architect, historian, and industrial manufacturer trained in historiography and his academic work focuses on eugenics, scientific racism, and their corresponding laws. The late Garland E. Allen, founding editor of the *Journal of the History of Biology*, was his mentor.

## POSITION OF THE PARTIES

Pursuant to Local Civil Rule 7(o)(2), Amicus states the position of the parties as follows:

**Plaintiffs:** Position unknown. Amicus has not been informed whether Plaintiffs consent to, oppose, or take no position on this motion.

**Defendants:** Position unknown. Amicus has not been informed whether Defendants consent to, oppose, or take no position on this motion.

Amicus respectfully submits that the positions of the parties are not dispositive of whether leave should be granted. The standard under *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008), is whether the proposed brief offers a unique perspective or raises issues not adequately addressed by the parties. This brief satisfies that standard regardless of whether the parties consent.

## MATTERS RELEVANT TO THE DISPOSITION OF THIS CASE

The Constitution empowers Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their

respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8.

The Founders' word choice is dispositive. Rights are *secured*, not *granted*. To secure implies protecting something that pre-exists and thus simply registered, without any other "formality" requirement per the plain English text of the Constitution; or per the Berne Convention's Article 5(2).

Within the bounds of founding intent and the text of the Berne Convention, the Copyright Office is a registry, and the Register is an administrator; a characterization upon which the determination of irreparable harm pivots.

This Court cannot resolve the employment question without deciding, at least implicitly, the nature of the institution that employs the Register. The employment question before this Court necessarily implicates the institutional character of the Copyright Office.

## THE DETERMINATION WILL ENDURE

Deciding whether the Register of Copyrights is an administrator serving under the Executive will decide who is permitted to make substantive determinations about who may participate in the system of secured rights the Constitution established.

In doing so, it may accelerate or foreclose on the consequences of violating treaties signed by the United States government, and by extension substantially affect the economic lives of millions within and outside of the United States.

The parties litigate employment. The livelihoods and expressive rights of everyone not party to this litigation will be collateral to whatever they resolve.

## THE STANDING PARADOX

The constitutional question concerns *who* the Register is permitted to be under Article I, § 8, cl. 8.

If the Copyright Office is more than a simple "registry", then the legal frameworks that

4

govern it, the "useful articles" and "romantic authorship" constructs, become relevant to these proceedings. These frameworks invite intrusion into the creative act far beyond the mere registration of property: the Copyright Office evaluates WHO qualifies as an "author" (the romantic authorship requirement), WHAT qualifies as protectable (the useful article bifurcation). That is the work of a tribunal, not a registry.

The court granted injunctive relief based on "irreparable harm." The standard for irreparable harm is clear: harm that cannot be adequately redressed by monetary damages. The institutional determination affects whether Perlmutter can satisfy this standard:

1. **If registrar:** Perlmutter's harm is ordinary employment termination. Back pay exists. Reinstatement exists. Compensatory damages exist. She has an adequate legal remedy and therefore no irreparable harm justifying injunctive relief.

2. **If tribunal:** Then the Copyright Office has been exercising substantive power over property rights beyond its Constitutional limits and in violation of the Berne Convention, Article 5(2).

## HYBRID AGENCY – THE SMITHSONIAN EXAMPLE

The government may argue that the Library of Congress, like the Smithsonian Institution, is a hybrid entity. The Smithsonian is a museum. It is a tourist attraction, an archive, an educational institution. It does not have the power to affect, grant, deny, or deprive fundamental rights. The Copyright Office does.

The Library of Congress may also contend that its name supplies its defense: it is Congress's library, a legislative support function. This defense fails upon examination. Congress does not adjudicate individual applications for rights. Citizens do not petition Congress to secure their copyrights. That is an agency function — and the Copyright Office performs it.

### Why Other Voices Must Be Heard

When the Copyright Office applies the "romantic authorship" construct to determine who

qualifies as an author, it exercises the power to exclude individuals and communities from the economy of creative expression. When it applies the "useful articles" doctrine to determine whether a work is eligible for protection, it exercises the power to define what counts as culture.

These are not the administrative functions of an archive or academic institution. They are the powers of a tribunal — deciding not merely *what* is registered, but *who is fit* to seek them.

An institution that claims legislative character while performing adjudicatory functions occupies no recognized Constitutional category.

## INTEREST OF AMICUS CURIAE

The Library of Congress and its Copyright Office are the initiating parties to injuries documented by the Declaration filed with this Amicus.

Amicus applied for copyright protection on three sculptural musical instrument body designs. The Copyright Office rejected each application under the "useful articles" doctrine. Amicus pivoted and sought to register his property rights with the USPTO. The damages were compounded by the USPTO.

Amicus is an applicant with a sequencing impairment. Accommodation requests inadvertently resulted in the exposure of the USPTO as non-compliant with longstanding equal access laws meant for the less-able.

The agency reacted with increasingly hostile adverse acts. The concurrently filed Declaration documents what the Amicus exposed and the agencies reaction:

- The USPTO's public-facing systems lack rudimentary accessibility features required by Sections 504 and 508 of the Rehabilitation Act.
- Requesting accessibility accommodation demonstrably triggered escalating adverse action: record tampering, non-docketing of civil rights correspondence, unauthorized attorney appearance, retroactive reclassification, etc.

6

The USPTO maintains an $879 million reserve (2025 disclosure), projected to exceed $1.249 billion by 2026 per the agency's statements. Its budgets document allocations for travel, entertainment, and employee bonuses. They document zero dollars for public-facing Section 504/508 compliance so the less-able can have equal access to their systems.

None of five petitions filed requesting assistance have received substantive response.

Most of these petitions were reclassified and rerouted to departments with no authority to adjudicate Civil Rights complaints. These departments fabricated timelines, refused to provide on-the-record responses, refused to apply controlling case law or to consider sworn evidence containing expert testimony or controlling precedent contained within USPTO databases.

These facts are brought before this Court because the controlling laws and controlling precedents that went ignored pivoted upon the "romantic authorship" and "useful articles" doctrines, and/or their downstream legal frameworks.

## THE "USEFUL ARTICLES" AND "ROMANTIC AUTHORSHIP" DOCTRINES OPERATION ON INDIGENOUS WORKS

The Copyright Office's history with the cultural works of at-risk communities is instructive to our purposes. Apply the "useful articles" or "romantic authorship" tests to Indigenous cultural works — tribal chants, traditional dances, communal textile patterns — and the outcome is categorical exclusion. These works are collaborative. They are inherited. They are unified in form and function. They fail every test the two constructs impose.

**The stark contradiction:**

Pornography receives copyright protection under 17 U.S.C. § 101 because the courts decided that editorial collaboration constitutes authorship.

Indigenous sacred chants are denied protection because, under the logic of the "romantic authorship" construct, they are collaborative.

7

PornHub's content receives federal protection. Navajo sacred chants do not.

Whether this exclusion was the intent of the constructs is a question the prosopographic history informs. The prosopographic history substantiates: the "useful articles" and "romantic authorship" legal frameworks were authored by the same Justices, the same courts, in the same years, as the now widely condemned *Civil Rights Cases* and the federal prohibition of Native American religious practices.

The harmed, at-risk, communities lost control as a consequence of the "wardship" decisions by these courts and these Justices. Their denial of ownership and protection produced predictable consequences: The originating community could not control commercialization. The culture was diminished. The imagery was trivialized. The sacred became a screen-print on a mass-produced t-shirt.

(See *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239 (1903), *Roth v. United States,* 354 U.S. 476 (1957), *Miller v. California,* 413 U.S. 15 (1973), *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852 (5th Cir. 1979))

## WHO OWNS THE COPYRIGHTED MATERIAL AT ISSUE?

The issues before this Court arise from a dispute over the corpus of works the Copyright Office has amassed over decades. Ownership of the work contained within the Copyright Office's corpus has been successfully challenged. That determination is a factor here.

Whether the Library of Congress may retain control over works acquired in violation of the Berne Convention and the Fifth Amendment — per *Valancourt Books, LLC v. Garland,* No. 21-5203 (D.C. Cir. Aug. 29, 2023) — is for the courts. Amicus takes position only on the proximate effect on his rights. He informs the court on the history of how they affect others.

The inconvenient history tied to the question of ownership substantively affects the Constitutionality of the Copyright Office's collection. The LOC, for example, holds

8

approximately 10,000 wax cylinder recordings of Native American music, songs, and oral traditions — "the country's largest collection of early recordings of American Indian music". It does so as a consequence of the community's "wardship".

The LOC's policy is to return copies, not originals. The LOC's Federal Cylinder Project (1979–ongoing) "sought to make *copies* available to tribal archives." The LOC returned cassette copies of the cylinder recordings. The Ancestral Voices project declares publicly that it seeks "repatriation, in *digital* form, of this heritage to Native American nations."

The Smithsonian's National Museum of the American Indian clarifies the legality of this stance: digital repatriation is not repatriation under federal law.

> "If *digital* access were a truly sufficient alternative, museums would have no reason to insist on maintaining possession of the originals; they could easily return the original objects to source communities while retaining the *digital* copies for their internal archives and records. Their firm refusal to do so, however, makes plain the truth: institutions themselves also acknowledge that the originals are irreplaceable, even as they claim that source communities should be satisfied with pixelated copies." — Afroditi Karatagli, Against the Illusion: The Limits of Digital Repatriation in Restitution Debates, Center for Art Law (December 8, 2025)

**The Taking**

The recordings were the product of work on the Reservations under the auspices of the Bureau of Ethnology between the years of 1879 and 1880, during an era when tribes lacked legal capacity to refuse. They were acquired under the plenary power doctrine established in *United States v. Kagama*, 118 U.S. 375 (1886).

The Library of Congress characterizes the taking as consensual. What it does not acknowledge: "consent" under wardship was not legally meaningful. A ward cannot meaningfully consent to or refuse federal action. The framework that enabled acquisition was the framework that declared tribes incapable of refusal; authored by the same hands, in the same court, inspired by the intellectual traditions of the era that the Justices that authored the "romantic authorship" and "useful article" constructs.

The Constitution Annotated — produced by the Congressional Research Service, housed in the Library of Congress — still cites *Kagama* as authority for federal plenary power over tribal affairs and the cultural artifacts the Library deems itself the caretakers of.

## "SAME HANDS" / "UNCLEAN HANDS"

The opinions and constructs did not spontaneously appear free from influence or context. The judges who wrote these doctrines operated within a consensus saturated with now-discredited hierarchical theories of innate capacity. The Justices were influenced by and were catalysts for their era:

Justice Miller authored both *Burrow-Giles* (1884), which embedded "romantic authorship" in constitutional doctrine, and *Kagama* (1886), which embedded Native American wardship.

Justice Bradley authored both *Baker v. Selden* (1879), which established the idea-expression dichotomy upon which later courts built copyright's "useful articles" distinction, and the *Civil Rights Cases* (1883), which dismantled Reconstruction civil rights enforcement.

Same hands. Same years. Same intellectual climate. The hands that wrote these doctrines were not clean. They were the product of the era of "white man's burden" and eugenic paradigms; paradigms the American people want nothing to do with anymore.

### The Prosopographic Citation History
### The Proximate Effect on Constitutionality

The prosopographic citation history contained with the concurrently filed Declaration establishes that the "romantic authorship" and "useful articles" constructs have no grounding in the Intellectual Property Clause. Both were grafted into American law from British case law and have not grounding in the intent of the clause.

Amicus does not ask the bench to take his word for the Constitutional deficiencies of the doctrines at issue. Justice Holmes warned against aesthetic judgment by courts in *Bleistein*

*v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903). Justice Douglas dissented upon the unanswered constitutional intent question in *Mazer v. Stein*, 347 U.S. 201, 214 (1954).

Justice Holmes's warnings went unheeded; Justice Douglas's question remains unanswered. The harm to at-risk communities has compounded across the intervening decades. The history of the two constructs inform the determination of Constitutionality.

The "romantic authorship" doctrine is unconstitutional because it conditions protected expression on an invented ideological model — compelling identity disclosure, penalizing collaboration, imposing a "mastermind" requirement foreign to the First Amendment. It burdens speech, association, and anonymity.

The "useful articles" doctrine is unconstitutional for a different reason: it conditions protection on a distinction that, in many objects, does not exist. Where form and function are physically coupled, the doctrine requires adjudicators to deny reality — eliminating principled standards and reducing adjudication to discretion.

They are orthogonal constitutional failures: one burdens fundamental rights through imposed ideology; the other nullifies due process by substituting a fiction about observable reality the experts find reprehensible for rule and standard.

## FOUNDING-ERA INTENT

Thomas Jefferson drafted the Patent Act of 1790 and administered the first Patent Board as Secretary of State. His practice as the nation's founding patent examiner is the Constitutional record of our Intellectual Property Clause. That record is unambiguous. Jefferson approved a half dozen patents today's Copyright Office and USPTO would reject on the notion that sculptural art and functional utility are separable.

Jefferson would not have applied an arbitrary bifurcation of art and utility. He knew as a practiced violin and cello player — as does any first-year student of the bowed instrument family — that the sculptural volume of the body determines the acoustics. The spectrum

11

evolved from the *viola da braccio* differentiates upon this principle: violin to viola, viola to cello, cello to contrabass.

The domes of Monticello, the Virginia State Capitol, and the University of Virginia are Vitruvian structures whose sculptural volumes were designed to produce specific acoustic effects. Jefferson was an Architect devoted to Vitruvian principles: *firmitas, utilitas, venustas* — strength, utility, beauty — as inseparable aspects of a single act of creation.

"Form follows function" is a Modern Architecture aphorism, but the founding generation knew the principle intuitively. The contention that Thomas Jefferson would have agreed with separability is built on quicksand.

## THE BRITISH TRANSMISSION VECTOR: NOTTAGE V. JACKSON AND VICTORIAN RACIAL HIERARCHY

*Nottage v. Jackson* is the doctrinal origin of the "romantic authorship" construct that was subsequently grafted into American law by the author of the *Kagama* wardship decision. Justice Miller transplanted *Nottage*'s language into American constitutional law in *Burrow-Giles v. Sarony*.

The vocabulary of *Nottage* is not neutral. Lord Justice Cotton's "mastermind" legal standard emulated specific intellectual paradigms of its era paralleling Francis Galton's "eminence" and Thomas Carlyle's "hero"; names now synonymous with racial hierarchies.

The British statute that American courts would later invoke — the Fine Arts Copyright Act of 1862 — presents a question the courts never asked: What did Parliament intend? The 1862 Hansard debates provide the answer. Parliament's purpose was commercial anti-fraud protection, not an imposition of Victorian era notions of cultural hierarchy.

### The Experts Weighed In

The bisection of art and utility was vociferously rejected by the dominant artistic movements of the era; all which unified function and art, championing the observation

12

that "form follows function" and that art and utility are not separable.

*Nottage v. Jackson* was not interpretation. It was invention. Lord Justice Cotton's "mastermind" requirement had no warrant in the parliamentary record. The prosopographic citation history substantiates it had no founding-era predicate. It is judicial gloss that exceeded, and contradicted, parliamentary purpose subsequently transplanted into American law.

## "ARBITRARY & CAPRICIOUS"
## A MISCOMPREHENSION OF OBSERVABLE REALITY

Per Helmholtz, the sculptural shape of an acoustic chamber and the frequency it produces are mathematically inseparable. Change the sculptural shape; change the frequency. Lord Rayleigh's *The Theory of Sound* (1877) formalized the principle. The shape is the sound. The form is the function. The "useful article" doctrine's central premise fails to comport with observable reality.

This conjugacy is not limited to musical instruments. In the physical world, properties are interdependent. Geometry affects behavior and performance. Jefferson knew this. The domes of Monticello and the University of Virginia are expressions of this knowledge. His work as the nation's first patent examiner testify to his opinion on the matter.

This renders the construct reviewable under *Loper-Bright:* A legal test whose application requires imagining a physical impossibility cannot Constitutionally serve as the mechanism for denying rights. Nor can an agency within the Federal government be an instrument through which treaty obligations are arbitrarily violated. Berne Convention characterizes any conditioning of the right to Copyright a "formality". Article 5(2) prohibits such "formalities".

The Library of Congress claims it is the rightful author of the construct; that it "introduced the modern separability test" through regulation and that Congress "essentially lifted" that

language into statute. (See: *Copyright at 125 – 1870 Law Important to Building LC's Collections*, by Jeanne Smith, Sept. 4, 1995) Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024), agency interpretations receive no automatic deference.

The pertinence of the Library of Congress declaring publicly that Copyright is a means by which to build a collection will be explained below.

## THE STANDARD FAILS THE REHABILITATION ACT

Amicus contends with a sequencing impairment that requires him to rely on assistive technology. The Civil Rights dispute between Amicus and the USPTO arise from the agency's non-compliance with the Rehabilitation Act but are directly applicable to a determination of the Constitutionality of the Copyright Office's controlling frameworks.

Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and ADA Title II, 42 U.S.C. § 12132, qualification standards that screen out disabled individuals must be necessary and job-related. The "romantic authorship" doctrine penalizes mediated expression — the very accommodation disabled creators require.

Selectively invoking the doctrine against creators who require assistive technologies constitutes differential treatment under *Alexander v. Choate*, 469 U.S. 287 (1985).

## ACCOUNTABILITY

In May 2025, Margaret Williams, General Counsel for the Library of Congress asserted that the Library of Congress operates independent of Executive Branch authority by having Federal agents removed from the Library's premises. The case before this court arises out of that day's events.

When institutional power is at stake, the LOC acts without hesitation. When at-risk communities — Indigenous peoples, disabled creators, those excluded by doctrines the LOC authored — wait decades for the same institution to examine its own inheritance, the response is silence.

14

The LOC holds the scholarly work characterizing the proximate effects of its controlling legal frameworks as cultural erasure. The LOC cannot claim ignorance. Urgency, it appears, depends on whose interests are at stake.

## LIBRARY OF CONGRESS - FAILURE AS TRUSTEE

**Deliberate Indifference:** Under *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989), institutional liability attaches where the need for corrective action is "so obvious" and the failure to act "so likely to result in the violation of constitutional rights" that the institution's inaction amounts to a deliberate choice.

**Means available:** The Library of Congress holds the founding-era evidence and decades of scholarship confirming the facts documented in the enclosed affidavit.

**Duty to acquire:** The LOC's Congressional Research Service and Law Library employ staff tasked with analyzing this class of constitutional question. The Register of Copyrights is required by statute to advise Congress on copyright's constitutional dimensions.

**Discharge would have produced knowledge:** The LOC employs approximately 3,000 staff. It operates fellowship programs — including the Kluge Center — designed to synthesize founding-era materials for contemporary policy. The scholarship on the disparate cultural impact of the "useful articles" doctrine has been cataloged in the LOC's own systems for decades. The institution cannot claim ignorance of work it commissioned.

The Copyright Office declares its commitment:

> "to helping fulfill copyright's Constitutional purpose and to promote creativity and free expression for the benefit of all." (https://www.copyright.gov/about)

A trustee who declares fidelity to a trust instrument, then administers the trust contrary to that instrument, has defined the breach.

The LOC's own Collections Policy Statement acknowledges that "copyright and publishing mechanisms" are insufficient "to preserve Indigenous histories."

15

The American Folklife Center's Ethnographic Collections guide states that its Native American holdings are "the intellectual property of the communities of origin." The Copyright Office's "romantic authorship" doctrine categorically denies such rights.

One institution. One Librarian. The left hand formally recognizes Indigenous intellectual property. The right hand administers doctrine that excludes it.

The National Congress of American Indians has identified a potential explanation:

> "The United States Patent and Trademark Office has taken positions in negotiations at the World Intellectual Property Organization more aligned with corporations that want to access and use Indigenous Peoples' genetic resources, traditional knowledge, and cultural expressions than with the United States' role as trustee for Tribal Nations." — Native American Rights Fund, January 12, 2024

The LOC cannot claim clean hands. It holds the historical record. It authored the doctrine. It documented the harm. It continued administering the cause while cataloging the effects.

## CONSTITUTIONAL QUESTIONS AS THEY PERTAIN TO AMICUS

Neither party has addressed the fact that many of the works Perlmutter refuses to allow to be mined by Artificial Intelligence were never granted protection in the first place; as is the case with the author of this Amicus.

**The Constitutional sequence as experienced by Amicus:**
1. Amicus submitted a sculptural work for copyright registration.
2. The Copyright Office denied registration under the "useful articles" doctrine — a doctrine it claims it authored.
3. 17 U.S.C. § 407(b) directs that deposits are delivered to the Library of Congress "for the use or disposition" of the Library.
4. The LOC administers the Copyright Office. The entity that denied registration acquires the work through the deposit mechanism.
5. The LOC benefits in two directions: it retains the doctrine excluding the work from protection, and it acquires the work through compelled deposit.

The LOC refuses to recognize property rights upon legal frameworks with no grounding in the original intent of the Intellectual Property Clause. Yet, the LOC compels authors and artists to surrender the work to the institution that refuses protection per those frameworks. That institution keeps the work, claims it for its collection, and fine artists and authors that resist.

The question if this is extraction under color of law and a Fifth Amendment taking was addressed by *Valancourt Books, LLC v. Garland*, No. 21-5203 (D.C. Cir. Aug. 29, 2023). *Valancourt* held that the mandatory deposit mechanism — applied without just compensation or genuine quid pro quo — is a Fifth Amendment taking.

**LOC Cataloging in Publication (CIP) mechanism is pertinent:** There is no practical way to opt out of § 407. This violates Berne. The LOC insists that CIP/PCN deposits do not satisfy § 407, but the CIP/PCN program render the taking for the purposes of building the Copyright corpus unnecessary and arbitrary.

The CIP/PCN deposits are voluntary mechanism to build the LOC collections. The § 407 requirement is not. The sole remaining purpose of § 407 is compelled acquisition; acquisition that in this instant case, is the foundation upon which Perlmutter claims a right to determine if the Copyright Office's corpus can be utilized to train Artificial Intelligence.

Under *United States v. O'Brien*, 391 U.S. 367 (1968), a regulation is constitutional only if no greater than necessary. Under *Koontz*, *Nollan*, and *Dolan*, conditions on benefits must be proportionate to legitimate government interests. When the interest is achievable through existing voluntary means, compulsion is unnecessary.

> *Berne Convention, Article 5(2): "The enjoyment and the exercise of these rights shall not be subject to any formality."*

Protection is automatic upon fixation. The *droit d'auteur* tradition treats copyright as a natural right, not a government-granted privilege. The Founders' word choice is dispositive: rights are "secured," not "granted"; securing something that pre-exists.

17

## PERLMUTTER V. BLANCHE, NO. 25-5285

The Executive seeks to exploit Copyrighted works for the training of Artificial Intelligence. The Register seeks to protect them, seemingly from capitalistic exploitation.

AI is here. Its existence is irreversible. Whatever trains AI will become the cultural infrastructure of the 21st century. Whatever is excluded recedes in proportion to what is included.

The same Western legal apparatus that corralled Indigenous peoples into reservations, outlawed their religions, and guaranteed their marginalization now debates licensing fees for commercial creators. The cultures that survived centuries of deliberate destruction — preserved now as archival collections in the Library of Congress — face exclusion from AI not through malice but through structural indifference.

It is a question of mathematics. Mathematics does not take sides. Math does not empathize.

The mechanism: The Library of Congress decides what works within its corpus can be utilized to train AI. The Library's ownership and control of the Copyright Office's corpus is questionable, and has been successfully challenged in the courts. What the Copyright Office does not allow to become part of AI, does not exist in the future's cultural infrastructure.

Previous mechanisms of cultural erasure were inefficient. They required legislation, enforcement, generations of attrition. AI is exponential. Every training cycle multiplies included cultures. Every cycle proportionally diminishes excluded ones. The reservations persist. The archives remain. But the cultures within them recede into footnotes as included cultures expand without limit.

The Court has not been asked to observe the structural erasure documented in this record, or the perpetuation of erasure that is the predictable outcome.

## THE INTERNATIONAL IMPLICATIONS

Under TRIPS Article 9, these violations expose the United States to tariffs — injuring every American who exports intellectual property.

The practical consequence of misusing American might to ignore Berne: U.S. copyright becomes a regional license, enforceable only within American borders until the dispute escalates to diplomatic crisis.

The United States has lost this argument before. In 1999, the European Communities challenged Section 110(5)(B) of the US Copyright Act under WTO dispute DS160, alleging the "business exemption" — allowing bars, shops, and restaurants to play music without royalties — violated Berne Articles 11bis and 11 as incorporated by TRIPS Article 9.1.

Continued violation of the Berne Convention carries documented risk. The consequences fall on those whose livelihood depends on exporting their intellectual property.

## THE STAKES BEYOND

The dispute between the parties concerns who gets to fire whom. Either answer requires this Court to identify the downstream constitutional obligations. The downstream consequences of the determination extend to everyone else.

The Copyright Office is not simply administering domestic law. It is administering the United States' international treaty obligations. Every registration decision, every eligibility determination, every deposit demand that violates Berne Article 5(2) as applied to a foreign work is a potential WTO dispute.

The institutional independence Perlmutter claims to protect — insulation from political direction — is simultaneously the institutional architecture that has allowed Berne-incompatible doctrines to persist for decades without Congressional correction.

A ministerial registrar that applies only statutory criteria — criteria enacted by Congress through the constitutional process, consistent with Berne and TRIPS — is accountable,

19

predictable, and treaty-compliant. A quasi-independent tribunal that authors its own eligibility doctrines, enforces them with penalties, and resists correction is the precise architecture most likely to produce the WTO liability cascade identified herein.

## AFFECTED COMMUNITIES ARE NOT REPRESENTED

The communities bearing the burden of these doctrines are not parties to this litigation. Peer-reviewed, education-controlled studies document the disparate impact of the "useful articles" doctrine and the "romantic authorship" doctrines on identifiable, at-risk, communities: Native American, Pacific Islander, African-American, and disabled applicants.

Amicus is a member of multiple affected classes — Hispanic national origin, visual impairment requiring accommodation — with pending applications before both the Copyright Office and the USPTO. His prosopographic research documents that the judicial figures who authored the exclusionary IP frameworks also authored the now-condemned *Civil Rights Cases* of the Reconstruction era.

No other party is positioned to present this perspective.

## JUSTICE DELAYED – THE HIERARCHY OF INJURIES

The Supreme Court has recognized that certain fundamental rights exist not as enumerated provisions but as penumbral guarantees derived from the structure of the Constitution. *Griswold v. Connecticut*, 381 U.S. 479 (1965). The right to participate in the economy of creative expression — to have one's work recognized as protectable, to compete on equal terms with other creators — is of this character.

The "useful articles" doctrine and the "romantic authorship" doctrine do not merely determine what is registered. They determine who may participate. An institution with the power to define who qualifies as an author, and what qualifies as protectable expression, exercises power over the conditions of cultural and economic participation.

20

That power must be located somewhere in the constitutional structure. If the Copyright Office exercises executive power, it is subject to executive oversight and *Loper Bright* review. If it is independent of the executive, it must be accountable through some other constitutional mechanism.

There is no third option in which such power exists without accountability.

**Perlmutter's claimed injury:**

- Loss of employment
- Loss of salary
- Damage to professional reputation
- *All remedied by: back pay, reinstatement, monetary damages*

**Native American communities' injury:**

- 140+ years of categorical exclusion from copyright protection
- 10,000+ wax cylinder recordings held by LOC without meaningful consent
- Cultural expressions denied protection while being commercialized by others
- Trust obligations breached by the very institution claiming independence
- *Remedy: Constitutional correction of the doctrines — which the employment litigation won't address*

**International treaty partners' injury:**

- Berne Convention Article 5(2) violations (formalities conditioning rights)
- TRIPS violations exposing U.S. to WTO sanctions (DS160 already proved this)
- 182 Berne signatories affected
- 164 WTO members affected
- Economic livelihoods of hundreds of millions of creators worldwide
- *Remedy: Treaty-compliant copyright administration — which the employment litigation won't address*

**Perlmutter received immediate judicial attention.** Within months of her termination, she obtained:

- D.C. Circuit injunction (September 10, 2025)
- Supreme Court consideration
- Ongoing litigation with multiple parties and amici

21

**Native American communities have waited 140 years.** Since *Burrow-Giles* (1884), the doctrines excluding their cultural expressions have operated continuously. The LOC:

- Holds their recordings
- Administers the doctrine excluding their protection
- Has documented the harm in its own scholarship
- Has proposed no remedy

The temporal asymmetry is constitutionally offensive: Why does Perlmutter's employment dispute — with questionable irreparable harm — receive immediate Supreme Court attention while the constitutional injuries to sovereign nations remain unaddressed?

### Irreparable Harm and the Scope of Constitutional Injury

Article III standing requires:

1. Injury in fact
2. Causation (traceable to defendant's conduct)
3. Redressability

### Perlmutter's claim to irreparable harm is questionable:

- Her injury (job loss) is traceable to Blanche's conduct
- But it's redressable by monetary damages and reinstatement
- Irreparable harm is the predicate for injunctive relief — and she may not have it

### The affected communities face injuries that are genuinely irreparable:

- Their injury (categorical exclusion from constitutional protection) is ongoing
- It's traceable to the doctrines the Copyright Office administers
- It's NOT redressable by monetary damages — only constitutional correction remedies it
- They've been denied justice for generations while Perlmutter's employment dispute receives immediate attention

### The Treaty Supremacy Argument

The Constitution is explicit: treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

**The Berne Convention (ratified 1989) requires:**

- Automatic protection upon fixation (Article 5(2))
- No conditioning of rights on formalities
- National treatment for foreign authors

**The Copyright Office's doctrines violate Berne by:**

- Conditioning protection on the "useful articles" test (which operates as a *de facto* formality)
- Conditioning protection on the "romantic authorship" test (which functions as a *de facto* formality)
- Applying eligibility standards that categorically exclude entire classes of works

**DS160 already proved the U.S. violates Berne.** The WTO ruled against the U.S. in 1999.

The Copyright Office continues administering Berne-incompatible doctrines.

## THE ECONOMIC SCALE DISPARITY

**Perlmutter's economic stake:**

- Personal salary and benefits
- Professional reputation
- Career trajectory

**Global economic stakes at issue:**

- U.S. intellectual property exports: hundreds of billions annually
- WTO sanctions exposure: potentially catastrophic for American creators
- Indigenous craft and cultural industries: $50+ billion globally
- Font and typography industry affected by the "useful articles" doctrine
- Every American who exports intellectual property

**The disproportion is staggering.** The court is being asked to adjudicate one person's employment while the downstream constitutional obligations affect:

- 574 federally recognized tribal nations
- 182 Berne Convention signatories
- 164 WTO member states
- Every American creator whose work might be challenged abroad under Berne

23

## THE INTEREST IN THE QUESTION

Amicus cannot claim to be fully agnostic on whether the Executive or Congress possesses authority to remove the Register either. He cannot be. The experience with the Library of Congress gives rise to a Civil Rights dispute against the Library and its Copyright Office. Amicus has no dispute with the current administration. That asymmetry exists.

The frustration of the Copyright Office's rejection was brief. Amicus moved onto researching alternatives the morning thereafter. Knowledge of where these doctrines used to deny rights came from changes the calculus. These constructs have categorically excluded Indigenous cultural expression for over a century.

Amicus's rejection can be corrected through the courts. The exclusion of entire cultures for generations is something else altogether.

## WHY THIS BRIEF IS DESIRABLE

The standard for amicus participation in this Court is whether the proposed brief offers "a unique perspective or raises issues not adequately addressed by the parties." *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008). This brief satisfies both criteria.

## CONCLUSION

For the foregoing reasons, Alvaro E. Siman respectfully requests that this Court grant leave to file the accompanying Brief as Amicus Curiae on the Question of Constitutional Obligations Incident to the Institutional Character of the Register of Copyrights.

Respectfully submitted,

Alvaro E. Siman, *Pro Se*
221 Donax Ave., Unit 1, Imperial Beach, California 91932
Dated: _____, 2026